## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JIMMIE HARDAWAY, JR.<br>Niagara Falls, NY 14305 | ) ) ) | |
| LARRY A. BOYD<br>Buffalo, NY 14211 | ) ) ) | |
| FIREARMS POLICY COALITION, INC.<br>5550 Painted Mirage Rd. Ste. 320<br>Las Vegas, NV 89149, *and* | ) ) ) ) | |
| SECOND AMENDMENT FOUNDATION<br>12500 NE 10th Place<br>Bellevue, WA, 98005, | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) ) | |
| KEVIN P. BRUEN, in his official capacity as<br>Superintendent of the New York State Police<br>New York State Police<br>1220 Washington Avenue<br>Building 22<br>Albany, NY 12226, | ) ) ) ) ) ) ) | Civil Action No. |
| BRIAN D. SEAMAN, in his official capacity<br>as District Attorney for the County of<br>Niagara, New York<br>Niagara County Courthouse,<br>3rd Floor,<br>175 Hawley St., Lockport, NY 14094, *and* | ) ) ) ) ) ) ) | |
| JOHN J. FLYNN, in his official capacity as<br>District Attorney for the County of Erie, New<br>York<br>Erie County District Attorney's Office<br>25 Delaware Ave<br>Buffalo, NY 14202, | ) ) ) ) ) ) | |
| *Defendants*. | | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Reverend Dr. Jimmie Hardaway, Jr., Bishop Larry A. Boyd ("Individual Plaintiffs"), Firearms Policy Coalition, Inc. ("FPC"), and Second Amendment Foundation ("SAF") ("Institutional Plaintiffs") (collectively "Plaintiffs"), by and through the undersigned attorneys, file this Complaint against Defendants State Police Superintendent Kevin P. Bruen, Niagara County District Attorney Brian D. Seaman, and Erie County District Attorney John J. Flynn (collectively "Defendants") in their official capacities as the state and local officials responsible under New York law for administering and enforcing the State's laws and regulations governing carriage of firearms in places of worship. In support of their Complaint against Defendants, Plaintiffs hereby allege as follows:

## INTRODUCTION

1.      The Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. When the People, by enacting that amendment, enshrined in their governing charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean to leave the freedom to exercise that right at the mercy of the very government officials whose hands they sought to bind. Instead, "the right to keep and bear arms" ranks "among those fundamental rights necessary to our system of ordered liberty" and consequently "certain policy choices" are definitively "off the table." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778, 790 (2010) (quoting *Heller*, 554 U.S. at 636).

2.      Plaintiffs are law-abiding citizens of New York. They are leaders of their respective churches, who wish to exercise their fundamental, individual right to bear arms in public for self-defense by carrying concealed firearms on church property in case of confrontation to both

themselves and their congregants. As leaders of their churches, they would be authorized to carry on church premises to keep the peace, and would do so, but for Defendants' enforcement of the unconstitutional laws, regulations, policies, practices, and customs at issue in this case.

3.      On June 23, 2022, the United States Supreme Court held in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*," and accordingly declared unconstitutional New York's "proper cause" discretionary carry licensing scheme, *id.* at 2122 (emphasis added).

4.      On July 1, 2022, the State of New York responded to *Bruen* in an act of defiance of the Supreme Court, enacting Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session), a true and correct copy of which is attached as Exhibit A. S51001 implemented expansive new criminal laws that ban the carry of firearms in so-called "sensitive locations," even for those who lawfully acquire and possess a license under the State's onerous licensing scheme. As explained by New York Governor Kathy Hochul in her July 1, 2022, press statement, "[i]ndividuals who carry concealed weapons in sensitive locations . . . will face criminal penalties."[1] The State's designation of these "sensitive locations" as no-carry zones took effect on September 1, 2022.

5.      Among the new "sensitive locations," New York designated "any place of worship or religious observation" as a place where ordinary, law-abiding citizens can no longer carry firearms. N.Y. PENAL LAW § 265.01-e(2)(c) (together with related regulations, policies, practices,

---

[1] NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Oct. 12, 2022).

and customs implementing N.Y. PENAL LAW § 265.01-e(2)(c),  the "Place of Worship Ban"). This Place of Worship Ban goes far beyond any constitutionally relevant historical justification, especially as the ban extends to places of worship that would otherwise permit congregants to carry firearms. The right to self-defense extends to more than just "those . . . who work in marbled halls, guarded constantly by a vigilant and dedicated police force," *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., dissenting from the denial of certiorari), but also to ordinary, law-abiding Americans "outside the home," *Bruen*, 142 S. Ct. at 2122. This includes those who, with the permission of their place of worship, seek to lead worship services, celebrate communion, or quietly pray with the assurance that they can defend themselves should the need arise. While citizens need no extra justification exercise their constitutional rights, *id.*, 142 S. Ct. at 2129, the events of the last decade have tragically made the need for self-defense in places of worship all too apparent, *see* Matt Zapotosky, *Charleston church shooter: 'I would like to make it crystal clear, I do not regret what I did,'* WASHINGTON POST (Jan. 4, 2017), available at https://wapo.st/3EmJ95q (murderer killed nine parishioners at Charleston's Emanuel African Methodist Episcopal Church in 2015).

6.   New York's Place of Worship Ban denies individuals who reside in the State—including Individual Plaintiffs, Institutional Plaintiffs' similarly-situated members, and others like them—their fundamental, individual right to bear loaded, operable handguns outside the home for self-defense.

7.   Plaintiffs Rev. Dr. Hardaway, Bishop Boyd, Firearms Policy Coalition, Inc., and Second Amendment Foundation thus bring this action to vindicate the fundamental rights that Defendants are infringing.

## PARTIES

8.       Plaintiff Reverend Dr. Jimmie Hardaway, Jr. is a natural person, an adult over the age of 21, a citizen of the United States, and a resident and citizen of the State of New York. Reverend Hardaway is the Pastor at Trinity Baptist Church in Niagara Falls, New York. Reverend Hardaway is a law-abiding, responsible gun owner and is not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Reverend Hardaway has a license to carry a handgun issued pursuant to New York law by Niagara County. He is subject to Defendants' enforcement of the State's restrictions on his right to bear arms in public, including the provision preventing him from carrying his firearm for self-defense on the premises of Trinity Baptist Church. Reverend Hardaway is a member of Institutional Plaintiffs FPC and SAF. Reverend Hardaway resides in Niagara Falls, New York 14305.

9.       Plaintiff Bishop Larry A. Boyd is a natural person, an adult over the age of 21, a citizen of the United States, and a resident and citizen of the State of New York. Bishop Boyd is the Pastor at Open Praise Full Gospel Baptist Church in Buffalo, New York. Bishop Boyd is a law-abiding, responsible gun owner and is not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Bishop Boyd has a license to carry a handgun issued pursuant to New York law by Erie County. He is subject to Defendants' enforcement of the State's restrictions on his right to bear arms in public, including the provision preventing him from carrying his firearm for self-defense on the premises of Open Praise Full Gospel Baptist Church. Bishop Boyd is a member of Institutional Plaintiffs FPC and SAF. Bishop Boyd resides in Buffalo, New York 14211.

10.       Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The

purposes of FPC include defending and promoting Second Amendment rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of New York. FPC's members include individuals who are not prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm or ammunition. FPC's members are adversely and directly harmed by Defendants' enforcement of the Place of Worship Ban. The interests that FPC seeks to protect in this lawsuit are germane to the organization's purposes, and, therefore, FPC sues on behalf of its members, including the Individual Plaintiffs herein. Plaintiff FPC has members who have been denied their right to carry by operation of Defendants' enforcement of the Place of Worship Ban. But for Defendants' enforcement of the laws and regulations challenged herein, FPC's non-prohibited members in New York would carry a firearm outside the home for self-defense.

11.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutionally protected right to possess firearms and firearm ammunition, and the consequences of gun control. SAF has over 700,000 members and supporters nationwide, including thousands of members in New York. SAF brings this action on behalf of those members, including the named Plaintiffs herein. SAF's members are adversely and directly harmed by Defendants' enforcement of the Place of Worship Ban.

12.     FPC and SAF recognize that "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983."

*Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). FPC and SAF contend that this circuit precedent is erroneous and should be overruled by a court competent to do so.

13.    FPC, as an organization, has been directly injured by the enactment of S51001 and Defendants' enforcement of the Place of Worship Ban. FPC has and continues to spend time and other resources, including funding, addressing and responding to the enactment of S51001, consuming resources that would have been directed elsewhere. For example, FPC has incurred costs in legal fees analyzing how S51001 affects its members and time in preparing an informational memorandum for its members in New York. FPC has also designed and implemented a New York Hotline program to answer questions and provide legal information to its New York members and the public. FPC will incur ongoing expenses to operate the Hotline, including internal FPC staff time and expenses related to outside counsel who will assist with the Hotline. FPC expects to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including those enacted in S51001, unless and until New York's unconstitutional laws are enjoined.

14.    SAF, as an organization, has been directly injured by the enactment and enforcement of the Place of Worship Ban. SAF has spent time addressing inquiries about S51001, consuming resources that would have been directed elsewhere. For example, SAF is creating a hotline to answer questions and provide legal information to its New York members and the public. SAF will incur ongoing expenses to operate the hotline, including internal SAF staff time and expenses related to outside counsel who will assist with the hotline. SAF expects to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including those enacted in S51001, unless and until New York's unconstitutional laws are enjoined.

15.     Defendant Kevin Bruen is the Superintendent of the New York State Police. As Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including the Place of Worship Ban. Defendant Bruen's official address is New York State Police, 1220 Washington Avenue, Building 22, Albany, NY 12226. Defendant Bruen is sued in his official capacity.

16.     Defendant Brian D. Seaman is the Niagara County District Attorney and chief prosecutor of the County. Defendant Seaman "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v. Di Falco,* 44 N.Y.2d 482, 487, 377 N.E.2d 732, 735 (1978); N.Y. CNTY. LAW § 700(1). Defendant Seaman's official address is Niagara County Courthouse, 3rd Floor, 175 Hawley St., Lockport, NY 14094. Defendant Seaman is sued in his official capacity.

17.     Defendant John J. Flynn is the Erie County District Attorney and chief prosecutor of the County. Defendant Flynn "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *Id.* Defendant Flynn**'s** official address is 25 Delaware Ave, Buffalo, NY 14202. Defendant Flynn is sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

19.     Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes,

ordinances, regulations, customs, and usages of the State of New York, of the rights, privileges or immunities secured by the United States Constitution.

20.     Venue lies in this Court under 28 U.S.C. § 1391, as at least one Defendant is a resident of this District and the events giving rise to Plaintiffs' causes of action arose or exist in this District in which the action is brought.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### *The Second Amendment*

21.     In *Bruen*, the Supreme Court explained that the "Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. After all, "[m]any Americans hazard greater danger outside the home than in it." *Id.*

22.     Since the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," States can exercise regulatory authority in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In fact, *Bruen* could not be clearer in its holding that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

23.     In *Bruen*, the Supreme Court provided specific guidance to lower courts on how States may and may not restrict the carrying of firearms in "sensitive places."

24.     In *Bruen*, the Supreme Court elaborated on what it had termed "sensitive places" in *Heller*, i.e., those discrete areas "such as schools and government buildings" where "longstanding" "laws forbid[] the carrying of firearms." *Id*. at 2133 (quoting *Heller*, 554 U.S. at 626). And the Court instructed lower courts (and by extension States like New York) to "use analogies to *those* historical regulations of 'sensitive places' to determine [if] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. (emphasis added). The Court also explained what courts and States could not do. In *Bruen*, New York attempted to characterize its pre-*Bruen* ban of public carry as merely a "sensitive place" restriction. *Id*. at 2133–34. There, the State attempted to define "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133 (internal quotation marks omitted). The Supreme Court rejected New York's capacious designation of sensitive places. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' *far too broadly*." *Id*. at 2134 (emphasis added). Under *Bruen*, the designation of "sensitive places" cannot be used to "in effect exempt cities from the Second Amendment" or "eviscerate the general right to publicly carry arms for self-defense." *Id*. Instead, the only permissible "sensitive places" are those with a "historical basis." *Id*.

### *New York's Regulatory Scheme*

25.     New York law generally forbids any person to "possess[ ] any firearm," N.Y. PENAL LAW § 265.01(1), without first obtaining "a license therefor," *id*. § 265.20(a)(3). Violating this ban is a class A misdemeanor, punishable by a fine of $1,000 or less or up to a year in prison. *Id*. §§ 70.15(1), 80.05(1), 265.01. Possessing a loaded firearm without a license is a class C felony,

punishable by a fine of up to $5,000 or between one and fifteen years of imprisonment. *Id*. §§ 70.00(2)(c) & (3)(b), 80.00(1), 265.03.

26.     Not only does New York's draconian firearm regulatory scheme impose great risk of serious criminal penalties, a violation can also result in a lifetime ban on the exercise of the right to keep and bear firearms under state and federal law.

27.     New York's ban is subject to minor exceptions for active-duty members of the military, police officers, and the like. *Id*. § 265.20. An ordinary member of the general public who wishes to carry a handgun outside the home for purposes of self-protection, however, can only do so if he obtains a license to "have and carry [a handgun] concealed" (a "carry license"), pursuant to N.Y. PENAL LAW § 400.00(2)(f). A person seeking such a license must submit an application—on a form approved by Defendant Bruen—to the Licensing Officer for the city or county where he resides. *Id*. § 400.00(3)(a). No license is available to authorize openly carrying handguns within the State.

28.     S51001 "expands eligibility requirements for concealed carry permit applicants. Expanded application requirements include character references, firearm safety training courses, live fire testing, and background checks. Additionally, applicants who have documented instances of violent behavior will be disqualified from obtaining a concealed carry permit. Disqualifying criteria also includes misdemeanor convictions for weapons possession and menacing, recent treatment for drug-related reasons, and for alcohol-related misdemeanor convictions." (Gov. Hochul's July 1, 2011, press statement regarding S51001, *supra*.).

29.     Even after qualifying for a license, New York's regulatory scheme, enforced by Defendants, prevents licensed individuals from carrying in most public places.

30.     Attempting to take advantage of the narrow circumstances in which governments may restrict the public carry of firearms for self-defense in "sensitive places," New York in S51001 has *broadly* defined "sensitive locations" and invented so-called "restricted locations" to bar the carrying of firearms in the vast majority of New York State.

31.     Under S51001, "sensitive locations" include:

a.  "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts;"

b.  "any location providing health, behavioral health, or chemical dependance care or services;"

c.  "any place of worship or religious observation;"

d.  "libraries, public playgrounds, public parks, and zoos;"

e.  "the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;"

f.  "nursery schools, preschools, and summer camps;"

g.  "the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;"

h.  "the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;"

i.   "the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;"

j.   "the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;"

k.   "homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;"

l.   "residential settings licensed, certified, regulated, funded, or operated by the department of health;"

m.   "in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;"

n.   "any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;"

o.   "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where

alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption;"

p.   "any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission;"

q.   "any location being used as a polling place;"

r.   "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage;"

s.   "any gathering of individuals to collectively express their constitutional rights to protest or assemble;"

t.   "the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage." *See* N.Y. PENAL LAW § 265.01-e(2)(a)– (t).

32.   New York makes the possession of firearms in these "sensitive locations" a Class E felony when an otherwise law-abiding, licensed firearm owner "knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e.

**The Challenged Place of Worship Ban**

33.     Under N.Y. PENAL LAW § 265.01-e(2)(c), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "any place of worship or religious observation," regardless of whether the place of worship or religious observation would *permit* such carry licensees to carry for self-defense. This blanket prohibition cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. New York may not bar Reverend Hardaway and Bishop Boyd from carrying firearms in a place of worship that would allow them to do so.

a.   New York will be unable to point to any relevant historical analogue to justify its law designating places of worship as off-limits to carrying for self-defense.

b.   In the colonies, governments often *mandated* that individuals carry firearms into their local places of worship. In 1643, Connecticut "[o]rdered[] that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." J. HAMMOND TRUMBULL, THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY at 93–95 (Hartford, Conn.: Brown & Parsons, 1850). Massachusetts Bay at times imposed a requirement for colonists to come to church armed. *See, e.g.,* 1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND at 190 (Boston: William White, 1853) ("And all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets . . . ."). Rhode Island, Maryland, Virginia, and Georgia all had similar

15

enactments in the colonial period. *See e.g.,* 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND at 94 (John Russell Bartlett ed., 1856) ("[N]oe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon.''); 3 ARCHIVES OF MARYLAND at 103 (William Hand Browne, ed., 1885) ("Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott"); 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE at 173 (William Waller Hening ed., 1808) (1632 Virginia statute providing that "All men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); 5 *id.* at 19 (1738 Virginia statute providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773 at 137–40 (Allen D. Candler ed., 1904) (1770 Georgia statute mandating that all those "liable to bear arms in the militia" and "resorting, on any Sunday or other times, to any church, or other place of divine worship . . . shall carry with him a gun . . . and shall take the said gun or pistols with him to the pew or seat . . . .").

c.  "Without a doubt, these laws constitute an important part of the historical record about bearing arms in the church prior to 1789. Based on the colonial laws preceding the adoption of the Second Amendment that made it a legal duty to bear arms in church, the scope of the legal right to bear arms extends to the church, the place of divine worship." Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 699 (2014) (emphasis omitted); *see also* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 232 (2018) ("Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings.").

d.  Given this history, New York cannot "show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect" Plaintiffs' "proposed course of conduct:" carrying his firearm for self-defense in his place of worship with that place of worship's permission. *Bruen*, 142 S. Ct. at 2135.

e.  Additionally, "[i]n contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," many places of worship "do not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. Sup Ct. 2017). Congregants may come and go as they please. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," a church crowded for service on a Sunday may be too

far from "the intervention of society on [the] behalf" of individuals, which will then be "too late to prevent injury." *Id.* As recent events have established, it is sometimes a parishioner that proves to be a place of worship's best defense. *See* Eliott C. McLaughlin, *Reluctant hero in Texas church shooting receives medal of courage*, CNN (Jan. 13, 2020), available at https://cnn.it/3QwG0lX (last visited Oct. 12, 2022).

34.    Plaintiff Reverend Dr. Jimmie Hardaway, Jr., is presently licensed under New York law to carry a concealed firearm. Reverend Hardaway is the Pastor and leader of Trinity Baptist Church in Niagara Falls, NY. Prior to the enactment of S51001, Reverend Hardaway typically would carry a firearm concealed on Trinity Baptist's premises, in particular on Sundays and during services. Reverend Hardaway has carried both for self-defense and because he feels a unique obligation to his congregants as Pastor to be prepared in case of confrontation. Trinity Baptist is in a neighborhood that has struggled with violent incidents. *See* Rick Pfeiffer, *Gluck Park Crime Brings Outcry*, NIAGARA GAZETTE (May 26, 2021), available at https://bit.ly/3rA6b0R (last visited Oct. 12, 2022) ("[W]hen night falls, [Gluck Park] has [become] a place where large fights have erupted, calls of 'shots fired' are frequent and, on April 8, [2021], a teenager was stabbed to death in a dispute over a dice game."). Moreover, tragic shootings in churches across the country, like that in Charleston in 2015, have reaffirmed Hardaway's desire to carry for self-defense in order to respond to those seeking to do harm. *See, e.g., A List of Some U.S. House of Worship Shootings Since 2012*, ASSOCIATED PRESS (Nov. 6, 2017), available at https://bit.ly/3rAxqsk; Matt Zapotosky, *Charleston church shooter: 'I would like to make it crystal clear, I do not regret what I did,'* WASHINGTON POST (Jan. 4, 2017), available at https://wapo.st/3EmJ95q (last visited Oct. 12, 2022).

35.     Additionally, as Pastor, Reverend Hardaway establishes the firearms policy for Trinity Baptist. In that role, not only would he grant permission to himself to carry for purposes of keeping the peace in his church (as he did prior to S51001) but he would also encourage congregants, who are otherwise licensed to conceal carry, to carry on church premises for the defense of themselves and other congregants.

36.     Plaintiff Bishop Larry A. Boyd is presently licensed under New York law to carry a concealed firearm. Bishop Boyd is the Pastor and leader of Open Praise Full Gospel Baptist Church in Buffalo, NY. Prior to the enactment of S51001, Bishop Boyd typically would carry a firearm concealed on Open Praise's premises, in particular on Sundays and during services. Bishop Boyd has carried both for self-defense and because he feels a unique obligation to his congregants as Pastor to be ready in case of confrontation. Open Praise is in a neighborhood that has struggled with crime, violence, and gang-related issues. *See, e.g.,* Harold McNeil, *Two sentenced in fatal shooting in Buffalo's Broadway-Fillmore neighborhood*, (May 9, 2022), available at https://bit.ly/3rNNoiQ (last visited Oct. 12, 2022); Eileen Buckley, *Community begging for end to gun violence*, WKBW Buffalo (June 24, 2021), available at https://bit.ly/3yBE1GS (last visited Oct. 12, 2022) ("A latest round of gun violence in Buffalo has shaken community members. Three people were shot dead at a home in the 100 block of Ashley Street in the city's Broadway-Fillmore section early Thursday morning.) Moreover, tragic shootings in churches across the country, like in Charleston in 2015, have reaffirmed Boyd's desire to carry for self-defense in order to respond to those seeking to do harm. *See, e.g., A List of Some U.S. House of Worship Shootings Since 2012*, ASSOCIATED PRESS (Nov. 6, 2017), available at https://bit.ly/3rAxqsk; Matt Zapotosky, *Charleston church shooter: 'I would like to make it crystal clear, I do not regret what I did,'* WASHINGTON POST (Jan. 4, 2017), available at https://wapo.st/3EmJ95q.

37.     Additionally, as Pastor, Bishop Boyd establishes the firearms policy for Open Praise. In that role, prior to S51001, he previously granted permission to himself to carry for purposes of keeping the peace in his church and he allowed other licensed congregants to carry. He would continue to authorize licensed concealed carry by himself and congregants on church premises for self-defense, but for the enactment and enforcement of S51001.

38.     Plaintiffs FPC and SAF have members in New York who intend and desire to exercise their right to keep and bear arms by carrying on their person a loaded, operable handgun for lawful purposes, including self-defense, outside their homes, in case of confrontation, in places of worship with the permission of those places. But for New York's unconstitutional Place of Worship Ban, and the Defendants' enforcement thereof, and the severe lifelong and criminal penalties associated with violations of the regulatory scheme, Plaintiffs FPC and SAF's members, including Plaintiffs Hardaway and Bishop Boyd, would exercise their right to keep and bear arms by carrying on their person a loaded, operable handgun for lawful purposes, including immediate self-defense in case of confrontation, without the fear or risk of arrest and prosecution, and the loss of their right to keep and bear arms for engaging in constitutionally protected lawful conduct.

39.     The challenged Place of Worship Ban operates to deny Plaintiffs and other typical law-abiding individuals from carrying loaded, operable handguns on their person in case of confrontation for immediate self-defense in a place of worship that would otherwise permit them to carry. As Defendant Bruen's subordinate, the First Deputy Superintendent of the State Police, has said, state "troopers 'are standing ready' to ensure the new laws are followed." Maki Becker, *Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun requirements*, THE BUFFALO NEWS (Aug 31, 2022), available at https://bit.ly/3KAf9nG ((last visited Oct. 12, 2022). The State Police further added "an easy message" for individuals like Plaintiffs who seek

to carry their firearms: "We have zero tolerance. If you violate this law, you will be arrested. It's as simple as that." *Id.*

## COUNT ONE
## DEPRIVATION OF CIVIL RIGHTS
## RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST., AMENDS. II AND XIV
## (42 U.S.C. § 1983)

40. Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

41. There is an actual and present controversy between the parties.

42. Defendants are implementing and will enforce the Place of Worship Ban, N.Y. PENAL LAW §§ 265.01-e(2)(c) and all related regulations, policies, and enforcement practices, which, individually and collectively, unconstitutionally burden, delay, chill, and/or deny law-abiding people, like and including Individual Plaintiffs and Institutional Plaintiffs' similarly situated members, the exercise of their fundamental, individual right to bear arms.

43. Individual Plaintiffs and Institutional Plaintiffs' similarly situated members desire to exercise their right to bear arms by carrying in public for lawful purposes, including immediate self-defense in case of confrontation in their respective churches and places of worship. "The Second Amendment's plain text . . . presumptively guarantees" Plaintiffs' "right" to do so. *Bruen*, 142 S. Ct. at 2135. In particular, Plaintiffs would intend to carry a loaded, operable firearm for immediate self-defense in case of confrontation in their places of worship, as they would be permitted by those places of worship to do, but for their reasonable fear of Defendants' enforcement and threatened enforcement of New York's laws, which could lead to their arrest and prosecution, and if convicted, the loss of their rights.

44.    Defendants cannot "identify an American tradition" of firearm regulation "justifying" the Place of Worship Ban. *Bruen*, 142 S. Ct. at 2135. Since Defendants cannot "demonstrat[e]" that the Place of Worship Ban and their enforcement thereof is "consistent with the Nation's historical tradition of firearm regulation," they are unconstitutionally infringing upon Plaintiffs' Second Amendment rights. *Id.* at 2130.

45.    42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

46.    Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the State of New York, including members of Plaintiffs FPC and SAF such as Plaintiffs Hardaway and Bishop Boyd, through Defendants' enforcement and implementation of the Place of Worship Ban, which has denied, and will continue to deny and prevent by criminal sanction, the exercise of the fundamental right to bear arms in public for self-defense and in case of confrontation unless and until redressed through the relief Plaintiffs seek herein.

47.    For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    A declaratory judgment that N.Y. PENAL LAW § 265.01-e(2)(c) infringes upon Plaintiffs' right to bear arms protected under the Second and Fourteenth Amendments to the United States Constitution and is thus devoid of any legal force or effect;

2.      Injunctive relief restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, from enforcing N.Y. PENAL LAW § 265.01-e(2)(c), and their regulations, policies, and practices implementing it;

3.      Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and,

4.      All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable.

Respectfully submitted this 13th day of October 2022,

David H. Thompson*                  /s/ Nicolas J. Rotsko____
Peter A. Patterson*                 Nicolas J. Rotsko
John W. Tienken*                    PHILLIPS LYTLE LLP
COOPER & KIRK, PLLC                 One Canalside
1523 New Hampshire Avenue, N.W.     125 Main Street
Washington, D.C. 20036              Buffalo, NY 14203-2887
(202) 220-9600                      (716) 847-5467
(202) 220-9601 (fax)                (716) 852-6100 (fax)
dthompson@cooperkirk.com            NRotsko@phillipslytle.com
ppatterson@cooperkirk.com
jtienken@cooperkirk.com

*App. to appear *pro hac vice* forthcoming

*Attorneys for Plaintiffs*