UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JIMMIE HARDAWAY, JR., et al.,

                              Plaintiffs,

                                                    Case No.:  1:22-cv-771

        v.

KEVIN P. BRUEN, et al.,

                              Defendants.


_____


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 3

    I.   New York's Place of Worship Ban.......................................................................... 3

    II.  The Place of Worship Ban's Effects on Plaintiffs. ............................................... 4

ARGUMENT ..................................................................................................................... 6

    I.     Plaintiffs are likely to prevail on the merits.................................................... 7

        a.  The Second Amendment's plain text protects Plaintiffs' proposed course of
            conduct............................................................................................................. 7

        b.  The Places of Worship Ban is not consistent with the historical tradition of
            firearms regulation in the United States....................................................... 8

           i.     The only historical analogues that can justify the ban are
                 "sensitive place" restrictions............................................................... 8

           ii.    The Place of Worship Ban is not a permissible sensitive
                 place restriction..................................................................................... 11

    II.    Plaintiffs will continue to suffer irreparable harm in the absence of a temporary
        restraining order and preliminary injunction. ............................................... 14

    III.   A temporary restraining order and preliminary injunction would be in the public
        interest........................................................................................................... 16

CONCLUSION ................................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465 (S.D.N.Y. 2010)..........6

*A.H. by & through Hester v. French*, 985 F.3d 165 (2d Cir. 2021)..........................................15, 16

*Antonyuk v. Bruen*, 1:22-cv-0734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022)................15, 16

*Antonyuk v. Hochul*, 1:22-cv-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ...................8, 16

*Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999).............................14, 15

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. Sup Ct. 2017) ......................14

*Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997)...........................................................16

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................................15

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ..........................................................................9

*Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97 (2d Cir. 2009) ............................................................15

*Hund v. Cuomo*, 501 F. Supp. 3d 185 (W.D.N.Y. 2020)........................................................6, 7, 16

*Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996) ....................................................................10

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .....................................................................7

*Lynch v. Donnelly*, 465 U.S. 668 (1984)........................................................................................9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)....................................................................10

*Martin v. Warren*, 482 F. Supp. 3d 51 (W.D.N.Y. 2020).............................................................6

*Mastrio v. Sebelius*, 768 F.3d 116 (2d Cir. 2014)........................................................................15

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) .........................7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022).......................................................................................................*passim*

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)............................................15

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)......................................................................................10

*Virginia v. Moore*, 553 U.S. 164 (2008) ........................................................................................9

*Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003) .........14

**Constitutions, Statutes, Rules, and Legislative Materials**

U.S. CONST. amend. II .....................................................................................................................7

New York Penal Law

 § 265.01-e .................................................................................................................................3
 § 265.01-e(2)(c) ...............................................................................................................1, 3, 11

FED. R. CIV. P. 65(c) ......................................................................................................................16

Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session).......................................1

## Other Authorities

*A List of Some U.S. House of Worship Shootings Since 2012*, ASSOCIATED PRESS (Nov. 6, 2017), available at https://bit.ly/3rAxqsk ...................................................................................2

3 ARCHIVES OF MARYLAND (William Hand Browne, ed., 1885) ....................................................12

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ..................................................................................13

19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773 ...........................................................................12, 13

David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203 (2018) ..................................................13

Eliott C. McLaughlin, *Reluctant hero in Texas church shooting receives medal of courage*, CNN (Jan. 13, 2020), available at https://cnn.it/3QwG0lX ............................................................14

NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA ...................3

1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND at 190 (Boston: William White, 1853) ..................12

1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND (John Russell Bartlett ed., 1856) ............................................................................12

1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE (William Waller Hening ed., 1809) ..............................12

J. HAMMOND TRUMBULL, THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY (Hartford, Conn.: Brown & Parsons, 1850) ...................11

*U.S. houses of worship increase security after shootings*, ASSOCIATED PRESS (July 18, 2022), available at https://bit.ly/3CHB3my ..................................................................................1, 2

Matt Zapotosky, *Charleston church shooter: 'I would like to make it crystal clear, I do not regret what I did*,*'* WASHINGTON POST (Jan. 4, 2017), available at https://wapo.st/3EmJ95q ............2

## INTRODUCTION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that individuals have a constitutional right under the Second Amendment to publicly carry firearms for self-defense. Yet shortly following *Bruen*, the State of New York enacted widespread prohibitions on carrying of firearms in public. *See generally* Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session). Among other location-specific restrictions, New York bans Plaintiffs—leaders of their churches and law-abiding citizens licensed to carry firearms under New York law—from carrying their firearms for self-defense in "any place of worship or religious observation." N.Y. PENAL LAW § 265.01-e(2)(c) (the "Place of Worship Ban").

New York's Place of Worship Ban is unconstitutional. After *Bruen*, there is no doubt that the Second Amendment's text "presumptively protects" Plaintiffs' intent to "carry[] handguns publicly for self-defense," including on the premises of places of worship and religious observation when those places would permit Plaintiffs to carry. *Bruen*, 142 S. Ct. at 2130, 2134. And the only way the Place of Worship Ban can be found constitutional is if New York can demonstrate this outright ban is "consistent with this Nation's historical tradition of firearm regulation" with "relevantly similar" restrictions with roots in the Founding. *Id.* at 2132, 2135. New York cannot meet its burden.

For many, places of worship are sanctuaries; peaceful settings for individuals to celebrate and exercise their faiths. But places of worship are not immune from the violence that can plague our communities and the designs of those who would do harm. This has been true for centuries. And over the past decade, this has become a tragic reality for congregations of many faiths across the country. *See U.S. houses of worship increase security after shootings*, ASSOCIATED PRESS (July

18, 2022), available at https://bit.ly/3CHB3my (last visited Oct. 14, 2022); *A List of Some U.S. House of Worship Shootings Since 2012*, ASSOCIATED PRESS (Nov. 6, 2017), available at https://bit.ly/3rAxqsk (last visited Oct. 14, 2022); Matt Zapotosky, *Charleston church shooter: 'I would like to make it crystal clear, I do not regret what I did,'* WASHINGTON POST (Jan. 4, 2017), available at https://wapo.st/3EmJ95q (last visited Oct. 14, 2022). While law-abiding citizens need no extra justification to exercise their constitutional rights, this violence in places of worship has reaffirmed Plaintiffs' intention to carry to defend themselves and, as leaders of their churches, to keep the peace and protect their congregants. In fact, since a murderer killed nine parishioners at Charleston's Emanuel African Methodist Episcopal Church in 2015, Reverend Hardaway has almost always carried a firearm for self-defense on Sundays and at services on the premises of the churches he has pastored.

New York has now stripped Reverend Hardaway, Bishop Boyd, and other New Yorkers of their ability to defend themselves should the need arise at their places of worship. This is wholly without historical justification and, accordingly, is unconstitutional under the Second Amendment. *Bruen*, 142 S. Ct. at 2130.  This denial of Plaintiffs' constitutional rights is causing them immediate and irreparable harm. Plaintiffs respectfully request this Court enter a temporary restraining order as soon as practicable[1] and then a preliminary injunction forbidding Defendants from enforcing the Place of Worship Ban while this case is litigated.

---

[1] Plaintiffs do not seek an ex parte temporary restraining order, but rather request the issuance of a temporary restraining order after notice and an expedited hearing. Pursuant to Local Rule 7(d)(1), Plaintiffs are filing a separate motion for an expedited hearing and delivering the required courtesy copies to Chambers.

## STATEMENT OF FACTS

**I.      New York's Place of Worship Ban.**

In *Bruen*, the Supreme Court held that New York's "proper cause" discretionary carry licensing scheme was unconstitutional under the Second Amendment. 142 S. Ct. at 2122. Shortly after the Supreme Court's decision, New York responded to *Bruen* by enacting Senate Bill S51001. Among other things, S51001 implemented expansive new criminal laws that ban carry of firearms in so-called "sensitive locations," even for those who lawfully acquire and possess a license under the State's onerous licensing scheme. As explained by New York Governor Kathy Hochul in her July 1, 2022 press statement, "[i]ndividuals who carry concealed weapons in sensitive locations . . . will face criminal penalties." NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision*, July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited October 14, 2022). The State's designation of these "sensitive locations" as no-carry zones took effect on September 1, 2022.

Among the new "sensitive locations," New York designated "any place of worship or religious observation" as a place where ordinary, law-abiding citizens can no longer carry firearms. N.Y. PENAL LAW § 265.01-e(2)(c) (together with related regulations, policies, practices, and customs implementing N.Y. PENAL LAW § 265.01-e(2)(c), the "Place of Worship Ban"). This ban extends to even those places of worship that would otherwise permit congregants to carry firearms on their premises. New York makes the possession of firearms in these "sensitive locations" a Class E felony when an otherwise law-abiding, licensed firearm owner "knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e.

Plaintiffs have filed suit seeking declaratory and injunctive relief. *See* Complaint, Doc. 1,

3

No. 1:22-cv-771-JLS (Oct. 13, 2022) (attached hereto as Ex. B).

## II.     The Place of Worship Ban's Effects on Plaintiffs.

Plaintiffs are Reverend Dr. Jimmie Hardaway, Bishop Larry Boyd**,** and two non-profit organizations with members in New York. *See* Declaration of Rev. Dr. Jimmie Hardaway, Jr. ¶¶ 1–12 (Oct. 14, 2022) (attached hereto as Ex. C) ("Hardaway Decl."); Declaration of Bishop Larry A. Boyd ¶¶ 1–12 (Oct. 14, 2022) (attached hereto as Ex. D) ("Boyd Decl."); Declaration of Brandon Combs ¶¶ 1–3 (Oct. 14, 2022) (attached hereto as Ex. E) ("FPC Decl."); Declaration of Alan M. Gottlieb ¶¶ 1–3 (Oct. 14, 2022) (attached hereto as Ex. F) ("SAF Decl."). Both organizations have created hotlines to answer questions and provide legal information to their New York members and the public. FPC Decl. ¶ 9; SAF Decl. ¶ 9. Both organizations will incur ongoing expenses to operate their respective hotlines, including internal staff time and expenses related to outside counsel who will assist with the hotlines. FPC Decl. ¶¶ 7–9; SAF Decl. ¶¶ 7–9. Both organizations expect to continue to be required to expend additional resources addressing New York's laws affecting the right to keep and bear arms, including the Place of Worship Ban, unless and until the Ban is enjoined. FPC Decl. ¶ 10; SAF Decl. ¶ 10. Defendants are tasked with enforcing the Place of Worship Ban.

Because of the enactment and enforcement of the Place of Worship Ban, Reverend Hardaway is unable to carry a firearm for self-defense or for the purpose of keeping the peace at his church. Hardaway Decl. ¶¶ 8–12. As Pastor of Trinity Baptist Church, Reverend Hardaway has the responsibility to establish the Church's policies and procedures, including its policies regarding concealed carry of firearms. Hardaway Decl. ¶ 4. Prior to the Place of Worship Ban, Reverend Hardaway would consistently carry on Trinity Baptist Church's premises, whether it be while leading services, quietly praying in the pews, preparing a sermon in his office, or providing

counseling to congregants. Hardaway Decl. ¶ 8. Trinity Baptist Church, like many places of worship, prides itself on being welcoming to allcomers who wish to participate in services or join the church community. Hardaway Decl. ¶ 9. But this open-door policy carries with it the attendant risk that Reverend Hardaway does not know who will walk into the door for services or whether they come with violent plans. Hardaway Decl. ¶ 9. This is all the more worrisome because Trinity Baptist is located in a neighborhood that has struggled with violent incidents, particularly in Gluck Park, which is adjacent to Trinity Baptist. Hardaway Decl. ¶ 9. Moreover, the recent history of violence in churches, particularly the murder of nine parishioners in Charleston's Emanuel African Methodist Episcopal Church in 2015, has reaffirmed Reverend Hardaway's conviction to carry for self-defense and to keep the peace at his church. Hardaway Decl. ¶ 10. In fact, since the Charleston tragedy, Reverend Hardaway has almost always carried a firearm for self-defense on Sundays and at services until the effective date of the Place of Worship Ban. Hardaway Decl. ¶ 10. And recognizing his congregants' right to carry for self-defense, he has previously encouraged other licensed parishioners to conceal carry at Trinity Baptist, and Reverend Hardaway would continue to allow parishioners to carry on church premises, but for the enactment and enforcement of the Place of Worship Ban. Hardaway Decl. ¶ 11.

Bishop Boyd has been similarly injured by the enactment and enforcement of the Place of Worship Ban. Because of the Place of Worship Ban, Bishop Boyd has stopped carrying a firearm for self-defense or for the purpose of keeping the peace at his church. Boyd Decl. ¶¶ 8–12. As Pastor of Open Praise Full Gospel Baptist Church, Bishop Boyd has the responsibility to establish the Church's policies and procedures, including its policies regarding concealed carry of firearms. Boyd Decl. ¶ 4. Prior to the Place of Worship Ban, he would consistently carry on Open Praise's premises, and he established a policy in which duly-licensed congregants could carry as well. Boyd

Decl. ¶¶ 8, 11. Now both he and his congregants cannot do so. Boyd Decl. ¶ 8. This is particularly problematic because Open Praise is in the Broadway Fillmore neighborhood of Buffalo, which has struggled with crime, violence, and gang-related incidents. Boyd Decl. ¶ 9. Bishop Boyd has often heard the "pop, pop, pop" of criminal gunfire on the streets. Boyd Decl. ¶ 9. Yet after the Place of Worship Ban, he has been left unable to defend himself when he preaches on church grounds. Boyd Decl. ¶ 12. Moreover, the recent history of violence in churches, particularly the murder of nine parishioners in Charleston's Emanuel African Methodist Episcopal Church in 2015, has reaffirmed Bishop Boyd's conviction to carry for self-defense and to keep the peace at his church. Boyd Decl. ¶ 10. In fact, Bishop Boyd feels a particular obligation, as pastor of the church, to be ready to defend it, especially since Open Praise prides itself on welcoming whomsoever may come to services. Boyd Decl. ¶¶ 9–10.

Because of the risk of exposing themselves to arrest and criminal charges for carrying a handgun on the premises of a place of worship or religious observation in violation of the Place of Worship Ban, Plaintiffs disarm prior to going to their churches. Hardaway Decl. ¶ 12; Boyd Decl. ¶ 12.

## ARGUMENT

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard to issue both is the same. *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). To issue both, the Court must find that Plaintiffs have demonstrated (1) "a likelihood of success on the merits,"

(2) "irreparable harm," and (3) "that a preliminary injunction is in the public interest."[2] *Hund v. Cuomo*, 501 F. Supp. 3d 185, 206 (W.D.N.Y. 2020). Here, each of those factors weighs decisively in favor of issuing Plaintiffs' requested temporary restraining order and preliminary injunction.

## I.   Plaintiffs are likely to prevail on the merits.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30 (emphasis added). Once this prima facie textual showing has been made, "[t]he *government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130 (emphasis added). "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n. 10 (1961) (emphasis added).

### a.   The Second Amendment's plain text protects Plaintiffs' proposed course of conduct.

As the Supreme Court made explicit in *Bruen*, the text of the Second Amendment "presumptively protects" Plaintiffs' proposed course of conduct: "carrying handguns publicly for self-defense." 142 S. Ct. at 2130, 2134. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 2134. By including "the right to 'bear arms' " the Second Amendment also "refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* Thus, the "definition

---

[2] When the government is party to the suit, the "final two factors" of "public interest" and "balance of equities" "merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

of 'bear' naturally encompasses public carry" and "[t]o confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id*. at 2134–35.

Defendants cannot dispute that Plaintiffs' proposed course of conduct is presumptively protected by the Second Amendment. *Cf. Bruen*, 142 S. Ct. at 2134 (noting that the State of New York did "not dispute this"); *see also Antonyuk v. Hochul*, 1:22-cv-0986, 2022 WL 5239895, at *14 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*") ("The Court respectfully reminds Defendants that, because the Second Amendment's plain text covers the conduct in question (carrying a handgun in public for self-defense), the Constitution presumptively protects that conduct." (internal quotation marks omitted)).  Plaintiffs seek to carry their firearms for purposes of self-defense in public on the premises of their places of worship with their churches' permission. Specifically, plaintiffs seek to carry while leading worship services, while working on church premises, or quietly praying in the pews. Hardaway Decl. ¶ 8; Boyd Decl. ¶ 8; FPC Decl. ¶ 6; SAF Decl. ¶ 6. In other words, Plaintiffs seek to "possess and carry weapons in case of confrontation" on church premises because "confrontation can surely take place outside the home." *Bruen*, 142 S. Ct. at 2135.

### b.  The Places of Worship Ban is not consistent with the historical tradition of firearms regulation in the United States.

#### i.  The only historical analogues that can justify the ban are "sensitive place" restrictions.

States can exercise regulatory authority over the right to carry firearms in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. *Bruen* makes clear that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.");

*id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

In considering whether the government has met its historical burden, courts are to engage in "reasoning by analogy." *Id*. at 2132. To be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id*. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*. at 2133. And, of course, it is the government's burden to identify a sufficiently close historical analogue to justify the challenged restriction. *Id.* at 2130.

It is also important to identify when the key period for establishing the meaning of the Second Amendment is. Although the Court in *Bruen* discussed whether, when considering state laws, the answer is 1791 (when the Second Amendment was adopted) or 1868 (when the Fourteenth Amendment was adopted), the Court's precedents establish that, for a lower court at least, 1791 must be the right answer. 1791 is the key because of the confluence of two lines of Supreme Court precedent. One establishes that with respect to the federal government, one must look to 1791 to determine the original meaning of provisions of the Bill of Rights. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *District of Columbia v. Heller*, 554 U.S. 570 (2008), sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth

Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). The other establishes that incorporated Bill of Rights provisions bear the same meaning when applied to the States as they do when applied to the federal government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (explaining that the Court has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment" (internal quotation marks omitted)). The combination of these two lines of precedent leads to the inescapable conclusion that when determining the scope of the Second Amendment as applied to the States through the Fourteenth, the key date is 1791, not 1868. Lower courts are bound to follow this precedent. *See, e.g., Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with a "wobbly, moth-eaten foundation" until overruled by the Supreme court), vacated by *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [stare decisis] . . . for it is this Court's prerogative alone to overrule one of its precedents").

In any event, *Bruen* already delineated the *one* aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying (in circumstances not present here)—restrictions on the carrying of firearms in particular locations: the limited tradition of designating certain narrow areas as "sensitive places." *Bruen*, 142 S. Ct. at 2133. The Court explained that there was a tradition of "forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* And while "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*,

legislative assemblies, polling places, and courthouses—[the Court was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Thus, the Court held that going forward, "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). In other words, courts must assess claimed sensitive place restrictions by whether they are "relevantly similar" to restrictions on firearms in legislative assemblies, polling places, and courthouses.

### ii. The Place of Worship Ban is not a permissible sensitive place restriction.

The Place of Worship Ban is "inconsistent with the Second Amendment" because New York will be unable to justify such a restriction with historically grounded analogies. *Id.* at 2161. Under N.Y. PENAL LAW § 265.01-e(2)(c), New York imposes criminal liability on carry licensees who exercise their right to bear arms in "any place of worship or religious observation," regardless of whether the place of worship or religious observation would *permit* such carry licensees to carry for self-defense. This blanket prohibition on carrying in and around a place of worship, even if the place of worship would permit carrying, cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

New York will be unable to point to any relevant historical analogue to justify its law designating places of worship as off-limits to carrying for self-defense at the time of the Founding. In the colonies, governments often *mandated* that individuals carry firearms into their local places of worship. In 1643, Connecticut "[o]rdered that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." J. HAMMOND TRUMBULL, THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY at 93–95 (Hartford, Conn.: Brown

& Parsons, 1850). Massachusetts Bay at times imposed a requirement for colonists to come to church armed. *See, e.g.,* 1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND at 190 (Boston: William White, 1853) ("And all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets . . . ."). Rhode Island, Maryland, Virginia, and Georgia all had similar enactments in the colonial period. *See e.g.,* 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND at 94 (John Russell Bartlett ed., 1856) ("[N]oe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon.''); 3 ARCHIVES OF MARYLAND at 103 (William Hand Browne, ed., 1885) ("Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott"); 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE at 173 (William Waller Hening ed., 1809) (1632 Virginia statute providing that "All men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *5 id.* at 19 (1738 Virginia statute providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA: PART I, STATUTES, COLONIAL AND REVOLUTIONARY, 1768–1773 (1770 Georgia statute mandating that all those "liable to bear arms in the militia" and "resorting, on any Sunday or other times, to any

church, or other place of divine worship . . . shall carry with him a gun . . . and shall take the said gun or pistols with him to the pew or seat . . . .").

"Without a doubt, these laws constitute an important part of the historical record about bearing arms in the church prior to 1789. Based on the colonial laws preceding the adoption of the Second Amendment that made it a legal duty to bear arms in church, the scope of the legal right to bear arms extends to the church, the place of divine worship." Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 699 (2014) (emphasis omitted); *see also* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 232 (2018) ("Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings."). And it is critical to recall that the purpose of the historical inquiry is to assess whether New York can demonstrate that its modern restrictions are sufficiently analogous to longstanding restrictions that are "incorporated into the Second Amendment's scope." *Bruen*, 142 S. Ct. at 2141 n.10. But a complete ban on carrying in places of worship cannot be consistent with the Second Amendment's scope when there existed a longstanding tradition at the Founding of governments *requiring* individuals carrying arms in places of worship. In other words, "[t]o maintain that the scope of the right to bear arms did not extend to the church makes no sense; colonial Americans bore arms in the church on a regular basis and were expected to do so." Boyd, *supra*, 8 LIBERTY UNIV. L. REV. at 699 (emphasis omitted).

Moreover, the history unequivocally demonstrates that carrying firearms in places of worship is not a new phenomenon but extends back to the Founding and before. This is yet further proof that New York's newly enacted Place of Worship Ban is unconstitutional.  As the Supreme

Court recently explained, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. After all, the "Founders themselves could have adopted" what New York has enacted here—"a flat ban on the possession of handguns in" places of worship—and they could have done so to address the same "perceived societal problem—firearm violence" in places of worship. *Id.* But they did no such thing.

Additionally, "[i]n contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security," many places of worship "do not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. Sup Ct. 2017). Congregants may come and go as they please. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," a church crowded for service on a Sunday may be too far from "the intervention of society on [individuals'] behalf" which will then be "too late to prevent injury." *Id.* As recent events have established, it is sometimes a parishioner that proves to be a place of worship's best defense. *See* Eliott C. McLaughlin, *Reluctant hero in Texas church shooting receives medal of courage*, CNN (Jan. 13, 2020), available at https://cnn.it/3QwG0lX (last visited Oct. 14, 2022).

## II.     Plaintiffs will continue to suffer irreparable harm in the absence of a temporary restraining order and preliminary injunction.

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245,

249 (2d Cir. 1999). "In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). This is true even when the loss of constitutional rights is for "minimal periods of time." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *see also French*, 985 F.3d at 184.

Plaintiffs will suffer irreparable harm without a temporary restraining order and preliminary injunction. As described above, their Second Amendment rights to carry firearms for self-defense are being infringed *each* and *every day* that they go to their churches. Hardaway Decl. ¶¶ 8–12; Boyd Decl. ¶¶ 8–12; FPC ¶ 6; SAF ¶ 6. After all, self-defense must take place wherever Plaintiffs happen to be, whether out on the sidewalk or while leading services in the front of their churches. Prior to the enactment of the Place of Worship Ban, Plaintiffs carried to defend themselves and keep the peace in their church. Hardaway Decl. ¶ 8; Boyd Decl. ¶ 8; FPC Decl. ¶ 6; SAF Decl. ¶ 6. That was the status quo ante—*i.e.*, "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014). It is this status quo that the Court should preserve first through a temporary restraining order and then a preliminary injunction. *See Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (noting the purpose of a temporary restraining order is "to preserve the status quo" pending fuller assessment of a preliminary injunction). Now Plaintiffs must disarm. Accordingly, the Place of Worship Ban has immediately and irreparably stripped Plaintiffs of the ability to defend themselves and their congregations while at church. Hardaway Decl. ¶ 12; Boyd Decl. ¶ 12; FPC Decl. ¶ 6; SAF Decl. ¶ 6. Because of the Place of Worship Ban, Plaintiffs are "suffer[ing] . . . diminished safety" because they are "not be able carry." *Antonyuk v. Bruen*, 1:22-cv-0734, 2022

WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022) ("*Antonyuk I*").

**III.    A temporary restraining order and preliminary injunction would be in the public interest.[3]**

The public interest strongly favors injunctive relief. Although "the State has an interest in administering its laws without interference by federal equitable power, that interest is diminished when the laws at issue likely impinge a federal constitutional right." *French*, 958 F.3d at 184. Moreover, the public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Antonyuk I*, 2022 WL 3999791 at *36. New York's Place of Worship Ban "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S. Ct. at 2156. It is in the public interest for this Court to vindicate that the Second Amendment is not a "second-class right" by temporarily restraining and then preliminarily enjoining enforcement of the Place of Worship Ban. *Id.*

**CONCLUSION**

For the foregoing reasons, the Court should temporarily restrain and then preliminarily enjoin the Place of Worship Ban.

---

[3] Plaintiffs respectfully request that this Court exercise its discretion under Rule 65(c) to waive any requirement to post security because a temporary restraining order and preliminary injunction enjoining enforcement of an unconstitutional state law "would not have a financial impact" on the State and security "would not mitigate" any alleged harm to the State's enforcement interests. *Hund*, 501 F. Supp. 3d at 209; *see also Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations]."); *Antonyuk II*, 2022 WL 5239895, at *23 ("Plaintiffs should be, and are, excused from giving security because there has been no proof of any 'costs and damages' that would have been sustained by any Defendant 'found to have been wrongfully enjoined or restrained'" under FED. R. CIV. P. 65(c).").

Respectfully submitted, this 14th day of October 2022.

|  | /s/ Nicolas J Rotsko |
|---|---|
| David H. Thompson* | Nicolas J. Rotsko |
| Peter A. Patterson* | PHILLIPS LYTLE LLP |
| John W. Tienken* | One Canalside |
| COOPER & KIRK, PLLC | 125 Main Street |
| 1523 New Hampshire Avenue, N.W. | Buffalo, NY 14203-2887 |
| Washington, D.C. 20036 | (716) 847-5467 |
| (202) 220-9600 | (716) 852-6100 (fax) |
| (202) 220-9601 (fax) | NRotsko@phillipslytle.com |
| dthompson@cooperkirk.com | |
| ppatterson@cooperkirk.com | |
| jtienken@cooperkirk.com | |

*Applications for admission *pro hac vice* forthcoming

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Federal Rule of Civil Procedure 5(b)(2)(C), I hereby certify that a true

and correct paper copy of the foregoing was served to Defendants by mail to the following addresses

on this 14th day of October 2022.

Kevin P. Bruen,
New York State Police
1220 Washington Avenue
Building 22
Albany, NY 12226

Brian D. Seaman
Niagara County District Attorney
Niagara County Courthouse, 3rd Floor
175 Hawley St.,
 Lockport, NY 14094

John J. Flynn,
Erie County District Attorney's Office
25 Delaware Ave
Buffalo, NY 14202

/s/ Nicolas J. Rotsko
Nicolas J. Rotsko
