UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JIMMIE HARDAWAY, JR., LARRY A. BOYD,
FIREARMS POLICY COALITION, INC., and
SECOND AMENDMENT FOUNDATION

Plaintiffs,

v.

KEVIN P. BRUEN, in his official capacity as Superintendent
of the New York State Police, BRIAN D. SEAMAN, in his
official capacity as District Attorney for the County of
Niagara, and JOHN J. FLYNN, in his official capacity as
District Attorney for the County of Erie,

Defendants.

No. 22-cv-00771 (JLS)

**STATE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER**

LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202

Ryan L. Belka
Assistant Attorney General
Of Counsel

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND..................................................................................................... 2

STANDARD OF REVIEW ........................................................................................................ 3

ARGUMENT .............................................................................................................................. 5

    I.   PLAINTIFFS DO NOT HAVE STANDING ......................................................... 5

       A.  The Organizational Plaintiffs Lack Standing Because They Have Suffered
No Injury of Their Own ..................................................................................... 5

       B.  The Individual Plaintiffs Lack Standing To Bring a Pre-Enforcement Facial
Challenge Because They Have Not Demonstrated An Intent To Violate
The Statute And A Specific Threat of Enforcement ....................................... 7

   II.  PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL
LIKELIHOOD OF SUCCESS ON THE MERITS................................................. 8

       A.  Plaintiffs Can Only Bring a Disfavored Facial Challenge............................ 9
       B.  The Place of Worship Provision Does Not Violate the Second Amendment............. 10

   III.  PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM ........................ 15

   IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH
IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS ..................... 17

CONCLUSION.......................................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Able v. United States*,
44 F.3d 128, 131 (2d Cir. 1995)......................................................................................4

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
740 F. Supp. 2d 465 (S.D.N.Y. 2010).............................................................................3

*Andrews v. State*,
50 Tenn. 165 (Tenn. 1871) ...........................................................................................13

*Antonyuk v. Hochul*,
22-cv-986 (N.D.N.Y.)....................................................................................................11

*Beal v. Stern*,
184 F.3d 117 (2d Cir. 1999).............................................................................................4

*Bill & Ted's Riviera, Inc. v. Cuomo*,
494 F. Supp. 3d 238 (N.D.N.Y. 2020).............................................................................4

*Carney v. Adams*
141 S. Ct. 493 (2020).................................................................................................5, 8

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).........................................................................................................6

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ..........................................................................................5-6

*Connecticut Citizens Defense League Inc. v. Lamont*,
6 F.4th 439 (2021)........................................................................................................5-7

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
318 F.3d 105 (2d Cir. 2003).............................................................................................9

*D.C. v. Heller*,
554 U.S. 570 (2008)................................................................................................. 10-11

*Diaz v. Pataki*,
368 F. Supp. 2d 265 (S.D.N.Y. 2005)..............................................................................9

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)........................................................................................................17

*English v. State,*
    35 Tex. 473 (Tex. 1873) ........................................................................14

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975)...............................................................................9

*Frey v. Bruen,*
    No. 21 Civ. 5334, 2022 WL 522478 (S.D.N.Y. Feb. 22, 2022) ...........8

*Goldsten v. Hochul,*
    Index No. 22-cv-8300 (S.D.N.Y.) dated October 14, 2022 ....................1

*Hill v. State,*
    53 Ga. 472 (Ga. 1874)..........................................................................14

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ..............................................................................5

*Hopkins Hawley LLC v. Cuomo,*
    No. 20-CV-10932 (PAC), 2021 WL 8200607 (S.D.N.Y. Jan. 8, 2021) ..................................16

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and
    Fourth Departments,*
    852 F.3d 178 (2d Cir. 2017)...................................................................9

*Joglo Realties, Inc. v. Seggos,*
    2016 WL 449140 (E.D.N.Y. Aug. 24, 2016) .......................................15

*L&M Bus Corp. v. Bd. of Educ.,*
    2018 WL 2390125 (E.D.N.Y. May 25, 2018) .......................................4

*Lawyers Cmte. for 9/11 Inquiry, Inc. v. Garland,*
    43 F.4th 276 (2d Cir. 2022) ...................................................................6

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)...............................................................................5

*Make the Rd. N.Y. v. Cuccinelli,*
    419 F. Supp. 3d 647 (S.D.N.Y. 2019)..................................................17

*Martin v. Warren,*
    482 F. Supp. 3d 51 (W.D.N.Y. 2020) ....................................................3

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)..............................................................................11

*Moore v. Consol. Edison Co. of N.Y.,*
    409 F.3d 506 (2d Cir. 2005)..................................................................11

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022) ................................................................................ 2, 10-12

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022) .......................................................................................1

*Nken v. Holder*,
556 U.S. 418, 435 (2009) ..............................................................................4, 17

*NYSRPA v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ...............................................................................17

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*,
769 F.3d 105. (2d Cir. 2014) ..............................................................................17

*People ex. rel. Schneiderman v. Actavis PLLC*,
787 F.3d 638 (2d Cir. 2015) ................................................................................4

*Restaurant Law Ctr. v. City of N.Y.*,
360 F. Supp. 3d 192 (S.D.N.Y. 2019) ..................................................................9

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................................................17

*Silent Gliss Inc. v. Silent Gliss Int'l Ltd.*,
No. 22-CV-522(EK)(MMH), 2022 WL 1525484 (E.D.N.Y. May 13, 2022) ........16

*State v. Reando*
(Mo. 1878) ........................................................................................................14

*Suitum v. Tahoe Reg'l Plan. Agency*,
520 U.S. 725, n.10 (1997)) .................................................................................9

*Time Warner Cable v. Bloomberg L.P.*,
118 F.3d 917 (2d Cir. 1997) ..............................................................................16

*U.S. v. Decastro*,
682 F.3d 160 (2d Cir. 2012) ................................................................................9

*United States v. Salerno*,
481 U.S. 739 (1987) .............................................................................................9

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .............................................................................................9

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir.), cert. denied, 142 S. Ct. 2569 (2022) ..............................10

*Winter v. Natural Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................4, 17

**CONSTITUTIONS**

Second Amendment ........................................................................................... *passim*

Fourteenth Amendment .....................................................................................12, 15

**FEDERAL STATUTES**

CCIA ........................................................................................................... 1-2, 9, 12

CCIA, Penal Law
   § 265.01-e .......................................................................................................3

FPC Law .................................................................................................................6

op. at 32-35. Penal Law
   § 265.01-e(3) .........................................................................................3, 12, 16

**STATE STATUTES**

1890 Okla. Stat. 495-96 .........................................................................................13

1889 Ariz. Sess. Laws 16 .......................................................................................13

1870 Ga. Laws 421 .................................................................................................12

Penal Law
   § 265.01-e(1) .....................................................................................................3

1870 Tex. Gen. Laws 63 .........................................................................................12

Defendant Kevin P. Bruen, sued in his official capacity as Superintendent of the New York State Police, respectfully submits this memorandum of law, together with the Declaration of Patrick J. Charles, previously filed as [ECF No. 39] in *Goldsten v. Hochul*, Index No. 22-cv-8300 (S.D.N.Y.) dated October 14, 2022 ("Charles Decl."), in opposition to Plaintiffs' Motion for a Temporary Restraining Order ("Mot.") [ECF No. 9].

## PRELIMINARY STATEMENT

In New York State Rifle & Pistol Association v. Bruen, 142 S. Ct. 2111 (2022), the U.S. Supreme Court recognized that states retain considerable discretion to confront the regulatory challenges posed by modern firearms, including the ability to require licensing and to limit the possession of firearms in certain locations. To address the ongoing crisis of gun violence in New York, consistent with Bruen, the State amended New York's existing gun laws via the Concealed Carry Improvement Act ("CCIA").

Among these provisions are restrictions on carrying weapons in multiple "sensitive locations" – places where the public is especially vulnerable, where critical governmental services are provided, or where persons exercise constitutional rights. The Supreme Court has endorsed laws barring firearms in sensitive places as "'presumptively lawful.'" Bruen, 142 S. Ct. at 2162 (Kavanaugh, J. concurring) (quoting D.C. v. Heller, 554 U.S. 570, 626-27 (2008). Religious institutions are one of a myriad of defined "sensitive locations" where the carrying of firearms is generally prohibited, and in fact religious institutions have long been considered one of the paradigmatic example of a "sensitive place" where firearms may be restricted.

Plaintiffs seek to undermine this protection for religious worshippers provided by the CCIA, arguing that it infringes their rights under the Second Amendment. But this motion for a temporary restraining order must fail, for any of four reasons.

1

First, Plaintiffs do not have standing. Second, Plaintiffs possess no clear or substantial likelihood of success on the merits. They have not met their initial burden under Bruen to show that the Second Amendment's protections extend to carrying guns in houses of worship. In any event, the restriction at issue is perfectly consistent with the Nation's history and tradition of firearm regulation. Indeed, there is a robust and clear historical tradition of states prohibiting weapons in religious institutions, and therefore the place-of-worship provision of the CCIA satisfies the Second Amendment inquiry laid out in Bruen. Third, Plaintiffs fail to establish imminent, irreparable harm – any harm to Plaintiffs is entirely speculative. By contrast, the serious risk of irreparable harm to public safety from a temporary restraining order is real. Finally, the balance of equities and the public interest weigh overwhelmingly in favor of New York's mission to protect all New Yorkers from the plague of gun violence.

Accordingly, Plaintiffs' motion for a temporary restraining order should be denied.

## FACTUAL BACKGROUND

On July 1, 2022, the CCIA was passed by the New York State Legislature in special session, then promptly signed into law by Governor Kathy Hochul. The bill was specifically designed "to align with the Supreme Court's recent decision in []Bruen" See Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7.

In Bruen, the Supreme Court found that a single provision of New York's gun licensing regime was unconstitutional: the provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a concealed weapon. The Court held that requiring such a heightened, individualized need for self-defense to obtain a license violated the Second Amendment. See Bruen at 2123 n.1. The Court did not address any other provision of New York's gun licensing or related statutes.

The Sponsor's Memo for the CCIA makes it clear that the Legislature was set on complying with Bruen and "protect[ing] individuals' Second Amendment rights as determined by the Supreme Court," while at the same time enacting measures to "prevent[] death and injury by firearms."

The proposed legislation updates New York's licensing scheme to eliminate the "proper cause" requirement that was deemed unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional application and training requirements. Under this bill, applicants who successfully meet New York's conceal carry license applications requirements will receive their license.

See S51001 State Senate Sponsor Memo.[1]

Part of the CCIA, Penal Law § 265.01-e enumerates a set of "sensitive locations" in which individuals generally may not possess "a firearm, rifle or shotgun." Penal Law § 265.01-e(1). As relevant here, the list includes "any place of worship or religious observation." Id. § 265.01-e(2)(c) (the "Place of Worship Provision"). This law protects people at worship by making it a crime to bring a firearm into a church, synagogue, or other place of religious observation.  In order to help protect those within, the law contains exceptions for police officers, peace officers, registered security guards, active-duty military personnel, and other statutorily designated persons. See id. § 265.01-e(3).

## **STANDARD OF REVIEW**

The standard for a temporary restraining order is the same as for a preliminary injunction. Martin v. Warren, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020); AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc., 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the

---

[1] https://www.nysenate.gov/legislation/bills/2021/S51001

standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). A temporary restraining order is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 24 (2008). The movant bears the heavy burden of establishing each of the following elements: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. Id. at 20. The final two factors – the balance of the equities and the public interest – "merge when the Government is the opposing party." L&M Bus Corp. v. Bd. of Educ., 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here, an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it). People ex. rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015). In cases such as this one where a plaintiff asks the Court to enjoin a duly enacted law, "[r]equiring such a heightened showing is consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'" Bill & Ted's Riviera, Inc. v. Cuomo, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)). Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. Actavis, 787 F.3d at 650 (quoting Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999) ). Plaintiffs cannot meet this standard.

## <u>ARGUMENT</u>

### I.   PLAINTIFFS DO NOT HAVE STANDING

As a threshold matter, plaintiffs lack standing to sue.  "The doctrine of standing [requires] that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"  <u>Carney v. Adams</u> 141 S. Ct. 493, 498 (2020) (quoting <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 704 (2013)).  And the injury has to be *real*: "an 'injury in fact' [] must be 'concrete and particularized,' as well as 'actual or imminent.'  It cannot be 'conjectural or hypothetical.'"  <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  Plaintiffs have not made the requisite showing.

### A.   The Organizational Plaintiffs Lack Standing Because They Have Suffered No Injury of Their Own

The organizational plaintiffs, Firearms Policy Coalition, Inc. (FPC) and Second Amendment Foundation (SAF), lack standing because they cannot bring suit vicariously on behalf of their members, and because they cannot demonstrate any injury in their own right.  The analysis is governed by the Second Circuit's recent decision in <u>Connecticut Citizens Defense League Inc. v. Lamont</u>, 6 F.4th 439 (2021).  <u>CCDL</u>, like this action, was a case brought by an interest group focusing on gun issues, attempting to challenge a state measure on Second Amendment grounds.  <u>Id.</u> at 441.  Although the district court granted a preliminary injunction, the Second Circuit reversed and vacated (in relevant part) on standing grounds: with regard to the organizational plaintiff, the Circuit noted its longstanding doctrine that an organization "lack[s] 'standing to assert the rights of its members," and could only bring "suit on its *own* behalf" if it could show that the organization itself suffered an "actual or threatened injury in fact."  <u>Id.</u> at 447; <u>see</u> <u>Conn. Parents Union v. Russell-Tucker</u>, 8 F.4th 167, 174 (2d Cir. 2021)

("where, as here, an organization is not directly regulated by a challenged law or regulation," it must establish "an involuntary material burden on its established core activities"). The organizational plaintiff in <u>CCDL</u> argued that it "diverted resources" in response to the challenged measure by "communicat[ing] with individuals across Connecticut" and "sen[ding] a letter to the Governor." <u>Id.</u> But the Circuit found that this was no basis for standing, when communicating with members, lobbying the government, and pursuing litigation generally were "integral to CCDL's mission to preserve the effectiveness of the Second Amendment," making the relied-on actions "not a departure from CCDL's usual activities." <u>Id.</u> (cleaned up).

So too with the organizational plaintiffs here. Plaintiff FPC states that its purpose is to "serve[] its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, and other programs." [ECF No. 10-8] ¶ 3. Plaintiff SAF likewise says its purpose is to "preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs." [ECF No. 10-9] ¶ 3. And the organizations' purported injuries amount to continuing with these grassroots advocacy activities, including by "addressing inquiries" and setting up a "hotline" to speak with members.[2] These activities cannot be a basis for standing because they are "not a departure from [the organizations'] usual activities."[3] <u>CCDL</u>, 6 F.4th at 447; <u>see</u> <u>Lawyers' Committee for 9/11</u>

---

[2] Voluntary litigation activity is also not a sufficient basis for standing. <u>See</u> <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 416-17 (2013); <u>Lawyers Cmte. for 9/11 Inquiry, Inc. v. Garland</u>, 43 F.4th 276, 283 (2d Cir. 2022).

[3] Both originations' "hotlines" appear to only be simple online contact forms. <u>See</u> [ECF No. 10-8] ¶ 9, [ECF No. 10-9] ¶ 9 (providing the URLs for the two "hotlines"). And Plaintiff FPC regularly sets up such "hotlines" to communicate members and find potential plaintiffs for lawsuits, including before the passage of the New York law it is challenging here. <u>See, e.g.</u>, https://twitter.com/gunpolicy/status/1536830928177221633 (June 14, 2022) (seeking plaintiffs in Florida for a lawsuit and telling them to "please fill out our hotline form"); https://twitter.com/gunpolicy/status/1540108011229683717 (June 23, 2022) ("[i]f you are denied a license to carry, please let our FPC Law team know by filing a report using the FPC 2A hotline").

Inquiry, Inc. v. Garland, 43 F.4th 276, 283 (2d Cir. 2022) (expenditure of money and resources does not confer standing if it goes to "the very mission of the plaintiff organizations").

Moreover, there is even less of a basis to pursue *injunctive* relief: the only ongoing harm alleged by either organization is "incur[ing] ongoing expenses to operate the hotline," and that both organizations "expect[] to continue to be required to expend additional resources addressing New York's laws." [ECF No. 10-8] ¶¶ 9-10, [ECF No. 10-9] ¶¶ 9-10.[4]  "Such a conclusory assertion cannot support standing, and falls short of establishing a 'likelihood' of future injury." CCDL, 6 F.4th at 448.

**B.**    **The Individual Plaintiffs Lack Standing To Bring a Pre-Enforcement Facial Challenge Because They Have Not Demonstrated An Intent To Violate The Statute And A Specific Threat of Enforcement**

The two individual plaintiffs similarly lack any injury in fact, let alone one traceable to any of the defendants.  Plaintiff Hardaway and Plaintiff Boyd have submitted affidavits that are virtually identical in all relevant respects, alleging that each plaintiff's practice was to carry firearms at church prior to the passage of the challenged law, but that they have ceased to do so; that each of their two churches has an "open-door policy" and so each plaintiff "will not know if [] strangers come with violent plans"; and that each plaintiff is worried about the "violence" and "crime" that occurs in their church's neighborhood.  [ECF No. 10-6] ¶¶ 8-10; [ECF No. 10-7] ¶¶ 8-10.  Each individual plaintiff separately states that they previously "encouraged parishioners to carry a firearm if they were licensed to do so," but no longer; and each avers, "I have been stripped of the ability to keep the peace, and I am suffering diminished personal safety every time I go to church."  [ECF No. 10-6] ¶¶ 11-12, [ECF No. 10-7] ¶¶ 11-12.

---

[4] The relevant sections of the two organizations' statements are word-for-word identical.

These allegations provide no basis for standing, particularly in a pre-enforcement facial challenge such as this one.  "A plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public, no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public." Carney, 141 S. Ct. at 499 (quotation marks omitted). Rather, in the context of a pre-enforcement facial challenge such as this one, standing requires "plausible allegations that a plaintiff intends to engage in conduct proscribed by a statute, and there exists a credible threat of prosecution thereunder." Frey v. Bruen, No. 21 Civ. 5334, 2022 WL 522478, at *4 (S.D.N.Y. Feb. 22, 2022) (quotation marks omitted).  Here, no plaintiff alleges the first element – in fact, both individual plaintiffs acknowledge that they have followed the law will continue to, see [ECF No. 10-6] ¶¶ 8, 11-12; [ECF No. 10-7] ¶¶ 8, 11-12, and no plaintiff alleges that any defendant has taken or threatened any enforcement action against them, see generally [ECF No. 10-6], [ECF No. 10-7]. Accordingly, there is no injury-in-fact for purposes of a pre-enforcement facial challenge, and certainly none traceable to any defendant in this action.

## II.   PLAINTIFFS CANNOT ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

In their motion for a temporary restraining order, Plaintiffs allege that the Place of Worship Provision is implicated by the text of the Second Amendment, that historical "sensitive place" restrictions are the only historical analogies that can justify the Provision, and that "New York will be unable to justify such a restriction with historically grounded analogies." [ECF No. 9-1] at 11-18.  In fact, the historical record is replete with examples of carriage restrictions in places of worship.  As such, Plaintiffs cannot demonstrate a clear or substantial likelihood of success on the merits for their claims.

### A.     Plaintiffs Can Only Bring a Disfavored Facial Challenge

Here, as noted above, Plaintiffs' bring a "pre-enforcement" challenge to the Place of Worship Provision of the CCIA.  See generally [ECF No. 9]  A long line of precedent within the Second Circuit establishes that any "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge. Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments, 852 F.3d 178, 184 (2d Cir. 2017); accord Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019).

A facial challenge to the provisions of a statute can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" U.S. v. Decastro, 682 F.3d 160, 168 (2d Cir. 2012) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)); see also United States v. Salerno, 481 U.S. 739 (1987)). Moreover, it is black-letter law that the New York State courts must be given the opportunity to narrow the provisions of the CCIA, if necessary, during the course of specific enforcement activities or judicial proceedings. See Erznoznik v. Jacksonville, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"). Because of this, "[a] plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 110 (2d Cir. 2003) (quoting Suitum v. Tahoe Reg'l Plan. Agency, 520 U.S. 725, 736 n.10 (1997)) (cleaned up); see also Diaz v. Pataki, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (same).

**B.      The Place of Worship Provision Does Not Violate the Second Amendment**

Plaintiffs' motion claims that the Place of Worship Provision violates their Second Amendment right to bear arms. However, plaintiffs have not met their burden under <u>Bruen</u> to establish this claim. And, in any event, New York's provision is consistent with a long and robust history of government prohibitions on firearms in sensitive places, and in places of worship specifically.

As the movants, "Plaintiffs bear the initial burden of establishing a likelihood of success on the merits." <u>We The Patriots USA, Inc. v. Hochul</u>, 17 F.4th 266, 281 (2d Cir.), <u>cert. denied</u>, 142 S. Ct. 2569 (2022). The burdens of proof on the underlying claims will inform the necessary showing at this stage. <u>See id</u>. As relevant here, and as plaintiffs concede (Mot. at 7), only when a challenger shows that "the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2126, 2129-30. The first step entails an analysis of "the Second Amendment's text, as informed by history." <u>Id.</u> at 2127; <u>see also</u> <u>Heller</u>, 554 U.S. at 595.

Because sensitive places are those where, historically, carrying weapons was "altogether prohibited," <u>Bruen</u>, 142 S. Ct. at 2133, these locations fall outside the textual "scope of the Second Amendment," <u>Heller</u>, 554 U.S. at 626. A challenger thus bears an initial burden to show that a location designated as "sensitive" in fact falls within the Second Amendment's ambit. In both <u>Heller</u> and <u>Bruen</u>, the challengers—and the Court—"canvassed the historical record" in depth for evidence supporting their textual interpretations before shifting the burden to the government to respond. 142 S. Ct. at 2127; <u>see also</u> Br. for Pet'rs at 25-40, <u>Bruen</u>, 142 S. Ct. 2111 (No. 20-843). But whatever this step-one burden entails here—a question that <u>Bruen</u> left open—plaintiffs'

submission does not even attempt to satisfy it, alone compelling the denial of a temporary restraining order against the Place of Worship Provision.

Plaintiffs' memorandum simply declares that because they want to carry guns in church, which is outside the home, their "proposed course of conduct is presumptively protected by the Second Amendment." Mot. at 8. This bare assertion, without supporting evidence or analysis, fails to meet "the requirement for substantial proof" for an interlocutory injunction. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); accord Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005). Indeed, Bruen "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. Moreover, far from presumptively invalid, Heller declared that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "presumptively lawful." 554 U.S. at 626-27 & n. 26 (emphasis added); see also Charles Decl. ¶¶ 14-16 (explaining the early history of sensitive place regulations).[5]

In any event, the Place of Worship Provision satisfies the Bruen "historical tradition" test. For this purpose, the Supreme Court explained that reasoning by analogy, comparing modern regulations to historical analogues, would be required and appropriate. Bruen, 142 S. Ct. at 2132. Here, review of such analogues reveals that the historical record contains a broad and well-established body of laws restricting the carrying of weapons in religious institutions.[6] The robust

---

[5] The Court re-emphasized the constitutionality of such laws in Bruen, declaring that "we are [] aware of no disputes regarding the lawfulness of such prohibitions." 142 S. Ct. at 2133. This sentiment was critical to achieving a majority: writing for himself and Chief Justice Roberts, Justice Kavanaugh emphasized that "the Second Amendment allows a variety of gun regulations," before excerpting Heller's sensitive places language in full, including the statement that such measures are "presumptively lawful," then writing, "with those additional comments, I join the opinion of the Court." Id. at 2162 (Kavanaugh, J., concurring).

[6] On October 6, 2022, Judge Suddaby of the Northern District of New York issued a temporary restraining order (currently administratively stayed by the Second Circuit) in the matter Antonyuk v.

record of state laws restricting firearms in religious institutions establishes that such regulations are deeply rooted in American society.

In the years directly following the passage of the Fourteenth Amendment,[7] multiple states passed laws explicitly and directly prohibiting the carrying of firearms in religious institutions.[8] For example, in 1870, Texas passed a law providing that "if any person shall go into any church or religious assembly . . . and shall have about his person . . . fire-arms, whether known as a six-shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor." 1870 Tex. Gen. Laws 63, Charles Decl. ¶ 18 & Ex. H. That same year, Georgia provided that "no person in said State of Georgia be permitted or allowed to carry about his or her person any . . . pistol or revolver, or any kind of deadly weapon, to any . . . place of public worship[.]" 1870 Ga. Laws 421, Charles Decl. ¶ 18 & Ex. I. In 1874, Missouri passed a law mandating fines or imprisonment "[i]f any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship." Charles Decl. ¶ 17 n.5 & Ex. J (1883 act increasing fines). In 1877, Virginia

---

Hochul, 22-cv-986 (N.D.N.Y.), enjoining much of the CCIA, including many of the sensitive place restrictions. While the State disagrees with that opinion and has appealed it to the Second Circuit, Judge Suddaby upheld the Place of Worship Provision in the main under the Second Amendment. Analyzing the historical record, Judge Suddaby held that "it is permissible for New York State to generally restrict concealed carry in 'any place of worship or religious observation,'" so long as the provision was construed to make an exception for those "who have been tasked with the duty to keep the peace at the place of worship or religious observation." Id., slip op. at 32-35. Penal Law § 265.01-e(3) honors Judge Suddaby's exception by exempting from the "sensitive place" restrictions certain persons including police officers, peace officers, and registered security guards.

[7] The Supreme Court in Bruen disclaimed that it was weighing whether the period around 1791 (when the Second Amendment was ratified) or around 1868 (when the Fourteenth Amendment, incorporating the Second Amendment against the states, was ratified) is more relevant to the historical analysis. Bruen, 142 S. Ct. at 2138. Rather, the Court gave consideration to laws passed during both periods. Id. at 2136-56.

[8] Similar laws have existed for centuries. See, e.g., 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales). Attached hereto as Exhibit A.

proscribed "carrying any gun, pistol, . . . or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place[.]" 1877 Va. Acts 305, Charles Decl. ¶ 18 & Ex. K. Arizona continued this tradition in 1889. 1889 Ariz. Sess. Laws 16, Charles Decl. ¶ 18 & Ex. L. ("If any person shall go into any church or religious assembly . . . and shall have or carry about his person a pistol or other firearm . . . he shall be punished . . . and shall forfeit to the County the weapon or weapons so found on his person."). The territory of Oklahoma followed in 1890. 1890 Okla. Stat. 495-96, Charles Decl. ¶ 18 & Ex. M ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly . . . any of the weapons designated in sections one and two of this article.").[9] In addition to these state statutes, municipalities across the nation also enacted prohibitions on firearms in places of worship. Charles Decl. ¶ 17 & Exs. E, G (describing the prohibitions of weapons in places of worship enacted in Charlotte, NC; Columbia, MO; Webb City, MO; and Stockton, KS).

In addition to these statutes passed in the wake of Reconstruction, state courts at the time also made clear that governments could prohibit firearms in religious institutions – and often opined that doing so was imperative. In 1871, the Tennessee Supreme Court stated that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them." Andrews v. State, 50 Tenn. 165, 182 (Tenn. 1871). In 1873, the Texas Supreme Court announced that "[w]e confess it appears to

---

[9] Notably, these statutes are in addition to the substantial number of states that did not need to pass laws specifically prohibiting weapons in places of worship during this time period, because they already had on their books broad prohibitions of public carry. See, e.g., Charles Decl. ¶ 17 n.4 (listing numerous municipalities' 19th-century prohibitions of public carry); id. at ¶ 18 (describing Tennessee's 1689 prohibition on the carrying of dangerous weapons into "any election…fair, race course, or other public assembly of the people."); Eric Ruben and Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121, 132-33 (2015) (noting that states including Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and Pennsylvania passed laws beginning in the 1830s broadly regulating public carrying of firearms).

us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." English v. State, 35 Tex. 473, 478-79 (Tex. 1873).[10] In 1874, the Georgia Supreme Court held that "[t]he practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." Hill v. State, 53 Ga. 472, 475 (Ga. 1874). And in 1878, the Missouri Supreme Court upheld the constitutionality of the state's law prohibiting concealed firearms in, inter alia, "any church or place where people have assembled for religious worship," describing the law as "nothing more than a police regulation, made in the interest of peace and good order, perfectly within the power of the legislature to make." State v. Reando (Mo. 1878), Charles Decl. ¶ 17 n.5 & Ex. N. The court also noted that similar laws had been upheld by the courts of Georgia, Louisiana, Alabama, Arkansas,  and Texas. Id.

Furthermore, these historical laws and statutes align with a recognized purpose of sensitive places, which is to promote the exercise of other fundamental rights (i.e. free exercise of religion, freedom of speech, the fundamental right to vote, access to the courts or assemblage in the public square).  In other words, sensitive places are such because "they produce the kinds of public goods protected by other constitutional rights," to allow "them to effectively produce the public good and political culture that we also consider valuable."  Darrell A.H. Miller, Constitutional Conflict and

---

[10] The Supreme Court, in Bruen, described English as an "outlier" on the question of whether it evinced a historical tradition of a "proper cause" requirement for public carry. However, the Court did not speak on the utility of English on the question of sensitive place restrictions, and in tandem with the other cited cases and statutes, it is unquestionably aligned with the public consensus at the time.

Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 462 (2019).[11]  "Lawmakers throughout Western history have attempted to preserve the special institutional features of places of worship by banning weapons from them and their vicinity."  Miller, 467-470.  And insofar as restricting firearms in places like legislative assemblies or polling places aims to minimize the chance of violence between those with opposing views, the Place of Worship Provision additionally serves an analogous function.

In the face of the overwhelming evidence that the United States has a robust historical tradition of excluding firearms from houses of worship, Plaintiffs point to several statutes dating from 1632, 1643, and 1770, that took the opposite tack, requiring citizens to carry weapons in houses of worship. Plaintiffs' reliance on these laws not only fails, but undermines their own point. First, the earliest of these statutes long pre-date the adoption of the Constitution, the Second Amendment, or the Fourteenth Amendment, and are thus of limited or no utility under Bruen. Second, many of these laws were enacted for the explicit purpose of enforcing slavery and protecting against slave uprisings. Charles Decl. ¶ 21-22. They are thus of limited worth in establishing a legitimate "historical tradition." And to the extent that these laws do retain any relevance, it is to demonstrate that, from the earliest days of settlement of what would become the United States, it was considered within the government's power to regulate the carriage of firearms in religious institutions.  Id.

In totality, the Place of Worship Provision easily satisfies Bruen's requirements.

## III.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

In the Second Circuit, the "presumption of irreparable harm arising from a constitutional deprivation is not automatic." Joglo Realties, Inc. v. Seggos, 2016 WL 449140, at *16 (E.D.N.Y.

---

[11] https://scholarship.law.wm.edu/wmborj/vol28/iss2/9/

Aug. 24, 2016). Instead, the Second Circuit has held that it "often will be more appropriate to" consider the nature and extent of the alleged injuries to the plaintiff absent injunctive relief. Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997). Thus, the alleged violations of Plaintiffs' constitutional rights, by themselves, are not sufficient to show irreparable harm. Plaintiffs' hypothesized potential harms do not satisfy this requirement.

Judge Vernon Broderick of the Southern District of New York recently denied a temporary restraining order challenging the same place of worship provisions at issue in this case. Attached hereto as Exhibit B is the Order in *Goldstein, et al. v. Hochul*, et al.; Index No. 22-cv-8300, dated September 30, 2022. Similar to the case here, the Plaintiffs in Goldstein sought emergency relief from the court alleging that they are "being deterred from attending service and engaging in religious observance"… [resulting in] "engaging in religious observance outside the [place of worship]" because of the fear of attack without armed protection. *Exhibit B*; Order at p. 4. The court noted that the harm pleaded by the Goldstein Plaintiffs was "too remote and speculative" and "fails to reach the stringent standard of 'immediate irreparable harm'".[12] Here, too, Plaintiffs' claimed harm is far too remote and speculative to support the emergency relief of a temporary restraining order.

Moreover, Plaintiffs ignore that they have options for protection of their congregation beyond unregulated private carry. The CCIA's sensitive place provisions contain exceptions for multiple classes of persons, permitting, inter alia, active and retired police officers, peace officers, and security guards to carry firearms in sensitive locations. Penal Law § 265.01-e(3). During the

---

[12] The Goldstein court also faulted the Plaintiffs for its delay in bringing its challenge and then seeking the extraordinary relief of a temporary restraining order.  Silent Gliss Inc. v. Silent Gliss Int'l Ltd., No. 22-CV-522(EK)(MMH), 2022 WL 1525484, at *8 (E.D.N.Y. May 13, 2022), see also Hopkins Hawley LLC v. Cuomo, No. 20-CV-10932 (PAC), 2021 WL 8200607, at *1 (S.D.N.Y. Jan. 8, 2021) (finding that a three-week delay between the announcement of a policy and Plaintiffs filing a TRO constituted "lack of immediacy".) *Exhibit B;* Order at p. 4.

pendency of this proceeding, there is nothing preventing Plaintiffs from engaging an appropriate person to serve in this role, such as by having a willing and appropriately trained congregant serve as a registered security guard.

## IV.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF NEW YORK'S MISSION TO PROTECT ITS CITIZENS

Finally, the balance of equities and considerations of the public interest weigh heavily against Plaintiffs. "[A] plaintiff seeking a preliminary injunction must demonstrate not just that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the balance of the equities tips in his favor and an injunction is in the public interest." Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs., 769 F.3d 105, 112 n.4. (2d Cir. 2014) (cleaned up). "These factors merge when the Government is the opposing party." Make the Rd. N.Y. v. Cuccinelli, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing Nken, 556 U.S. at 435). Further, the reviewing court must ensure that the "public interest would not be disserved" by the issuance of the injunction. Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

Here, "it is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d 242, 261 (2d Cir. 2015). In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (internal quotation marks and citation omitted). Here, any prejudice to Plaintiffs from the denial of a preliminary injunction is outweighed by the benefit to the public. The State certainly is not ignorant of the history of attacks on houses of worship that Plaintiffs recite, and do not doubt that Plaintiffs' fear of violence is genuine, but they have not provided evidence to show that their proposed solution – permitting all congregants to worship armed – will enhance

17

congregants' safety. While Plaintiffs have an understandable fear of mass shootings, pre-planned mass shootings are not the only form of violence that can affect congregants; in addition, broad legal carrying of deadly weapons in dense congregate settings can result in spontaneous, unplanned violence even by otherwise law-abiding citizens, or in accidental shootings leading to injuries or deaths. For example, when one of the parties is armed, a dispute over cell phone use in a movie theater can escalate into unnecessary death.[13] Or a shouting match at a bowling alley can turn into a shooting.[14] Or at a club.[15] Or in grocery stores and bars.[16] And, even at places of worship.[17] Likewise, a substantial number of gun-related injuries and deaths are caused by accidental shootings.[18] In seeking relief in the form of enjoining the Place of Worship Provision, Plaintiffs focus only on half of this equation, ignoring the public consequences that are equally or more likely to result from the unchecked carrying of deadly weapons in sensitive locations. This balancing of the equities requires that Plaintiffs' request for a temporary restraining order be denied.

---

[13]   See   https://www.nytimes.com/2022/02/26/us/curtis-reeves-murder-trial-acquitted.html.   The shooter was acquitted of second-degree murder because a jury determined that he acted in self-defense in response to a bag of popcorn being thrown at him.

[14]   See   https://www.pleasantonweekly.com/news/2022/07/16/three-people-shot-at-granada-bowl-in-livermore;   https://www.npr.org/2019/01/05/682499047/three-dead-after-fight-escalates-into-shooting-at-california-bowling-alley.

[15]   See   https://abc6onyourside.com/news/local/triple-shooting-columbus-refugee-road-weyburn-road-9-5-2021.

[16]   See https://abcnews.go.com/US/wireStory/argument-leads-fatal-shooting-checkout-line-grocery-82708061.

[17]   See https://www.washingtonpost.com/news/acts-of-faith/wp/2016/05/05/parishioner-shot-to-death-in-church-during-hymns-was-only-armed-with-his-bible-police-say/. ("'It is clear the shooter brought a gun to a crowded church, he introduced that gun into a verbal altercation that turned into a fistfight and then fired the gun twice, aiming at the vital part of the body, killing the victim,' Montgomery County District Attorney Kevin Steele said[.]").

[18] See https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0220-0.

## **CONCLUSION**

For the reasons set forth above, the State Defendant respectfully requests that the Court

deny Plaintiffs' motion for a temporary restraining order.


Dated: New York, New York
        October 19, 2022


                                LETITIA JAMES
                                Attorney General
                                State of New York


                            By: /s/ Ryan L. Belka
                                RYAN L. BELKA
                                Assistant Attorney General
                                350 Main Place, Suite 300A
                                Buffalo, NY 14202
                                (716) 853-8440
                                Ryan.Belka@ag.ny.gov

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JIMMIE HARDAYWAR, JR., LARRY A. BOYD,
FIREARMS POLICY COALITION, INC. and SECOND          **CERTIFICATE OF SERVICE**
AMENDMENT FOUNDATION,

                            Plaintiffs,          22-CV000771-JLS

      vs.

KEVIN P. BRUEN, BRIAN D. SEAMAN, and JOHN J.
FLYNN,

                         Defendants.

_____


       I hereby certify that on October 19, 2022, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system.


DATED:       Buffalo, New York
                October 19, 2022


                                    LETITIA JAMES
                                    Attorney General of the State of New York
                                    Attorney for Defendant
                                    BY: */s/ Ryan L. Belka*
                                    Ryan L. Belka
                                    Assistant Attorney General of Counsel
                                    Main Place Tower, Suite 300A
                                    350 Main Street
                                    Buffalo, NY 14202
                                    (716) 853-8440
                                    Ryan.Belka@ag.ny.gov

# OPPOSITION

# EX. A

# Statutes of the Realm.

# THE

# STATUTES

## OF

# THE REALM.

PRINTED BY COMMAND

OF HIS MAJESTY

# KING GEORGE THE THIRD.

IN PURSUANCE OF AN ADDRESS OF

## THE HOUSE OF COMMONS

## OF GREAT BRITAIN.

From Original Records and Authentic Manuscripts.

## VOLUME THREE

500        26° HEN.VIII. c. 5, 6.        *A.D.*1534.

## CHAPTER V.

AN ACTE that Kepars of feries on the Water of Severne shall not convey in their ferie botes any maner of pson goodꝭ or cattels after the son going downe till the son be up.

*Escape of Felons from Gloucester-shire, &c. into South Wales, &c.*

FOR ASMOCHE as dayle dyverse felonyes robberies & murders ben many tymes cōmytted & done yn the countyes of Glouꝰ and Somercet, yn the parties nere adjoyninge unto the Water called the Water of Severne betwene Englande & Southwales, and after suche murders & felonyes don the said robbers felons and murderers with the said goodes so robbed & stolne make their conveyaunce withe the saide goodes so stolne by nyght at dyvers passages or feries over the said ryver or water, as the passages of Auste, Fremeland, Pyrton, Arlyngham, Nowenham, Portsedes Poynte, and all suche other lyke passages over the said ryver yn to Southwales, or ynto the forest callyd the foreste of Dene also adjoyninge to the same water, and whan they be over the saide water then the goodes so stolne be by dyvers privyleges ther kepte, all be it the Owner and Owners have true and perfecte knowlege therof yet they so robbed and spoyled be without remedye for to obteyne their saide goodes so stolne, and so that the secrete and sodeyne conveyaunce by nyght of the saide goodes over the said feries and passages dothe not only greatly encourage dyvers persones to come out of the ptyes of Southwales, to steale robbe & murder dyverse persones yn their houses in the saide counties joyninge upon the said borders of Wales, but also causeth manye robberies and felonyes yn sondrie wayes to be commytted and don upon the said border nere adjoyninge to the same ryver, to the great damage and hurte of the *Penalty of Fine and Imprisonment, on Keepers of Ferries carrying Offenders into or from Wales, between Sun-set and Sun-rise.* Kynges Subjectes inhabitinge there onlesse some remedie therefore be provyded: It maye therfore please the Kynge our Soveraigne Lorde and the Lordes spirituall & temporall and the Commons yn this present parliamente assembled and by the auctoryte of the same, to enact that everie parsone or persones takinge upon hym or theym to have and kepe any of the said passages or any other passage upon Severne aforesaide, [fromheseforthe '] do not convey nother carie with any maner barge boote or other vessell any person or persones with horses, mares, oxen, kye, or any other cattell, nor no other persone or persones before the tyme of the son risinge yn the morninge, and after the tyme of the son beinge gon downe at nyght; upon peyne of imprisonment and fyne to be sette on hym that shall so convey or carie over any of the said passages over the said ryver of Severne out of Englande yn to Wales or the forest of Dene, or out of Wales or the saide forest of Dene in to Englande, oneles the saide passengers & everie of theym have good knowlege of suche person & persones and of their dwelling places, and upon requeste to theym made by any person or persones do disclose the name and the dwellinge place of everye suche person or persones so by theym conveyed over the said water, to any suche persone or parsones requiringe the same, If sute be made for or after theym upon any outcrie, hute, or fresshe sute of or for any felonye robberie murder and manslaughter, commytted and done from hensetforth: *Such Keepers shall give Sureties not to offend in carrying such Offenders.* And that the Kynges Justiciars of Peace within everie the seid Countyes of Glouꝰ and Somercet at their Quarter Sessyons shall have full power and auctorite to call before theym all suche persones whiche hereafter shall kepe any of the saide passages, or any other ferie or passage over the saide water yn to Wales or the saide foreste, or oute of Wales or the said forest ynto Englande, and to bynde theym with sufficient sureties with theym in recognisaunce yn suche somes of money as it shall seme to the discrecion of the said Justiciars of peace, that they and everie of theym, beinge passengers and kepars of feries and passages as is aforesaid, from hensforthe shall not after the saide tymes before lymytted and appoynted convey or carie, nor cause to be conveyed or caried, any maner of person or persones or any kynde of cattall, but suche persones as they do knowe and will answere for, and knowe where their abidingꝭ dwellinges & habitacions be, and upon requeste made to theym or any of theym as is above saide shall from tyme to tyme disclose aswell the same persone or persones as the goodes and cattals so passinge the saide passages upon fresshe sute made or hereafter to be made upon any felonye murder or robberie, commytted & dōne yn the borders of the Countyes aforesaide, or yn any other place within this Realme or Southwales.

## CHAPTER VI.

AN ACTE that murders & felonies done or cōmytted within any Lordshippe Marcher in Wales shalbe enquired of at the Sessions holden within the Shere groundꝭ nexte adjoyninge, with many good orders for ministracōn of Justice there to be had.

*All Persons shall appear on Summons at the Sessions Court, &c. in Wales or the Marches.*

FOR ASMOCHE as the people of Wales, and marches of the same, not dreadinge the good and holsome lawes & statutes of this Realme have of longe tyme contynued and psevered yn perpetracion and cōmyssion of dyvers and manye folde theftes, murders, rebellyons, wilfull burninge of Houses and other scelerous Dedes and abhomynable malifactes to the highe dyspleasure of God, inquyetacion of the Kynges well disposed subjectes, and disturbaunce of the publike weale; whiche malefactis and scelerous dedes be so roted and fyxed yn the same people, that they be not like to [ sease ' ] onlesse some sharpe correcion and punyshmente for redresse and amputacion of the p̄mysses be provyded accordinge to the demerites of the offendours; Be yt therfore enactyd by the Kynge oure Soveraigne Lorde, and the Lordes spirituall and temporall and the Cōmons yn this present parliament assembled, and by auctorite of the same, that all and singler parsonne and parsones dwellynge or resiaunt within Wales or yn the Lordshippes Marches of the same, fromc tyme to tyme, and at all tymes hereafter, upon suche monycion or warnynge gyven for the Courte to be kepte yn Wales or yn anye of the Lordshippes Marches aforesaid, as before this tyme hathe bene used, shall parsonally repayre, resorte, and appere before the Justice Stewarde Lyeutenaunt or other officer, at all and everie Sessions Courte and

' fromhensforth *O.*        ' cease *O.*

Courtes, to be holden before the same Justice Stewarde or other officer, yn any what so ever Castell Fortresse or other place within Wales or within the precincte lymyttes and jurisdiccions of everie of the Lordshippes Marchers or Signories aforesayde or the marches of the same, as by the saide Justice Stewarde or other officer shalbe appoynted ; And then and there shall gyve his and their parsonall attendaunce to do execute and accomplishe all and everie thinge and thinges whiche to hym or theym shall affere and appertayne, upon peyne of suche fynes forfaytures and amerciamentes as shalbe afferyd assessyd and taxed by the Justice Stewarde or other officer to the Kynges use, yf yt be within any of the Kynges Lordshippes marchers, And yf yt be within any other Lordshippes marches, thenne to the use of the Lorde of the said Lordshippe marcher for the tyme beynge ; the saide forfaytures & amercyamctes to be levyed parceyved and taken by weye of distres, of the goodes and cattalles of everie psonne not apperinge at the saide Courte or Courtes, or not doinge executinge or accomplyshinge his dutye as is above saide.

And for asmoche as the officers yn the Lordshippes Marchars yn Wales have ofte and sondrie tymes heretofore unlaufully exacted the Kynges subjectes within suche Lordshippes where they have had rule or auctoryte, by manye and sondrie wayes and meanes, and also commytted theym to strayte dures and inprisonmente for small and lyght fayned causes & extorciously compellyd them therbye to paye unto theym fynes for their redempcions contrarie to the lawe, Therfore be yt further enactyd that yf any Stewarde, Lyeutenaunte, or any other Officer of any Lordshippe marchar, do fayne pcure or imagen anye untrue surmise agaynste any parsonne or parsones that shall so gyve their parsonall attendaunce before them at suche Courte or Courtes, and uppon the same untrue surmyse commytte them to any dures or imprisonment contrarie to the lawe, or contrarie to the true and laudable custome of that Lordshippe, that then upon sute made unto the Kynges Cōmyssioners or counseill of marches for the tyme beinge, by any suche parsonne or pśsonnes so imprisonned or by any of their frindes, that then the same Cōmyssioners or Counsaill shall have full power and auctoryte to sende for suche Steward, Lyeutenaunte or Officer, and also for the persone or personnes so imprisoned ; And yf the same persone or personnes so imprisoned can evydently prove before the said Counsaill by good and substaunciall witnesse or otherwise that his imprisonmente was upon any fayned surmyse, without cause reasonable or lawefull, that then the same Cōmyssioners shall have full power and auctorite to assesse the said officer to paye to the said person or persones wrongfully imprisonned vj s. viij d. for everie daye of their imprisonmente, or more by the dyscrecions of the said Cōmyssioners accordinge to the hurtes and behavour of the persone or persones imprysonned ; And that the same Cōmyssioners shall set further fyne upon the said Officer to be payed to the Kynges use as by their discrecions shalbe thought convenyent ; And yn case the same Officer do refuse to appere before the same Cōmyssioners yncontinent after anye cōmaundement to theym dyrectyd and delyverid, after any suche complaynte made to the same Cōmyssioners, that then the same Cōmyssioners shall have full power and auctorite, upon everie defaulte made by anye Officer or Officers, to assesse and sett upon everie suche Officer or Officers makinge defaulte suche fyne or fynes to be levyed to the Kynges use as by their dyscrecions shalbe thought convenyent ; And that the same Cōmyssioners shall have full power and auctoryte to compell the said officer or officers, by waye of imprisonment, as well to paye suche fynes as shalbe sett and taxyd upon theym to the Kynges use, as to paye unto everie psone or persones so imprisoned suche somes of money as they shalbe ressyd to paye for their wronge ymprisonmente.

And also be yt enacted by auctorite aforesaide, that no psone or psonnes dwellinge or resiaunte within Wales or the Lordshippĉ marches of the same, of what estate degree or condicion so eṽ he or they be of, comynge resortinge or repayringe unto any Sessions or Courte to be holden within Wales or any Lordshippes marches of the same, shall bringe or beare or cause to be brought or borne, to the same Sessions or Courte or to any place within the distaunce of two myles from the same Sessions or Courte, nor to any towne, churche, fayre, markett, or other congregacion, except yt be upon a hute or outcrie made of any felonye robberie done or perpetrated, nor yn the highe wayes yn affraye of the Kyngĉ peace or the Kingĉ liege people, any bill, longebowe, crosbowe, handgon, swerde, staffe, daggare, halberde, morespike, speare, or any other maner of weapon, privye cote or armour defence ; upon payne of forfature of the same weapon, privy cote or armour, and to suffre inprisonmente & make fyne & raunsome to the Kynges Highnes by the dyscrecion of the Kynges Comyssioners of his Marches for the tyme beynge ; except hit be by the cōmaundmente lycence or assente of the said Justices, Stewarde or other Officer, or of the Cōmyssioners or Counsaill of the Marches for the tyme beinge.

And that no pson nor psons from henseforth, without licence of the said Cōmyssioners in writinge, shall within Wales or Marches of the same or in any [ Shires¹ ] adjoyninge to the same, requyre pcure gather or levye any Commorthe, Bidalle, Ten'ntĉ ale, or other collecčōn or exaccōn of goodes cattalles money or any other thinge, under colour of marienge or [ suffringe² ] of their children, sayenge or synginge [ their¹ ] fyrste masses or gospelles of any prestes or clarkes, or for redempcion of any murder or any other felonye, or for any other maner of cause by whatt name or names soever they shalbe callyd ; nor shall make or pcure to be made any games of runnynge wrestlinge leapinge or any other games, the game of shotinge onely exceptyd & forprised ; upon payne of one hole yeres ymprisonmente of everie pson or psonnes as shall gather or pcure to be gatherid, any such colleccion or exaccyon, or shall make or pcure to be made any games as is aforesaide ; And further they and everie of theym shall make suche fyne as by the discrecion of the Kynges Cōmyssioners of his Marches shalbe thought convenyente : And further the said Cōmyssioners by this pśent acte shall have power & auctorite to here & det'myne the said offences by their examynacōn.

And that no psone or psonnes shall hereafter at any tyme caste any thinge yn to any Courte within Wales or in the Lordshippes marchers of the same, by the meane or name of an Arthel, by reason wherof the Courte maie be letted disturbed or discontynued for that tyme ; upon payne of one hole yeres imprisonment of any suche psone or psones as

**[margin notes:]**

II.
Wrongs committed against Subjects, by Officers of the Marches, by Imprisonment, Extortion, &c.

The King's Commissioners or Council of the Marches empowered to redress such Wrongs. and to punish Offenders by Damages, Fine, &c.

Officers refusing to attend, &c. may be imprisoned.

III.
No Weapons shall be brought to Courts, Churches, Fairs, &c.

IV.
None shall make Collecčōns, Exactions or Games in Wales.

V.
No Arthel shall be cast for the discontinuing of any Court in Wales.

---

¹ Shire *O.*        ² sufferyng *O.*        ³ there *O.*

shall caste or cause to be caste any suche Arthel in to any Courte or Courtes hereafter to be holden within Wales or the Lordshippes marches of the same; any custome before this tyme used to the contrarie not withstandinge; And that all Sessions & Courtes hereafter to be holden within Wales or the Lordshippes marches of the same shalbe kepte within the moste sureste & peacible place within the same Lordshipe marcher wheare the saide Justice Stewarde or other Officer shall appoynte.

*Courts shall be kept in the surest Places.*

**VI.**

*For Punishment of Offences committed within the Marches of Wales;*

AND for the punyshement and spedye tryals, aswell of the counterfettors of any [coioyne¹] currant within this Realme, wesshinge clyppynge or mynysshinge of the same, as of all and singler felonyes murder wilfull burnynge of houses, manslaughters robberies burgularies rapes & accessaries of the same, & other offences felonyouslye done perpetratyd and cōmytted or hereafter to be done perpetratyd and cōmytted within any Lordshippe marches of Wales; Be yt enacted by auctorite aforesaide that the Justices of the [Goale delyverie⁴] and of the peace and everie of theym for the tyme beinge, in the Shyre or Shires of Englonde where the Kynges writte runnethe, next adjoyninge to the same Lordshippe marcher or other place yn Wales where suche countaytinge wesshinge clippinge or mynisshinge of any coyne currant within this Realme, or murther, hath bene or hereafter shalbe comytted or done, or where any other felonyes or accessaries shalbe hereafter cōmytted perpetrated or done, shall from henseforthe have full power and auctorite at their Sessions & Gaole delyverie to enquire by verdicte of twelve men of the same Shyre or Shyres nexte adjoynynge, within Englande where the Kynges writte runneth, there to cause all suche counterfaytors, washers, clyppers of money felons [murderers,²] and accessaries to the same, to be indyted accordynge to the lawes of this Lande; in lyke maner & forme as yf the same pety treasons murders felonyes & accessaries to the same had byn done cōmytted or perpetratid wythin any of the said Shires within the said Realme, and also to here detmyne & judge the same accordinge to the Lawes of the Realme; And that all foreyne plees pleadyd by any of the said malefactours or offendours shalbe tryed and determyned in the said Shyre or Shires; And that the acquitalle or fyne makynge for any of the causes aforesaid in any of the Lordshippes marches shalbe no barre for any pson or psons beynge indyted in the said Shyre or Shires within two yeres nexte after any suche murder or felonye done.

*As also Trial of Foreign Pleas.*

*Acquittal in the Marches no bar.*

**VII.**

*Justices in England may award Process into the Marches against Offenders; and certify Outlawries and Attainders to the Officers of the Marches; who shall thereupon apprehend and convey Offenders into England, &c.*

AND further it is enacted, that the said Justyces of Peace and Gaole delyverye and everye of them shall have full power and auctoryte to awarde all maner of pces, as well of owtelawrye as other wyse, ayenst all & everye suche offender & offendours so indyted in maner and forme and accordynge to the customes and lawes used and accustomed within this Realme of Englande; And that the said Justices or two of them afore whome any suche offender shall happen to be outlawed or attaynted by outlagarye, shall immedyatlye uppon the same outlagarie or attaynder dyrecte & sende unto the Kynges officers of his Lordshippes [marches⁴] or to ther deputyes, or unto the Lorde or Lordes marchers of the same Lordshippe marcher or to his or their Officer or Officers or to ther deputyes, wherin suche offence murther or felonye shall happen to be donne, or where any suche offender murderer or felone shall happen to be resyaunte, a Certificate under the Seales of them or ij of theym of any suche outlagarye or attaynder; commaundynge them & everye of theym by the same under payne of forfature of a hundrethe pounde to the Kynge, to be levyed & pceyved as well of the goodes cattells landes & tentt of the same Lorde or Lordes marchers as of the good & catells lande & tenementt of the Kynges officer there, to apprehende & attache or cause to be apprehendyd & attachyd the bodye or bodyes of the same offender or offendours so outlawed or attaynted, and sauflye to kepe or cause to be kepte the same offendour or offendours, till suche convenient tyme before the nexte Sessyons of the Kynges Justices of hys Gaole delyverie of the Shire where suche offendour or offendours shall happen to be outlawed or atteynted, as to the Kynges officers of his Lordshipps marchers or to theire deputyes, or unto the Lorde marcher or [Lordes marchers³] of the same Lordshippe marcher, or to hys or their Officer or Officers or their deputyes, where suche Offender or Offenders shalbe apprehendyd attached deteyned & kepte shalbe thought expedyent for the conveyaunce and conductinge of the same Offendour or Offendours in maner and forme folowynge, to be delyverid from the Kynges officers or theyr deputyes, or the Lorde marcher or [Lordes marchers⁴] or his or their Offycer or Offycers to other psons assigned by this acte to receyve and conveye suche offender or offendours by indenture to be made betwene the delyverour or delyverours and the receyvour or the receyvours, that is to saye; That the Kynges offycers of his Lordshippe marcher or theyr deputyes, or the Lorde or Lordes marchers of the Lordshippe marcher or his or theyr Offycer or Offycers or theyr deputyes, where suche offender or offendours shalbe apprehendyd attached deteyned and kepte, shall sauflye and surely conducte & conveye or cause to be conducted and conveyed the same Offendour or Offendours to the next Lordshippe marcher towarde the Shyre where the same offendour or offendours shall happen to be outlawed or atteynted; and that the Kynges offycers of the same Lordshippe marcher or their deputyes, or the Lorde or Lordes marchers of the same Lordshyppe marcher or his or their Offycer or Officers or their deputyes, shall receyve and saufelye and surely conducte and convey the same Offendour or Offendoures to the nexte Lordshippe marcher; And so the Kynges offycers of everye Lordshippe marcher or their deputyes, or the Lorde or Lordes marchers of the same Lordshippe or his or their offycer or officers or their deputyes, to receyve conducte and convey saufely and surely everie suche offendour or offendours, frome one Lordshippe marcher to another Lordshippe marcher, by indenture as is aforesaid, unto the tyme that suche offendour or offendours shalbe saufely delyverid before the said Justices of the Gaole delyverye; uppon payne of forfature by everye of the Kynges officer or Lorde marcher by whose defaute the same offendour or offendours shall ne maye nott appere before the same Justyces at theyr said Sessyons, there to stande and abyde the order of the Kynges Lawes, C.fi. to be levyed and pceyved of the goodes and catells landes and tenementes of the same Offycer or Lorde to the Kynges use: And that all and everye Officer and Offycers Lorde and Lordes or other personnes to whome any Certificat shall be dyrectid as is abovesaid, shall at the nexte Sessyons and Gaole delyverie to be holden after the [prehensyon⁷]

or attachment of suche offendoure or offendours, retorne the same Certificate in dewe fourme and what he or they have done in that behalff upon the peyne aforesaid. Savynge alwaye to all and everie offendour and offendoures all and singler traͮses chalenges excepcyons advauntages and all other plees to of and upon the outlawrie pnounced or pmulged agenst the same offendour or offendours, in maner and forme as is and hathe be used and accustomed by the Lawes of this Realme for any the Kynges subjectes dwellynge within the same Realme.

Saving of Challenges, &c.

Provyded alwaye and be it enacted by the auctorite aforesaid, that if any pson or psonnes whiche shall happen hereafter to be indytyd outlawed arrayned convycted or atteynted by force of this acte, do fynde suche suffycyent suertyes before the Kynges Justyces of his Gaole delyverye as by ther discrecͦn shalbe thought convenient, that the same psonne or psonnes shall not from thensforthe commyt nor doo any felonye murder or felonyous offence, nor be accessarie to any felonye murder or felonyous offence, but at all tymes fromthensfurthe shalbe of good behavour agaynst the Kynge our Soͮayn Lorde his Heyres & successours his and their lawes and subjectes, that then the same Justyces of Gaole delyverie for the tyme beynge, withe and by the assente consente & agrement of the Lorde Presydent and two of the Kynges Cͦmyssioners or Counsaile of the marches for the tyme beynge, or thre of theim at the leaste whereof the Lorde Presydent or one of the said Counsell to be one, shall & maye by their dyscrecyon, for one tyme onlye, admyt any suche offendour to a ͨteyn fyne or sͦme of money ... hym by theim to be assessyd and taxid, to be surely paide to the Kynges use; and shall have full power and auctoryte by this present acte to discharge any suche offendour or offendours, so arained outlawed convycted and attaynted of all and everye suche felonye murther or felonyous offence and accessaryes of the same, and of all execucͦns and punyshmentͬ of dethe whiche the̅ same offendour or offendours shuld suffre by the cͦmen lawes of this Realme; so that the same offendour or offendours stonde not apelyd of the said felony murther or felonyous offence or as accessaries of the same offences at the tyme of his said Discharge; and that everie suche offendour so discharged as is above saide shalbe for the same offence or offences done within any of the Kynges Lordshippes marchers 'or any other Lordshippes marchers dischargid aswell agaynste the Kynges Highnes his Heyres and successours as againste all other Lordes marchers for one tyme onely.

VIII.
Offenders may be discharged, on a certain Fine, and giving Surety for their future good Behaviour.

Provyded alwaye and be it enacted by the auctorite aforesaid, that this present acte or any thynge therin conteyned shall not extende ne take place to abridge depryve or mynorate any Lybertyes privylege or auctoryte of any Lordes marcherͬ, heretofore grauntyd to the same Lorde, or lawfullye used or accustomed by the said Lorde or any of his auncetours; onles the foresaid offendours happen to be indyted outelawed arrayned convycted or attaynted by force of this acte as 'ys above said, within two yeres next after suche murder or other felonyous offence perpetratyd doone or cͦmytted within the said Lordsheppes marchers or any of theym; any thynge in this p̃sent acte before reheruyd to the contrarye notwithstandynge.

IX.
Saving for Liberties of Lords Marchers.

And furthermore be hit enacted by the auctoryte aforesaid, that all murthers roboryes felonyes and accessaries of the same whiche shall happen hereafter to be dͦne perpetratyd or commytted within the Shyre of Meryonythe in Wales, shall and maye be fromhensforthe enquyred herde and determyned in the Countyes of Carnarvan or Anglesee, before the Kynges Justyce of [Nortwales¹] or his deputye for the tyme beynge, by verdyt or ynqueste to be taken by the inhabytauntͬ of the same Shires of Carnarvan and Anglesee, or otherwyse yf by the dyscrecͦn of the Justyce there or his deputye shalbe thought convenyent. And that the same Justyce or his deputye for the tyme beynge shall have full power and auctorite by his discrecyon to here and determyne all and everye the forsaid murders felonyes roberies and accessaryes in fourme aforesaid.

X.
Offences committed in Merionethshire, shall be tried in Carnarvon and Anglesea.

And where heretofore upon dyvers murders robberyes and felonyes perpetratyd and doone, as well within the Lordshippes marchers of Wales as yn other places of Wales withoute the same Lordshippes, the Offenders dyverse tymes flee and escape frome the same Lordeshippe or other place where suche offence was commytted, and have repayred and resorted ynto a nother Lordshippe marcher, and there by the ayde comfort and favour of the saide Lorde of the same Lordshippe or his officer or offycers have bene abydynge and resiaunte, ynto whiche Lordeshippes the same Lordes marchers have and doo pretende a custome and privylege that none of the Kynges Mynistres or subjectes may entre to pursue apprehende and attache any suche offender thereunto repayred as is aforesaid, by reason wherof the same Offendours wente unpunyshed to the anymacyon and encouragynge of other [yll¹] dysposed people; It is therefore enacted by the auctoryte above saide, that everye Offycer and Offycers and their deputyes, upon commaundement gyven by the Commyssioners or Councell of the Marches for the tyme beynge, shall brynge sende or delyver everye suche Offender to the Offycer ... f the Lordshippe marcher or other place where any suche offence is or shalbe commytted or done, upon the meres and bondes of the said Lordeshippes, or to the said Commyssioners or Counsayle accordynge as to the said Offycers by theym shalbe commaundyd, under peyne of [xl. fi.²]; the same commaundement or commyssyon to be dyrected to any suche Offycer to be sende convayed and delyveryd by a Sergeaunte at armes or a Pursevaunt attendaunt on the said Counselle in the marches for the tyme beynge.

XI.
For the securing Offenders escaping from one Lordship to another.

---

¹ Northwales *O.*        ² evyll *O.*        ³ Fourty poundͬ *O.*

## CHAPTER VII.

### AN ACTE for amendynge of Highe Wayes in Sussex.

Recital of Statute 14 & 15 Hen.VIII. c. 6. § 2, &c. authoring Persons to lay out Highways in the Weald of Kent.

WHERE YT IS ORDEINED and enaĉlyd by auĉloryte of thys ꝑsent plyament, heretofore holden at London the xv. daye of Aprill in the xiiij yere of the Kynges moste noble reigne, and from thens adjorned to Westmynster the laste daye of Julye the xv. yere of his reigne and there holden, In consyderaĉon that many comen wayes in the Weld of Kent be so depe and noyous by wearinge and course of Water and other occasyons, that people cannot have theyre passages and cariages by Horses upon or by the same but to their grete peynes perills and jeopdye, that yf any pson or psonns from that tyme in any place within the said Welde of the said Countye, of his good mynde and disposyĉon without any value of good by him or by theym to be receyved for the same, will for the comen wele of the Kynges people assigne and ley out a more commodious weye in and over the Londes therunto adjoynynge, wherof the pson or psonnes or other to his use shalbe seasid of fee in estate of inheretaunce, that the same newe waye, so to be assigned and layde oute, by oversyght & assent of two Justyces of the peace of the said Countye and xij other dyscrete men withe yn the same hundrethe, inhabiting where any suche newe waye shalbe lymetted and layed out, or inhabytinge within the same hundrethe and other hundredes to the said hundreth next adjoyninge, shalbe fromthensfurthe holden occupied and used in lyke maner as the said olde waye there nowe is or before hath byn ; And that also the same pson or psonns so dysposed willinge and accomplyshinge shall and maye for the said newe waye so assigned and used [receyve[1]] and holde in weye [in[1]] recompense for the same newe waye so to be gyven, the [sole[1]] and grounde of the olde waye, in severaltie to theym their heyres and assignes to their owne use and pfytt for ever, without any comen waie or passage there from thensforthe to be had or claymed, any ꝑscripĉon or use to the contrarye notwithstandinge ; yn lyke maner and fourme as is lymytted by the said aĉte of a ĉten newe waye grauntyd by the same aĉte to be made by George Guldeforde squyer at Hempsted in the said Weld of Kent ; And that the said ij Justyces of peace and xij other dyscrete men, by whose oversight and assent the said newe waye by vertue of the said aĉte shall be assigned lymitted and layde out, shall within thre monethes next after the assignement lymitaĉon and leynge out of the same, make certificat ynto the Kynges moste honorable Courte of Chauncerye under ther seales, of the length and bredyth of the said newe waye or strete and of other thinges adjoyninge or conĉninge the same, as by their discrecyons shalbe thought moste expedyent or requysyte for the comen welthe of that cõtre to be certyfyed, and that certificat to be made from tyme to tyme as ofte as any suche newe waye or strete shalbe assigned limytted and layde out in forme above written.

PROVYDED alwaye that yf any pson or psonnes or body polytyke have or ought to have, or hereafter shall have any Churche waye or other what so ever waye or passage over or throughe any maner landes adjoyninge to anye of the said olde ways or stretes, whiche shalbe taken and used by force of that Aĉte as severall soile and freeholde in recompence for any newe waye to be made and laide oute in forme aforesaid, or have or ought to have or hereafter shall have any landes or teñtes adjoynynge to the olde waye, that they and everie of them their heires and successours shall maye have and use their said waye or wayes out of and in the said newe waye, over and through the lande of the said olde waye or strete ynto or over the said landes or tenementes adjoyninge to the same, and so to passe and repasse as shall apperteyne over the same olde waye, at suche convenyent place or places therof as therfore shalbe lymytted and assigned by the said ij Justices of peace and other xij men and by them to be ĉtyfyed in the Chauncerie, amonge other thinges by them to be ĉtyfyed in forme aforesaid, any thinge in the said Aĉte above written notwithstandynge ; as by the same Aĉt manifestly apperithe : And Forasmoche as in manye places within the Countie of Sussex lyke Aĉt for the alteraĉon of comen waies and stretes there beynge moche annoyous is moche necessarie and expedient for the comen welthe and commodyte of the Kynges subjeĉtes of the said Countie of Sussex to be had and made, In consyderaĉon wherof be hit ordeyned and enaĉlyd by the Kynge oure Soverayn Lorde and the Lordes spirituall and temporall and the Commons in this ꝑsent pliamente assemblyd and by yᵉ auĉloryte of the same, that the said Aĉt above rehersid and recited shall and maye from hensforthe extend take effeĉt and be put in execucyon yn everie place convenyent or necessarie within the said Countye of Sussex, where the wayes and stretꝑ be noyous to the Kinges said Subjeĉtes of the same Countye of Sussex, in lyke forme and maner and in all poyntes and condicyons and withe lyke ꝑviso to be had donne and executyd as is conteyned and expressyd in the above recyted aĉte conĉnynge the chaunge of the wayes and stretes in the said Countye of Kent ; any ꝑscripĉon use custome or other thinge to the contrarie beinge yn any wyse not withstandinge.

The recited Aĉt may be put in Execution in the County of Sussex.

## CHAPTER VIII.

### AN ACTE for the reedifienge of voyde groundes in the Citie of Norwich.

Fire at Norwich, whereby many void Spaces of Ground remain uninclosed ;

WHER BY ynfortunate [chaunce[1]] of fyre a greate nomber of houses of habytacyon within the Cytie of Norwich about xxvj yeres paste were burned and utterly consumed, to the greate hevynes discomforte losse and hinderaunce of the inhabitantes of the same Citie, by reason of whiche burninge dyvers and many voide groundes, wheruppon before the same fyre good and substancyall houses of habitaĉon were stondynge, remayninge now at this daye unreedyfied, and not only unreedyfied but also do lye as desolate and vacant groundes, many of theym nighe adjoyninge to the highe stretes replenished with moche unclennes and filthe, to the greate annusance of the said inhabitantis and other the Kynges subjeĉtꝑ passinge by the same, and to thentent that a reformacyon may be had in that behalf,

---

¹ receyve O.—reteyn St. 14, 15 Hen. VIII. c. 6.      ¹ chaunce O.          ¹ of } St. 14, 15 Hen. VIII. c. 6.   ¹ soyle }

Case 1:22-cv-00771-JLS    Document 28    Filed 10/19/22    Page 34 of 41

OPPOSITION

EX. B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
STEVEN GOLDSTEIN individually and on                    :
behalf of CONGREGATION BNEI                             :
MATISYAHU, and MEIR ORNSTEIN,                           :
                                                        :                    22-CV-8300 (VSB)
                                    Plaintiffs,         :
                                                        :                    **ORDER**
                      -against-                         :
                                                        :
KATHY HOCHUL, in her official capacity as               :
Governor of the State of New York; LETITIA              :
JAMES, in her official capacity as Attorney             :
General of the State of New York;                       :
KEECHANT SEWELL, in her official                        :
capacity as Commissioner of the New York                :
City Police Department; LOUIS FALCO, III,               :
in his official capacity as Rockland County             :
Sheriff; ERIC GONZALEZ, in his official                 :
capacity as the District Attorney of Kings              :
County; and THOMAS WALSH, II, in his                    :
official capacity as the District Attorney of           :
Rockland County.                                        :
                                                        :
                                    Defendants.         :
                                                        :
--------------------------------------------------------X

<u>VERNON S. BRODERICK, United States District Judge</u>:

        Plaintiffs filed this action by filing a Verified Complaint on September 29, 2022.  (Doc.

1.)  On that same day, Plaintiffs Steven Goldstein individually and on behalf of congregation

Bnei Matisyahu, and Meir Ornstein filed a proposed order to show cause requesting, among

other things, a temporary restraining order ("TRO") enjoining Defendants Governor Kathy

Hochul, Attorney General Letitia James, Commissioner Keechant Sewell, Sheriff Louis Falco,

III, District Attorney Eric Gonzalez, and District Attorney Thomas Walsh, II from enforcing

Penal Law § 265.01-e(2)(c).  (Doc. 4.)  Because Plaintiffs fail to show immediate and irreparable

injury sufficient to satisfy the stringent requirements for a temporary restraining order, Plaintiffs'

motion for a temporary restraining order is DENIED.

I.    DISCUSSION

"Ex parte relief . . .  by way of a temporary restraining order is an emergency procedure."

*Dama S.P.A. v. Does*, No. 15-CV-4528 (VM), 2015 WL 10846737, at *1 (S.D.N.Y. June 15,

2015).  The purpose of TROs is limited to preserving the status quo and preventing irreparable

harm "just so long as is necessary to hold a hearing, and no longer", such that the court will be

able to provide effective final relief.  *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979).

Courts have characterized ex parte TROs as appropriate only where "irreparable injury will be

caused absent prompt judicial intervention in circumstances where the adversary cannot be

contacted, or where advance contact with the adversary would itself be likely to trigger

irreparable injury*." Lim Tung v. Consol. Edison of New York*, No. 19CV5444RRMSJB, 2019

WL 4805080, at *3 (E.D.N.Y. Oct. 1, 2019), *see also Little Tor Auto Ctr. v. Exxon Co., USA*,

822 F. Supp. 141, 143 (S.D.N.Y. 1993) (citing examples including "discovery of contraband

which may be destroyed as soon as notice is given").

In considering the appropriateness of a TRO, the Court must examine "whether the

movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a

temporary restraining order".  *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y.

2020) (emphasis in original).  "The court may issue a temporary restraining order . . . only if . . .

specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable

injury, loss, or damage will result to the movant before the adverse party can be heard in

opposition."  Fed. R. Civ. P. 65(b)(1); *see also Pan Am. World Airways, Inc. v. Flight Engineers'*

*Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842 (2d Cir. 1962) ("The purpose of a

temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.").

Aside from the issue of immediacy, the standard for the issuance of TRO is the same as for a preliminary injunction. *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction"). A party seeking a preliminary injunction must demonstrate: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc*., 312 F.3d 94, 96 (2d Cir. 2002). Issuance of preliminary injunctive relief, such as a TRO or preliminary injunction, "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*). Lastly, "the district court has wide discretion in determining whether to grant a preliminary injunction, and [the Second Circuit] reviews the district court's determination only for abuse of discretion." *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005).

II.     APPLICATION

In the instant case, Plaintiffs seeks a TRO enjoining Defendants from "enforcing Penal Law § 265.01-e(2)(c)". (Doc. 4 at 3.) Plaintiffs failed to plead irreparable harm sufficient to meet the stringent standard set out in Fed. R. Civ. P. 65. Plaintiffs have failed to demonstrate

that the enforcement of Penal Law § 265.01-e(2)(c) will lead to a threat of irreparable harm that will occur immediately but-for this Court issuing a TRO. *See Omnistone Corp.* 485 F. Supp 3d at 367. The "irreparable harm" described by counsel includes Plaintiffs being deterred from attending services and engaging in religious observance outside the synagogue, and having to limit their participation in religious activities at the synagogue because of their fear that, without armed protection, the synagogue will be the target of anti-Jewish attack. Without reaching the issue of whether this showing could support some form of preliminary injunctive relief, I find that the harm pled is too remote and speculative, and fails to reach the stringent standard of "immediate irreparable harm." *Id.*

Further, § 265.01-e(2)(c) was signed into law on July 1, 2022, and came into effect on September 1, 2022. By the time the TRO was filed, Plaintiffs had been on notice for several months about the law, and the law had been in effect for a month. "While delay does not always undermine an alleged need for preliminary relief, months-long delays in seeking [injunctive relief] have repeatedly held by courts in the Second Circuit to undercut the sense of urgency." *Silent Gliss Inc. v. Silent Gliss Int'l Ltd.*, No. 22-CV-522(EK)(MMH), 2022 WL 1525484, at *8 (E.D.N.Y. May 13, 2022), *see also Hopkins Hawley LLC v. Cuomo,* No. 20-CV-10932 (PAC), 2021 WL 8200607, at *1 (S.D.N.Y. Jan. 8, 2021) (finding that a three-week delay between the announcement of a policy and Plaintiffs filing a TRO constituted "lack of immediacy".) Because temporary restraining orders are fundamentally an emergency relief mechanism, "delay in seeking the remedy suggests that the remedy is not really needed." *Minzer v. Keegan*, No. CV-97-4077 CPS, 1997 WL 34842191, at *6 (E.D.N.Y. Sept. 22, 1997). This lack of immediacy belies the notion that Plaintiffs' alleged harm is sufficiently "immediate" such that the extraordinary relief of a temporary restraining order is necessary or justified.

Lastly, Plaintiff has not justified why a TRO is the appropriate remedy in this situation. Plaintiffs have confused the requirements of the TRO pleading standard requiring "immediate and irreparable injury" to mean that simply alleging that an injury is "immediate and irreparable" is sufficient to meet this prong. It is not. An injury is only "immediate and irreparable" in the TRO context if the absence of immediate judicial intervention will cause irreparable injury that will make it difficult, if not impossible, for the court to provide effective final relief after hearing from both parties. For example, courts in this district have found that emergency TRO relief is appropriate in the context of discovery of contraband which may be destroyed as soon as notice is given, or if the adverse party has a history of destroying evidence once notified of a lawsuit. *See, Little Tor Auto Ctr.,* 822 F. Supp. at 143; *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979). Other examples where TROs might be appropriate are property disputes where one party is likely to move the property outside of the state or country, or transfer it to a third-party, making judicial ability to provide relief difficult, if not impossible. Here, Plaintiffs do not seek to "preserve an existing situation *in statu quo*" by enjoining the order. Plaintiffs do not allege that but-for immediate judicial action, irreparable harm that would cause final resolution of the case and permanent relief to be difficult or impossible. If anything, instead of asking the Court for emergency relief to preserve the status quo, Plaintiffs seek Court action to alter the status quo and enjoin a law that has already been in effect for a month. For these reasons, Plaintiff has not sufficiently pled "immediate and irreparable injury" such that a TRO is necessary.

For these reasons, it is hereby:

ORDERED that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is DENIED without prejudice.

IT IS FURTHER ORDERED that the above named defendants show cause, at Room 518, United States Courthouse, 40 Foley Square, in the City, County and State of New York, on October 28, 2022 at 10:00 a.m., or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining defendants during the pendency of this action from enforcing Penal Law 265.01-e(2)(c).

IT IS FURTHER ORDERED that to the extent that Defendants wish to file opposing papers, such papers be filed by October 14, 2022, and that Plaintiff's reply be filed by October 21, 2022.

SO ORDERED.

Dated:     September 30, 2022
           New York, New York

Vernon S. Broderick
United States District Judge