UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JIMMIE HARDAWAY, JR., et al.,

        Plaintiffs,

    v.                                Case No.: 1:22-cv-771

STEVEN A. NIGRELLI, et al.,[*]

        Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
FOR A TEMPORARY RESTRAINING ORDER**

---

[*] Superintendent Bruen has resigned, effective October 19, 2022. Under Federal Rule of Civil Procedure 25(d), his successor, Acting Superintendent Steven A. Nigrelli, is "automatically substituted as a party" with "later proceedings . . . in the substituted party's name."

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

    I.     Plaintiffs Have Standing. ..............................................................................................1

    II.    Plaintiffs Have Demonstrated A Likelihood of Success................................................3

         a.    Plaintiffs' Conduct Falls Squarely Within the Presumptive
             Protection of the Second Amendment ..................................................................3

         b.    The State Has Not Demonstrated the Place of Worship Ban is Consistent
             with the American Tradition of Firearms Regulation............................................5

    III.   Plaintiffs Have Demonstrated Irreparable Harm. ........................................................10

    IV.   The Public Interest Would Be Served By A Temporary
          Restraining Order.........................................................................................................10

CONCLUSION.......................................................................................................................10

**TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page**

*Antonyuk v. Hochul*, 1:22-cv-986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ..............4, 8, 9, 10

*Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) ........................................3

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ...............................................................1, 2

*District of Columbia v. Heller*, 554 U.S. 570 (2008)......................................................................6, 9

*Hill v. State*, 53 Ga. 472 (1874) ............................................................................................................8

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)...........................................................6, 7, 8

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)................................................................2

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*,
    519 F. App'x 714 (2d Cir. 2013) ....................................................................................................3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...................1, 4, 5, 6, 7, 8, 9

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) ........................................................................................3

*N.Y. State Citizens' Coal. for Child. v. Velez*, 2016 WL 11263164 (E.D.N.Y. Nov. 7, 2016) ........3

*Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014)..................................................................3

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ................................................................................................2

*State v. Wilforth*, 74 Mo. 528 (1881) ...................................................................................................8

*Steffel v. Thompson*, 415 U.S. 452 (1974) .........................................................................................2

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)...............................................................1, 2

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012)..................................................................3

*United States v. Price*, 2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) ........................................6

*United States v. Quiroz*, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) ......................................4

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021)..................................................................................8

**Constitution and Statutes**

42 U.S.C. § 1983..................................................................................................................................2

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 157 (Watkins, eds.)..............5

**Other Authorities**

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*,
    28 WM. & MARY BILL OF RTS. J. 459 (2019)..............................................................................9

Mark W. Smith, *Not All History is Created Equal* (Oct. 12, 2022) (working draft)
    https://bit.ly/3CMSKjw ..................................................................................................................7

Jon Swaine and Dalton Bennett, *Buffalo shooting suspect wrote of plans 5 months ago,
    messages show*, WASH. POST (May 16, 2022), https://wapo.st/3MKHsAJ .............................10

**INTRODUCTION**

The Second Amendment presumptively protects Plaintiffs' proposed course of conduct of carrying in public in their places of worship. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022). And the State has identified *zero* historical evidence from the Founding to justify the Place of Worship Ban. When *no evidence* exists at the Founding of "address[ing] a perceived societal problem" with a "flat ban," the modern ban is unconstitutional. *Id.* at 2131. With Plaintiffs' suffering ongoing, irreparable harm and the public interest being squarely in favor of upholding constitutional rights, a temporary restraining order is warranted.

**I. Plaintiffs Have Standing.**

In order to establish standing, Plaintiffs must establish a "personal stake in the outcome of the controversy" by demonstrating an injury in fact fairly traceable to the challenged conduct of Defendants that will be redressed by a favorable decision of this Court. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). Reverend Hardaway and Bishop Boyd have demonstrated that here. Their injury is S51001's immediate and actual disarmament of Plaintiffs in their respective places of worship each and every day they preach the Gospel and set foot on the premises of their churches. *See* Hardaway Decl., Doc. 9-4, ¶¶8–12 (Oct. 14, 2022); Boyd Decl., Doc. 9-5 ¶¶8–12 (Oct. 14, 2022). For purposes of standing, this Court must assume that this immediate and actual disarmament unconstitutionally infringes Plaintiffs' Second Amendment rights. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647–48 (2022). And there is no dispute this is traceable to Defendants and that this Court's issuance of a TRO and injunctive relief would redress this ongoing injury. As alleged in the Complaint, the State's enforcement officials have made abundantly clear that this law *will be enforced.* For example, now-Acting Commissioner Nigrelli stated, that state troopers "are standing ready," explaining that

1

the State Police has "zero tolerance. If you violate this law, you will be arrested. It's as simple as that." *See* Compl., Doc. 1, ¶ 39 (Oct. 13, 2022).

The State's argument boils down to the fact that Plaintiffs have not *actually* been arrested yet and have not promised to *break* the law. State's Mem. of Law in Opp'n, Doc. 28 at 8 (Oct. 19, 2022) ("State Br.") (criticizing Reverend Hardaway and Bishop Boyd for saying "they have followed the law [and] will continue to"). As the Supreme Court reaffirmed this year, such a break-the-law threshold for standing "finds no support in our standing jurisprudence." *Cruz*, 142 S. Ct. at 1648. Instead, "[w]hen an individual is subject to" "threatened enforcement of a law," then "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. Indeed, it is not even necessary for an individual to "first *expose* himself to actual arrest or prosecution to be entitled to challenge a statute that he claims *deters* the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, (1974) (emphases added); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007). Thus, in *Steffel*, the plaintiff had standing to challenge a criminal trespass statute that had caused him to *refrain* from engaging in certain handbilling activities: he "alleged . . . that . . . he had not done so because of his concern that he . . . would be arrested for violation of" the challenged law. 415 U.S. at 456. The same reasoning applies here: Plaintiffs have standing because they have refrained from carrying firearms in their churches only because of the very real prospect of arrest and prosecution should they do so, as demonstrated by Acting Commissioner Nigrelli's comments.

Because Reverend Hardaway and Bishop Boyd have standing, there is no need for this Court to address the standing of FPC and SAF.[1] *See Rumsfeld v. FAIR*, 547 U.S. 47, 53 n.2 (2006).

---

[1] FPC and SAF preserve the right to seek to overrule circuit precedent that an organization does not have standing to assert the rights of its members under 42 U.S.C. § 1983. Compl. ¶ 12.

2

But FPC and SAF both have standing. Courts in the Second Circuit have found that organizations have adequately alleged standing when they have "diverted resources from education and training," fielded phone calls to counsel members about the change in the law, and investigated and advocated on their members' behalf with respect to the law's requirements. *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013); *Olsen v. Stark Homes, Inc.,* 759 F.3d 140, 158 (2d Cir. 2014); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *N.Y. State Citizens' Coal. for Child. v. Velez*, 2016 WL 11263164, at *3–5 (E.D.N.Y. Nov. 7, 2016). FPC and SAF have alleged that here. *See* Combs Decl., Doc. 9-6, ¶¶6–10 (Oct. 14, 2022); Gottlieb Decl., Doc. 9-7 ¶¶6–10 (Oct. 14, 2022). In particular, they both have established hotlines to address concerns from their members and the public to answer questions about where individuals can lawfully carry in New York State. They would not have done so, but for the unconstitutional burden imposed on New Yorkers by S51001. The hotlines divert resources from their normal activities as they were only established to address new questions and concerns about lawful carry *after* the enactment of S51001. *See Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021).

II. **Plaintiffs Have Demonstrated A Likelihood of Success.[2]**

    a. **Plaintiffs' Conduct Falls Squarely Within the Presumptive Protection of the Second Amendment.**

---

[2] Contrary to the State's assertions, there is no heightened standard applicable to these proceedings because Plaintiffs seek a prohibitory restraining order to maintain the status quo. *See* Pls.' Mem. in Support, Doc. 9-1 at 15 (Oct. 14, 2022) ("Opening Br.") (noting the relevant status quo is before the effective date of S51001). Nevertheless, Plaintiffs meet any heightened standard because there is a substantial likelihood that the Place of Worship Ban is unconstitutional in all its applications or, at the very least S51001 lacks a plainly legitimate sweep. *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012).

Plaintiffs possessed firearms for purposes of self-defense and keeping the peace until the effective date of S51001. Plaintiffs would immediately carry again at their places of worship, but for the credible threat of arrest and prosecution. *See* Hardaway Decl. ¶8; Boyd Decl. ¶8. Plaintiffs' proposed course of conduct is presumptively protected by the *text* of the Second Amendment because the "definition of 'bear' naturally encompasses public carry." *Bruen*, 142 S. Ct. at 2134.

The State seeks to flip the burden and impose upon Plaintiffs the burden to establish that carrying in sensitive places is presumptively lawful. *See* State Br. at 10. This is directly contrary to *Bruen*. This Court need look no further than to *Bruen*'s articulation of the governing standard to see the lack of merit behind the State's arguments. In a short Part III-A, the Supreme Court conducted the textual analysis. It asked if the word "bear" "naturally encompasses public carry." *Bruen*, 142 S. Ct. at 2134–35. The Court said yes. Since the plaintiffs in *Bruen* sought to carry "outside the home," the Second Amendment presumptively protected their conduct. That was the end of the textual inquiry in *Bruen*—as it must be in this case too. *See Antonyuk v. Hochul*, 2022 WL 5239895, at *6 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*"); *United States v. Quiroz*, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022).

In Part III-B of *Bruen*, the Court then shifted to the historical analysis where it *repeatedly* stated that the *State* bears the burden of justifying its modern law within the historical tradition of firearm regulation in America. *See* 142 S. Ct. at 2135 ("the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation"); *id*. ("Only if respondents *carry that burden* can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."); *id.* at 2138; *id.* at 2150; *id.* at 2156. The Court, in discussing how a State could meet its historical burden, provided that the

4

State *could* try to justify its restrictions on public carry by pointing to longstanding, "historical regulations of sensitive places." *Id.* at 2133 (quotation marks omitted). The Court offered this as an "example" of regulations that States could point to justify analogous restrictions. *Id.* Yet, ultimately, *Bruen* (as this Court should hold here) rejected the State's arguments about sensitive places—not because of a textual inquiry—but rather because the State's "sensitive places" argument was inconsistent with "the general right to publicly carry arms for self-defense" that was established under history in "Part III-B." *Bruen*, 142 S. Ct. at 2134. In other words, the *State* did not meet its burden to show that the law at issue in *Bruen* qualified as a valid "sensitive place" restriction.

### b. The State Has Not Demonstrated the Place of Worship Ban is Consistent with the American Tradition of Firearms Regulation.

The State has failed to meet its burden for at least six reasons. First, the State has pointed to *zero* evidence at the time of the Founding. In fact, *all of the evidence* before the Court shows not a single comparable restriction to the Place of Worship Ban anywhere in what would become the United States, as of 1791. *Bruen*, 142 S. Ct. at 2150 (noting it is New York's burden to "sift the historical materials"); *id*. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."). To the contrary, at the time of the Founding, the tradition was the complete opposite—many colonies had made it a *duty* to bring firearms to places of worship. And in at least one State, Georgia, that duty remained on the books after ratification of the Constitution. *See* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 157 (Watkins, eds.). The absence of any Founding era analogues is dispositive. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the

5

challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131; *United States v. Price*, 2022 WL 6968457, at *4 (S.D. W. Va. Oct. 12, 2022).

Instead of focusing on Founding Era, the State argues that this Court should not countenance the statutes Plaintiffs have identified because the laws may have been motivated by slavery in the South. State Br. at 21. This is a meritless argument. For one, the Supreme Court, in discussing the scope of the Second Amendment in *Heller*, relied on the very same 1770 Georgia law. The Supreme Court explained that "[m]any colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and defence of this province from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'" *District of Columbia v. Heller*, 554 U.S. 570, 601 (2008). In part because of statutes like this, the Supreme Court found that "pre-Second Amendment state constitutional provisions," like the Second Amendment, "secured an individual right to bear arms for defensive purposes." *Id.* at 602. For another, it does not matter if these laws only extended to white residents of the States at the time of the Founding. One of the principal purposes of the 14th Amendment was to ensure that the full scope of fundamental rights secured by the Bill of Rights extended to all citizens, regardless of race. This included providing a constitutional basis for past legislation which, "explicitly guaranteed that 'all citizens,' black and white, would have 'the constitutional right to bear arms.'" *McDonald v. City of Chicago, Ill*., 561 U.S. 742, 773 (2010) (plurality op.); *see also id*. 561 U.S. at 846–850 (Thomas, J., concurring). Since the scope of the Second Amendment extended to arms bearing in places of worship at the time of the Founding, by virtue of the Fourteenth Amendment that guarantee has been made enforceable against the States and for all citizens of *all races*, even if neither was true in 1791.

Second, the Reconstruction Era in this case is too late for the historical inquiry and thus irrelevant.[3] As discussed in Plaintiffs' Opening Brief, the Founding era is the only appropriate time period for the historical analysis in this case. Opening Br. at 9–10. *See generally* Mark W. Smith, *Not All History is Created Equal* (Oct. 12, 2022) (working draft), https://bit.ly/3CMSKjw. This Court is bound by two lines of Supreme Court precedent, which mandate (1) that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791, and (2) that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government. The State offers no response to these binding precedents. Simply put, since "post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S. Ct at 2137 (quotation marks omitted).

Moreover, it is quite the position for the State to claim Founding laws have a discriminatory past but then to mostly rely on laws from the Reconstruction South where Southern Governments repeatedly, either de jure or de facto, sought to disarm newly freed slaves. *Bruen*, 142 S. Ct. at 2151 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted."); *McDonald*, 561 U.S. at 847 (describing "systematic efforts in the old Confederacy to disarm the more than 180,000 freedmen who had served in the Union Army"); *id.* at 779 (quotation marks omitted) ("In the years immediately following the Civil War, a law banning the possession of guns by all private citizens would have been nondiscriminatory only in

---

[3] The State points to mid-nineteenth century laws that regulated the carry of firearms generally in a footnote. State Br. at 13 n.9. These laws were discussed in *Bruen*. 142 S. Ct. at 2148 & n.23. They were understood not to bar carry in public, but instead to impose liability on individuals who were "reasonably accused of intending to injure another or breach the peace." *Id.* at 2148–49. Thus, the laws could not justify a modern ban, which "prevent[s] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 2150.

the formal sense."). One of the leading voices urging that this disarmament must stop came from, of all places, a church. *Id*. at 848 (quoting an editorial published by the African Methodist Episcopal Church).

Third, the laws from Reconstruction that the State does cite fail to demonstrate any *tradition* of firearms regulation. Instead, the State points to laws and court decisions from a mere handful of States: Texas, Georgia, Virginia, Missouri, Arkansas, and Tennessee. Not only do these laws not agree on the particulars, *Antonyuk II*, 2022 WL 5239895, at *15 (noting various exceptions to these statutes), but this is a fraction of the Union, which at the time numbered 37 States. The absence of other analogues suggests a tradition of *not* forbidding firearms in places of worship. Moreover, the Supreme Court has already explained why many of these very laws and court opinions should not be relied on. *Bruen* rejected Texas's law and Texas Supreme Court decisions as "outliers" which "provide *little insight* into how postbellum courts viewed the right to carry protected arms in public," 142 S. Ct. at 2153. Missouri's law "seemingly" allowed "*open carry*," thus providing at least one avenue for the exercise of Second Amendment rights. *Id*. at 2155 n.30; *State v. Wilforth*, 74 Mo. 528, 531 (1881). And Georgia's Supreme Court was operating under a "clearly erroneous" and "fundamental misunderstanding of the right to bear arms" by only viewing it as a militia-based right, rather than a right for individual self-defense. *Bruen*, 142 S. Ct. at 2155; *see also Young v. Hawaii*, 992 F.3d 765, 837 (9th Cir. 2021) (en banc) (O'Scannlain, J., dissenting) (explaining that decisions, including the Georgia Supreme Court's decision in *Hill v. State*, 53 Ga. 472, 475 (1874) "offer little instructive value").

Fourth, perhaps recognizing that there are almost no direct analogues that could conceivably justify its Ban, the State is forced to look elsewhere. The State points to restrictions in Arizona Territory in 1889 and Oklahoma Territory in 1890. Here too, the Supreme Court has

8

spoken on statutes from these same territories: "we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence." *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 632)). Here, the contemporaneous historical evidence from the Founding demonstrates the scope of the Second Amendment extended to places of worship.

Fifth, relying only on a law review article, the State contends that "a recognized purpose of sensitive places . . . is to promote the exercise of other fundamental rights." State Br. at 14. But this law review article again *cites nothing* from the Founding with respect to places of worship, except some of the very statutes that Plaintiffs rely on. *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL OF RTS. J. 459, 468 (2019). In any event, the Supreme Court has instructed that the State must demonstrate both *how* the historical regulations they rely on burdened the right to bear arms and *why* they did so. *Bruen*, 142 S. Ct. at 2133. The State has not identified any tradition of a complete ban on place of worship, except in outlier states, thus their historical regulations fail the *how* metric, i.e., no tradition that "impose[s] a comparable burden" as the Place of Worship Ban. *Id.* And, as even their own citation concedes, the tradition at the Founding included imposing a duty to carry in church because of a society beset by violence. Miller, *supra*, at 468 (noting "hostile indigenous people or . . . periods of war"). Thus, the *why* metric is in Plaintiffs' favor too: the tradition at the Founding to protect people at places of worship from violence in their society was to impose a *duty* to carry at church. *Heller*, 554 U.S. at 601.

Sixth, and alternatively, if any credence is given the handful of state regulations from Reconstruction and beyond (it should not), then these historical statutes mostly provide a tradition of exceptions "for those persons who have been tasked with the duty to keep the peace at the place

9

of worship or religious observation." *Antonyuk II*, 2022 WL 5239895 at *16. As Plaintiffs have stated in their declarations and the complaint, they intend to carry to keep the peace in their churches. Hardaway Decl. ¶8; Boyd Decl. ¶8.

### III. Plaintiffs Have Demonstrated Irreparable Harm.

Plaintiffs have demonstrated irreparable harm because S51001 deprives them of their constitutional right to bear arms in public for self-defense. Opening Br. at 14–16. Contrary to the State's assertions, this irreparable harm is both immediate and hardly speculative. The Court need only consider that the murderer who killed 10 people in a supermarket in Buffalo in May of *this year*, also "mused about other areas he might attack such as majority-Black churches or schools." Jon Swaine and Dalton Bennett, *Buffalo shooting suspect wrote of plans 5 months ago, messages show*, WASH. POST (May 16, 2022), https://wapo.st/3MKHsAJ. This is in addition to the documented horrors inflicted upon churches across this country. *See* Compl. ¶¶34, 36. Every day that Plaintiffs are unable to protect themselves and their congregations is another day where S51001 has stripped them of a fighting chance if violent circumstances were to arise. Hardaway Decl. ¶12; Boyd Decl. ¶12. That is as irreparable as it gets.

### IV. The Public Interest Would Be Served By A Temporary Restraining Order.

The State's claims of harm to public safety ring hollow as Plaintiffs have been consistently carrying in their churches prior to September 1, 2022 with none of the State's claimed-of harms occurring. As more fully stated in Plaintiffs' Opening Brief, the public interest favors the issuance of a temporary restraining order. *See* Opening Br. at 16.

### CONCLUSION

For the foregoing reasons, the Court should temporarily restrain Defendants from enforcing the Place of Worship Ban.

Respectfully submitted, this 20th day of October 2022.

| | |
|---|---|
| David H. Thompson* | /s/ Nicolas J Rotsko |
| Peter A. Patterson* | Nicolas J. Rotsko |
| John W. Tienken* | PHILLIPS LYTLE LLP |
| COOPER & KIRK, PLLC | One Canalside |
| 1523 New Hampshire Avenue, N.W. | 125 Main Street |
| Washington, D.C. 20036 | Buffalo, NY 14203-2887 |
| (202) 220-9600 | (716) 847-5467 |
| (202) 220-9601 (fax) | (716) 852-6100 (fax) |
| dthompson@cooperkirk.com | NRotsko@phillipslytle.com |
| ppatterson@cooperkirk.com | |
| jtienken@cooperkirk.com | |

*Appearing *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Clerk of the District Court using its CM/ECF system on this 20th day of October 2022.

<u>/s/ Nicolas J. Rotsko</u><br>
Nicolas J. Rotsko