```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


JIMMIE HARDAWAY, JR.,                      Docket Number:
LARRY A. BOYD,                          1-22-cv-00771-JLS
FIREARMS POLICY COALITION,
INC.,
SECOND AMENDMENT FOUNDATION,*
                             *
Plaintiffs,                  *
                             *
                             *          Buffalo, New York
              v.             *          October 20, 2022
                             *
                             *          1:31 p.m.
                             *
STEVEN A. NIGRELLI,                     ORAL ARGUMENT
In his official capacity as
Superintendent of the New
York State Police,
BRIAN D. SEAMAN,
In his official capacity as
District Attorney for the
County of Niagara, New York,
JOHN J. FLYNN,
In his official capacity as
District Attorney for the
County of Erie, New York.    *
                             *
Defendants.                  *
                             *
* * * * * * * * * * * * * * * *
```

```
                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JOHN L. SINATRA, JR.
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:              PHILLIPS LYTLE LLP,
                                 By NICHOLAS J. ROTSKO, ESQ.,
                                    SAMUEL M. WILLIAMS, ESQ.,
                                 One Canalside,
                                 125 Main Street,
                                 Buffalo, New York  14203-2887
```

```
 1   For the Defendant Nigrelli:        NEW YORK STATE ATTORNEY
                                        GENERAL'S OFFICE,
 2                                      By RYAN LANE BELKA, ESQ.,
                                        Main Place Tower,
 3                                      Suite 300A,
                                        350 Main Street,
 4                                      Buffalo, New York  14202.

 5   For the Defendant Seaman:          GIBSON McASKILL & CROSBY, LLP.,
                                        By BRIAN P. CROSBY, ESQ.,
 6                                        MELISSA M. MORTON, ESQ.,
                                        69 Delaware Avenue
 7                                      Suite 900,
                                        Buffalo, New York  14202.

 8
     For the Defendant Flynn:           COUNTY OF ERIE,
 9                                      DEPARTMENT OF LAW,
                                        By KENNETH R. KIRBY, ESQ.,
10                                      95 Franklin Street,
                                        Suite 1634,
11                                      Buffalo, New York  14202.

12
     The Courtroom Deputy:       KIRSTIE L. HENRY
13

14   Court Reporter:                    BONNIE S. WEBER,
                                        Notary Public,
15                                      Robert H. Jackson Courthouse,
                                        2 Niagara Square,
16                                      Buffalo, New York  14202,
                                        Bonnie_Weber@nywd.uscourts.gov.
17

18         Proceedings recorded by mechanical stenography,
                 transcript produced by computer.
19

20

21             (Proceedings commenced at 1:31 p.m.)

22

23         THE CLERK:  All rise.

24         The United States District Court for the Western

25   District of New York is now in session.  The Honorable John
```

 1  Sinatra presiding.

 2          **THE COURT:**  Please be seated.

 3          **THE CLERK:**  The Court advises parties and listeners

 4  that they are strictly prohibited from recording these

 5  proceedings in whole or in part by any device.

 6          Court calls a Hardaway and others versus Bruen and

 7  others.  Case number 22-CV-771.  This is the date set for oral

 8  argument.

 9          Counsel for the plaintiffs, please state your

10  appearances for the record.

11          **MR. ROTSKO:**  Nicholas J. Rotsko and Samuel M.

12  Williams of Phillips Lytle for plaintiffs Hardaway and others.

13          **THE CLERK:**  Counsel for the defendants, please state

14  your appearances for the record.

15          **MR. BELKA:**  Brian Belka, Office of the Attorney

16  General on behalf of Kevin P. Bruen.

17          **MR. KIRBY:**  Kenneth R. Kirby, Assistant Erie County

18  Attorney for defendant John J. Flynn, in his official capacity

19  as district attorney for the County of Erie, New York.

20          **MR. CROSBY:**  Brian Crosby from Gibson, McAskill and

21  Crosby, on behalf of Brian Seaman, the -- in his official

22  capacity as the Niagara County District Attorney.

23          **MS. MORTON:**  Good afternoon, Your Honor.  Melissa

24  Morton, also from Gibson, McAskill and Crosby on behalf of Brian

25  D. Seaman in his official capacity as District Attorney for

1   Niagara County.

2          **THE COURT:**  Okay.  Good afternoon, everyone.  We're

3   here today on plaintiff's TRO application.

4          Do we have any preliminary issues that we should deal

5   with right away?

6          **MR. BELKA:**  No.

7          **THE COURT:**  No?  I have one.  Does anyone have an

8   objection with me amending the caption to put Nigrelli on the

9   caption as the defendant now, instead of Bruen, given the

10  transition?

11         **MR. BELKA:**  No objection for the defendants, Your

12  Honor.

13         **MR. KIRBY:**  No objection.

14         **THE COURT:**  Anyone else?

15         **MR. ROTSKO:**  No objection.

16         **THE COURT:**  Okay.  We'll do that.

17         I've spent a good deal of time studying the papers and

18  the relevant case law and I've had the benefit of the State's

19  filing in Goldstein from last Friday in the Southern District,

20  so I've had the ability to preview some of the arguments that

21  the State eventually made in this case.

22         So I'm kind of familiar and comfortable with the

23  issues and don't need to hear anyone summarize anything that

24  they have put in their papers, but I do want to have some of my

25  questions discussed here today, so that's going to be how we

1   proceed.

2          If we leave something out and you need to interject,

3   feel free.  And for the district attorney defendants, I'm not --

4   given those submissions, and what they said, I'm not really

5   going to be looking to you all that much, but if you need to

6   chime in, feel free, okay?

7          All right.  Let's talk about the standing issue first.

8          Mr. Belka, why don't the plaintiffs have standing?

9          **MR. BELKA:**  Your Honor, the plaintiffs don't have

10  standing -- in part, the organizational plaintiffs do not have

11  standing because any action that they've taken as a result of

12  the CCIA is just an extension of the kinds of activities that

13  they do in the regular course of their business.

14         Both of the organizational defendants operate hotlines

15  and other member services to educate people about firearms,

16  policy and law.

17         The passage of the CCIA is no different.  Whether it

18  was Constitutional or un-Constitutional, does not result in an

19  injury, in fact, to those organizational defendants (sic).

20         Additionally, the individual plaintiffs have

21  volunteered that they will comply with the law.  They indicate

22  no -- they indicate no desire to violate the CCIA, therefore

23  there is no potentiality of enforcement of the CCIA, as it

24  relates to them individually.

25         I would also note that their desire to bring a

Hardaway, et al v Nigrelli, et al - Proceedings - 10/20/22   6

 1   concealed weapon into a church is allowable in certain
 2   circumstances under the CCIA.
 3          As outlined in our papers, certain peace officers and
 4   other security guards can provide the security that they
 5   require.
 6          Again, it's an argument that they have no injury in
 7   fact, Your Honor.
 8          **THE COURT:**  Okay.
 9          Mr. Rotsko, how do you respond to that?
10          **MR. ROTSKO:**  First of all, with respect to the
11   institutional plaintiffs, this is the only state where the
12   plaintiffs have needed to set up a hotline and to divert
13   resources to responding to a plethora of questions from New York
14   State citizens and others passing through the State, given the
15   sweeping scope and the breadth of the CCIA, it was necessary to
16   set up a hotline.
17          So they are diverting resources away from their other
18   core activities to -- to respond to the CCIA.  And under Second
19   Circuit precedent, that is sufficient to establish
20   organizational standing for these entities.
21          However, for the TRO, it -- the -- it's not really
22   even necessary for the two institutional entities to have
23   standing, because the pastors clearly do.
24          The pastors have been disarmed in their houses of
25   worship.  They have been stripped of their ability to defend

1    themselves and their congregations and they suffer diminished

2    safety because of the ban on carrying firearms in places of

3    worship.

4            The State Police has made it clear that the CCIA is

5    going to be enforced.  There is no waffling on the part of the

6    State Police.

7            And many cases cited in our brief reject the State's

8    proposed break the law standard.  Our clients don't need to go

9    out and break the law in order to have standing.

10            They have been disarmed in their places of worship.

11    Their places of worship are in violent locations.  Churches

12    suffer from threats of violence.

13            So that that injury is sufficient to establish

14    standing for the pastors and that's what we need in terms of a

15    standing for the TRO, Your Honor.

16            **THE COURT:**  As to the two pastors, Mr. Belka, aren't

17    the -- isn't the fact that the statute is new, nobody is talking

18    about repealing it.

19            And the fact that the Governor and the head of the

20    State Police is on record, saying:  We're going to arrest you if

21    you violate the statute, isn't that enough?

22            **MR. BELKA:**  It's not enough, Your Honor.  The

23    plaintiffs have indicated that they would comply with the

24    statute.

25            There is no indication of future enforcement, as it

1    relates to these plaintiffs individually.  In fact, the

2    submissions by the District Attorneys indicate as much.

3         There has been absolutely no potentiality of

4    enforcement.  Both the DAs said that they have not received

5    information related to enforcing the statute related to this

6    plaintiff or anyone else.

7         **THE COURT:**  They don't have to go out and get arrested

8    to have standing, though, do they?

9         **MR. BELKA:**  They do not.  But they do need to indicate

10   that they would violate the statute being un-Constitutional and

11   they expressly do not do that.

12        **THE COURT:**  All right.  Let's move on from standing.

13        Does the Second Amendment right -- does the Second

14   Amendment right presumptively cover the two individual

15   plaintiffs?  The pastors here?

16        Mr. Rotsko first.

17        **MR. ROTSKO:**  Yes, Your Honor.  It clearly does.  The

18   Second Amendment protects the right of the people to keep and

19   bear arms in public, outside the home.

20        The pastors are part of the people.  The firearms they

21   carried -- they carried to church prior to the ban are arms and

22   the churches are outside the home, so it definitely fits within

23   the language of the Constitution.

24        **THE COURT:**  The right as to carry outside the home in

25   public, does that encompass places of worship?

1          **MR. ROTSKO:**  It does, Your Honor.

2          **THE COURT:**  Mr. Belka, how do you respond to that?

3          **MR. BELKA:**  Your Honor, I think you have hit on the

4     point that we made in our brief, which is that there needs to be

5     a showing by the plaintiff that the Second Amendment text

6     extends to places of worship.

7          As Bruen noted or as we argued, Bruen does not

8     separate the world into home and other places.  It expressly

9     limits public carry in sensitive locations.

10          And when sensitive locations are at issue, plaintiffs

11     are required to make a showing, based on text, history and

12     tradition, that there has been an ability to carry in sensitive

13     locations; in this case, a place of worship.

14          So as it relates to your question, does the Second

15     Amendment apply to the individuals?  Yes.

16          Does it apply to their ability to carry at their place

17     of worship?  Plaintiffs have not made that showing.

18          **THE COURT:**  Anything -- anything else on that initial

19     showing concept, Mr. Rotsko?

20          **MR. ROTSKO:**  Sure.  The historical record is replete

21     with an absence of regulation barring carrying of firearms in

22     churches.

23          We submit a statute showing that firearms were

24     required to be brought to churches, up through the time of the

25     founding.

1      It's clear that prior to the CCIA, citizens could

2  carry firearms in church.  And what the State is attempting to

3  do is shift the burden over on to plaintiffs, whereas -- you

4  know, that's unnecessary because the plain text of the Amendment

5  encompasses carry in church.

6      And it's the State's burden to demonstrate the

7  historical tradition.

8      **THE COURT:**  Isn't that enough, Mr. Belka, that the

9  case law interpreting the Second Amendment has said that there

10  is a right in your home.  There is also a right in public.

11      Haven't we covered everywhere at that point?

12      **MR. BELKA:**  We haven't, Your Honor.  Then if that's

13  the case, then Bruen would not have made -- they codified the

14  sensitive locations.

15      **THE COURT:**  Well, that's a separate question.  We're

16  talking about the threshold question now.

17      **MR. BELKA:**  Correct, Your Honor.  But I believe that

18  that is part of the threshold question.

19      Plaintiffs advance an essentially strict liability

20  standard, that as long as they come in and claim some type of

21  Constitutional violation, it requires the Government to go on a

22  historical scavenger hunt.

23      I don't believe that that is anything that is

24  contemplated in Bruen.  I believe that there is an initial

25  showing required by the plaintiffs --

```
 1              THE COURT:  Okay.
 2              MR. BELKA:  -- to demonstrate that the Second
 3   Amendment extends to these sensitive locations.
 4              THE COURT:  All right.  Whether it is presumptively
 5   covering the plaintiffs, there is a page and a half or two and a
 6   half pages from Bruen on that topic, so I don't think I need
 7   anything more.
 8              Let's talk about the next step.  Is the State meeting
 9   its burden, assuming the State needs to meet its burden?
10              And the first part of it is talking about analogies to
11   courthouses, legislative assemblies and poling places.
12              In the State's brief, Mr. Belka, you wrote something
13   along the lines of that insofar as restricting firearms in
14   places like legislative assemblies or poling places aims to
15   minimize the chance of violence between those with opposing
16   views, the place of worship provision additionally serves an
17   analogous function.
18              What do you mean by that?
19              MR. BELKA:  What I mean by that, Your Honor, is that
20   sensitive locations often are areas in which Constitutional
21   rights are enacted.
22              We're here right now, in a place that has generally
23   been considered a sensitive location and you cannot bring a
24   firearm into it.
25              The Constitutional right to access the courts comes
```

1    into conflict with public carriage in some of these sensitive

2    locations.

3           And that is at its -- is absolutely true in places of

4    worship, where -- I should just back up very briefly, we're here

5    on a facial challenge where the plaintiffs must demonstrate that

6    the current regulation is un-Constitutional in every aspect.

7           So with respect to Mrs. Boyd and Mr. Hardaway, the

8    question for the Court is:  In a situation where all the

9    parishioners in a place of worship do not want firearms, can

10   somebody legally go into that place of worship and carry their

11   firearm without the enforcement of the CCIA?

12          It is that kind of standard that we're looking at.

13          **THE COURT:**  So one parishioner has the veto right over

14   everybody else in a congregation?

15          **MR. BELKA:**  I'm saying that in sensitive locations,

16   Constitutional rights come into conflict and certain individuals

17   in their place of worship could feel that their exercise of

18   religion is being infringed on by somebody else's public

19   carriage right.

20          Those sensitive locations throughout history have

21   defaulted -- defaulted, as we demonstrate in our papers, have

22   often restricted firearms in those locations, so those

23   institutions can serve those public policy purposes.

24          **THE COURT:**  New York hasn't had a restriction like

25   that on its books since the beginning.

1          So from the beginning of time, we've had to worry

2    about people carrying legally in the pew next to me, right?

3          **MR. BELKA:**  From the beginning of time, the person

4    wasn't carrying legally in New York, because the Sullivan law

5    hasn't had an extraordinarily restrictive view on concealed

6    carry and --

7          **THE COURT:**  Which is not Constitutional, right?

8          So we're relying on the un-Constitutional part of that

9    statute.

10          **MR. BELKA:**  Well, I disagree with that.  The

11    requirement that whether -- whether it was this requirement or

12    others that depressed the number of concealed carry permits in

13    New York.

14          The additional probable cause -- the additional cause

15    standard that was required was found un-Constitutional, but the

16    rest of the licensing statute, which is rigorous, was upheld.

17          **THE COURT:**  The number of people who have permits to

18    carry concealed in the State, whether it's one person or eight

19    million people, doesn't affect whether the carry rights are

20    Constitutional or not, does it?

21          In other words, the Constitution doesn't change

22    because more people can now carry concealed, does it?

23          **MR. BELKA:**  It does not, Your Honor.  However, in

24    these sensitive locations where other Constitutional rights,

25    such as access to the courts, voting, religion, your right to

1    worship exactly how you please, those issues do come in conflict

2    in these sensitive locations.

3           And historically, it has been demonstrated that the

4    way governments have handled that, all the way going back to the

5    dates we're going to talk about, are to restrict firearms in

6    those sensitive locations.

7           **THE COURT:**  So talk, Mr. Rotsko, about the sensitive

8    locations now:  Legislative assemblies, courthouses, poling

9    places.

10          Heller talks about schools, too, but Bruen doesn't

11   seem to want to pick that up.

12          **MR. ROTSKO:**  Correct.

13          **THE COURT:**  What's going on there and why is there a

14   failure of analogy?

15          **MR. ROTSKO:**  Well, first of all, yes, churches are not

16   sensitive locations -- sensitive places.

17          I'll get to the analogies in just a moment -- the

18   specific analogies, but first I would just point out that before

19   we even need to start determining whether a church is like the

20   poling place, the legislative assembly or the court, we had to

21   check to see if the church is a new sensitive location.

22          The language in Bruen says:  You get into that

23   historical analogizing if you are -- if the Court is confronted

24   with a new sensitive location that didn't exist at the time of

25   the founding.

1          Churches have been around for a long time.  Churches

2    were here at the time of founding.  Gun violence was present at

3    the time of the founding.

4          There is no evidence that the founders -- any state

5    legislature at the time tried to make churches a gun free zone

6    in order to deal with gun violence, so we don't even need to go

7    on to the analogies.

8          **THE COURT:**  And perhaps -- and perhaps you can stop

9    there, but isn't it safer for us to keep talking?

10         **MR. ROTSKO:**  Sure.  Absolutely.

11         **THE COURT:**  Okay.  I understand the argument you are

12   making.

13         **MR. ROTSKO:**  Okay.

14         **THE COURT:**  I know where it comes from, but I do need

15   to know about whether there is a good analogy or not.  I know

16   you are getting there.

17         Go ahead.

18         **MR. ROTSKO:**  Yes, Your Honor.  So churches are not

19   similar to legislative assemblies, poling places or courts.

20         In legislative assemblies and in courts, the

21   Government is providing the self defense.  Basically, stepping

22   in and providing -- those are secure locations where the

23   Government is providing the security.

24         Churches do not have that -- that benefit.  Poling

25   places are in operation once every two to four years, for a

1   limited duration; just during the course of election day.

2           Churches meet every Sunday.  So the how and why

3   that -- that positions poling places, legislative assemblies and

4   courts as sensitive places at the time of the founding, the how

5   and why is it not present for churches.

6           Let me just see if I have another comment on that.

7   The other -- the other unique future of the poling places,

8   legislative assemblies and courts is -- well, particularly the

9   poling places and legislative assemblies, this is where you have

10  a lot of emotional discrepancy, perhaps, between citizens and/or

11  their representatives arguing passions and it makes sense to

12  keep firearms out of that circumstance.

13          Church is generally a place where people tend to get

14  along.

15          **THE COURT:**  Mr. Belka, does it matter that poling

16  places, courthouses and legislative assemblies are places where

17  the core functions of our democracy are being exercised?

18          **MR. BELKA:**  I think that that's part of it.  I think

19  that that's part of it -- the Constitutional rights that are

20  being enacted there.

21          But I think that the Constitutional rights that are

22  being enacted are the core function of it.  Not the access to

23  democracy functions.

24          **THE COURT:**  So because people are exercising their

25  First Amendment rights at the place of worship, then you cannot

1    exercise their Second Amendment rights there at the same time?

2         MR. BELKA:  I'm saying it could interfere.

3         THE COURT:  Well, what --

4         MR. BELKA:  I'm saying that that's one reason why we

5    don't allow a bunch of guns around a voting place, because

6    people can be intimidated because there is other things that

7    guns do other than cause violence.

8         If there was a gun in this room, it would raise the

9    temperature quite significantly.

10        THE COURT:  What if we're -- what if there is a rally

11   on the steps of City Hall?  That's a First Amendment protected

12   activity, isn't it?

13        If people are --

14        MR. BELKA:  Assemblage, that's right.

15        THE COURT:  So you can't have your Second Amendment

16   rights there at the same time?

17        MR. BELKA:  I think that it can -- I think that in

18   certain circumstances, it can be limited by the Government.

19        THE COURT:  Okay.  Anything more on the sensitive

20   places issue, Counsel?  No?

21        All right.  Let's talk about the next piece of the

22   analysis, is whether there is an American tradition in support

23   of this place of worship exclusion.

24        Tell me about your argument, Mr. Belka, and the

25   enactments that are cited in your papers.

1          **MR. BELKA:**  Your Honor, we cited to -- as you know, we

2    employed a historian to go through and have an expert comb the

3    historical record for us.

4          I think that it is required.  I think that with due

5    respect to everyone in the room, including myself, that lawyers

6    and judges pontificating about history and exactly what everyone

7    was thinking in 1791 is a dangerous way to go about things.

8          And I think that expert historians are well suited for

9    that type of analysis.  Our historian found six state statutes

10   that restricted carriage in places of worship; four municipal

11   statues that restricted carriage in places of worship.

12         And that there were eight states that had general

13   prohibitions on carriage and therefore did not require a

14   specific place of worship carriage provision.

15         And six municipal statutes that, again, would not

16   require any sort of specific place of worship statute because

17   that would be encompassed by the general prohibition.

18         In addition, there is high court commentary

19   identifying at least seven states that had public carriage

20   restrictions in place of worship.

21         Those identified as Andrews v. State, English v. State

22   and Hill v. State and State v. Reendo (phonetic).

23         These -- the high court commentary was not that

24   carriage restrictions in places of worship were outliers, but,

25   in fact, scoffed at the idea that anyone would need to bring a

1  gun into a place of worship.

2        History is hard.  Some of it is lost along the way and

3  the things we can find indicate that public carriage

4  restrictions in places of worship were not only common, but were

5  not uncommon.

6        And plaintiff has made no showing other than a couple

7  of statutes that predate the -- I believe that they predate the

8  Second Amendment -- no.  I'm sorry.  That's a totally separate

9  argument.

10       They have not made any showing of courts -- high court

11 commentary or other statutes saying that there should be guns in

12 churches.

13       Other than the few compulsory statutes that they cite

14 and our expert has made some commentary on what kinds of

15 statutes those were.

16       **THE COURT:**  The Texas statute, the Missouri statute,

17 the Virginia statute, the Georgia statute and then there is two

18 territories, Oklahoma and Arizona at the time.

19       How long were each of those enactments on the books?

20       **MR. BELKA:**  I have no idea, Your Honor.

21       **THE COURT:**  Doesn't that matter?  Doesn't it matter --

22       **MR. BELKA:**  Perhaps.

23       **THE COURT:**  -- if we are looking for a tradition,

24 doesn't it matter we aren't talking about enactments that may

25 have been a flash in the pan?

 1          **MR. BELKA:**  Your Honor, I think that when we get into

 2    how long and how many -- I realize that I just recited those

 3    things -- I think that we are into a, you know, how many scoops

 4    to make a sundae kind of argument.

 5          And I think what the Court needs to look at here is

 6    whether or not what you are looking at looks like dessert, okay?

 7          You have a whole bunch of statutes that have been

 8    cited.  It's a clear American tradition that exists; there is

 9    proof in front of the Court on it.

10          There is no proof on the other side that that is not

11    the case.  There is no expert on the other side saying that

12    these are not the way things were.

13          I find it hard to believe that the balance of the

14    evidence is on the other side in this case.

15          **THE COURT:**  Mr. Rotsko, what about those laws?

16          **MR. ROTSKO:**  Well, Your Honor, the Tennessee law was

17    on the books for less than a year; the Georgia law was on the

18    books for eight years.

19          The Georgia Supreme Court upheld that Georgia law and

20    the Supreme Court in Bruen said that the Georgia Supreme Court

21    was -- was applying a clearly erroneous understanding of the

22    Second Amendment when the Georgia Supreme Court upheld that law.

23          These -- these laws that are identified by the State's

24    esteemed professor are a mere experiment in state law, scattered

25    around the country.

1          They come nowhere near establishing a tradition at the

2    founding, that guns or churches were gun free zones.

3          They suffer a variety of infirmities, the Bruen court

4    has pointed out and rejected.  And they just -- there is no way

5    that can constitute a tradition.

6          Six state laws that lasted just a short period of

7    time, a couple territories, handful of municipalities and those

8    municipalities, those ordinances banned guns everywhere in town.

9    That's clearly violative of the Second Amendment.

10          So they're using un-Constitutional laws to try to

11   justify another un-Constitutional law.

12          Bruen makes clear that if subsequent tradition departs

13   from the text -- what the text of the Second Amendment says,

14   then the text controls.  That's what I have to say about the

15   professor's work.

16          With respect to the date of these statutes, none of

17   them are from anywhere near the founding.

18          The Supreme Court has made clear that the scope of the

19   Second Amendment is what it was in 1791.  That's what Heller

20   says, as you know.

21          And McDonald came along and said that when that --

22   that right is incorporated against the states, it's the very

23   same scope that it has against the states that it has against

24   the Federal Government.

25          They need to find some evidence that churches were gun

1   free zones in 1791.  Not only did they not find a single piece

2   of evidence to that effect, but they certainly didn't identify a

3   tradition.

4          **THE COURT:**  But the Court spent a lot of time, a lot

5   of pages on history, during the Civil War -- before, during and

6   after the Civil War.

7          That has to be relevant in some way, doesn't it?

8          Why is the Court spending so much time on that

9   history, if it's not relevant?

10          **MR. ROTSKO:**  The way -- the way Bruen discusses that

11   history, my understanding is that it is -- it helps to confirm

12   what -- what the scope of the Second Amendment was at the time

13   of the founding.

14          **THE COURT:**  If the -- Mr. Belka, if the 14th Amendment

15   is going to be looked at post enactment, with laws that came on

16   the books maybe 20 years after the ratification of the 14th

17   Amendment -- if that's going to set up one outcome, how can that

18   outcome be different from an outcome that would be set up by

19   looking at 1791 era enactments and laws and understandings that

20   would then govern Congress?

21          Can you have a Second Amendment outcome be different,

22   applicable to Congress and then applicable to the states?

23   Different tests, different outcomes?

24          **MR. BELKA:**  I believe that that's McDonald, Your

25   Honor.  That there isn't.  That it is applied the same to the

 1  Federal Government.

 2        **THE COURT:**  I think that's right.

 3        So how did to we look at reconstruction era statutes

 4  then and have that maybe affect what happened in 1791?

 5        **MR. BELKA:**  Well, the Court expressly -- sorry, the

 6  Court in Bruen expressly does not decide between 1791 and 1868.

 7        **THE COURT:**  But all of your statutes are

 8  reconstruction era statutes, aren't they?

 9        **MR. BELKA:**  Yeah.  Because finding historical statutes

10  is hard.  Stuff gets lost along the way and the things -- I

11  think that it is instructive that anything you find points

12  towards the outcome that restrictions in churches are allowable.

13        **THE COURT:**  Except for the colonial era laws that say

14  you must bring your sidearm to worship.

15        What about that?

16        **MR. BELKA:**  I mean, when they have three -- I guess,

17  we're comparing numbers -- we're, like, three versus six.

18        I mean -- look, I think that the idea of -- the idea

19  that if you didn't cross the Mississippi in 1791, that you can

20  never cross it ever again, I do find a little bit goofy, okay?

21        But if part of the analysis is what the historical

22  tradition is, I think that being able to have an expert put

23  together a certain amount of western history and put it all

24  together, number one, it's the history that we found.  Number

25  two, that means there could be other stuff out there.

 1          But in the absence of other evidence indicating that

 2    that was not the case, I think that it's relatively persuasive

 3    in this context.

 4          **THE COURT:**  Okay.

 5          Mr. Rotsko --

 6          **MR. ROTSKO:**  I would reiterate that churches are not

 7    new.  Gun violence is not new.  They both existed at the

 8    founding.

 9          There is no evidence that any state legislature or

10    Congress tried to make churches gun free zones to deal with gun

11    violence during the founding era.

12          **THE COURT:**  What we're looking at here, isn't it, is

13    whether the right that was enacted or codified in 1791

14    encompassed the right to carry in places of worship, aren't we?

15          Aren't we trying to figure out whether that's the

16    case?  Isn't that the whole purpose of the analysis?

17          **MR. ROTSKO:**  Yes, Your Honor.

18          **MR. BELKA:**  I agree, Your Honor.

19          **THE COURT:**  So shouldn't we be focused more on what

20    the understanding of the right was around 1791?

21          **MR. ROTSKO:**  Yes, Your Honor.

22          **THE COURT:**  Aren't we -- I'm not saying we need to

23    ignore entirely what happened in 1860 -- '70, '72, 1890, but

24    here is the thing, in 1905, the Sullivan law was enacted.

25          And it was on the books for 117 years and the Court

1   wasn't persuaded that that was long enough either.

2           **MR. BELKA:**  I'm sorry, the Court wasn't --

3           **THE COURT:**  The Court in Bruen was not persuaded that

4   117 years worth of New York Sullivan law was enough to establish

5   a tradition there.

6           **MR. BELKA:**  Well, the Government is going to have a

7   pretty tough time, if 107 years of a tradition isn't enough.

8           **THE COURT:**  Tell me about irreparable harm.

9           **MR. ROTSKO:**  Your Honor, the pastors are suffering

10  irreparable harm because their places of worship are less safe

11  now than when the statute -- they are less safe now, because of

12  the statute.

13          There is diminished security of the pastors and their

14  congregations.  The Tops shooter in Buffalo, in May, he

15  committed the atrocity on Saturday.

16          His plan was to go to a majority black church the next

17  day, according to the Washington Post research into his private

18  messages.

19          There was a mass shooting at an African American

20  church in Charleston.  This raises the risk level that these

21  pastors perceive.

22          And it's not an illusion.  It's a reality.  They can't

23  protect themselves or their congregants because of this law.

24          The State doesn't even attempt to argue that the place

25  of worship ban will in any way mitigate the risk of violence in

1    the churches from mass shooters or otherwise.

2          The ban makes the churches essentially sitting ducks.

3    It takes a soft target and makes it even softer.  The TRO will

4    at least give the churches a fighting chance to defend

5    themselves in the event that -- of a violent threat.

6          That happened in a church in Texas.  It happened

7    recently in an Indiana mall.  The churches face irreparable

8    injury.

9          **THE COURT:**  Your clients can hire security, can't

10   they?

11         That's what Mr. Belka argues or -- I don't know --

12   deputize some of their congregants, maybe, something like that.

13         **MR. ROTSKO:**  Well, I think under the CCIA, the church

14   could not simply pass a resolution designating two or three

15   congregants and/or the pastor as those with a duty to keep the

16   peace in church, because they wouldn't be -- they wouldn't meet

17   the exception to the statute, just by the virtue of being

18   designated by the church.

19         You know, to the security guard point, the Second

20   Amendment doesn't say that you have the right to keep and bear

21   arms if you -- if you can afford security guards or if you can't

22   afford security guards.

23         It doesn't require you to first go and exhaust your

24   ability to go find security guards.  That's what we would say on

25   that.

1           **THE COURT:**  Mr. Belka, irreparable harm.  Tell me why

2   there isn't any here, sufficient for a TRO.

3           **MR. BELKA:**  Your Honor, the issue is irreparable harm.

4   Again, it is -- there are exceptions under the statute by which

5   places of worship can implement armed security equivalent to

6   individuals who are exercising their right for private carriage.

7           In addition, I'll note that this exact issue was

8   before Judge Broderick in the Goldstein matter.  He found that

9   the plaintiffs making similar accusations, although Jewish

10  houses of worship, versus historically black houses of worship,

11  that those claimed irreparable harms were far too speculative

12  and remote.

13          It is what we've argued in this case as well, that

14  there is no irreparable harm for those reasons.

15          **THE COURT:**  So if I carried into a house of worship

16  every day and all of a sudden, I can't carry anymore and then

17  after that something happens and I can't pull out my sidearm,

18  isn't that irreparable harm?

19          **MR. BELKA:**  Your Honor, I believe that irreparable

20  harm -- again, under this statute, you would be protected by

21  the -- by the ability to have armed security guards and have the

22  same kind of security that you would be able to provide for

23  yourself.

24          **THE COURT:**  Okay.  Let's talk about -- let's talk

25  about the public interest.

1          Why, Mr. Rotsko, is a temporary restraining order in

2    the public interest?

3          **MR. ROTSKO:**  Your Honor, the State's alleged concern

4    is accidental shootings in church and violent arguments arising

5    between the congregants, those are unpersuasive.

6          Our plaintiffs have carried in church for years.  None

7    of those instances have ever happened.

8          The -- it's emphatically within the public interest

9    that the Constitutional rights of our citizens are protected,

10   Your Honor.

11         **THE COURT:**  In their papers, Mr. Belka, plaintiff made

12   an argument about gun violence specifically against churches

13   covered in the news recently bearing on the public interest

14   issue.

15         How does the State respond to that?

16         **MR. BELKA:**  Your Honor, the Government's position on

17   public safety is that it would be advanced by enacting a place

18   of worship restriction.

19         Certainly, that's the policy choice that's been made

20   and there is significant evidence to back those kinds of policy

21   choices up.

22         Again, it's also within the public interest that these

23   institutions be allowed to function as Constitutional enacting

24   bodies, right?

25         That the individuals at the places of worship be able

1    to worship in peace, without the threat of gun violence.

2         I understand the argument on the other side, but, you

3    know, it's like lawyers, you get one lawyer and that

4    proliferates six more.

5         It is the same with guns.  The policy choice in this

6    case is to try to limit firearms in that institution in order to

7    allow the free expression of religion to take place.

8         **THE COURT:**  I know that's the policy choice that was

9    made by the legislature and the Governor.

10        And contrasted with what's in the Constitution and the

11   case law that says that when you are looking at the Second

12   Amendment, certain policy options fall off the table.

13        **MR. BELKA:**  It also is true that the Second Amendment

14   does not act as a regulatory straightjacket.

15        And there are policy options that are available to

16   these individuals, specifically, in the sensitive locations as

17   allowed by Bruen and Heller.

18        **THE COURT:**  So in the context of whether there may be

19   a Second Amendment violation, under the TRO rule, I need to

20   determine whether the injunction is in the public interest or

21   it's not in the public interest.

22        Does it matter?  Does it matter the extent of the

23   Constitutional violation or whether it's a close question,

24   whether it's a clear violation?

25        **MR. BELKA:**  I believe that it needs to be a clearer

1    violation, as opposed to a close question, Your Honor.

2           **THE COURT:**  Mr. Rotsko, anything else on public

3    interest?

4           **MR. ROTSKO:**  I think it is a clear violation, Your

5    Honor.

6           **THE COURT:**  You think it's a clear violation here, is

7    what you are saying?

8           **MR. ROTSKO:**  Of the Second Amendment.

9           **THE COURT:**  Right.

10          **MR. ROTSKO:**  I guess I could also point out that

11   the -- I'm a little unclear.

12          It seems to be that the State is arguing that a

13   congregant -- or that if this law is enjoined, that no church

14   could make a policy decision to ban firearms independently in

15   their congregation and that's not what I think the Second

16   Amendment here requires.

17          Churches certainly would have the right to be able to

18   make their own churches gun free zones, if they so chose.  The

19   question is whether the State can do it and we're arguing that

20   they can't.

21          **THE COURT:**  Okay.  On public interest, Mr. Belka,

22   final word?  Anything else?

23          **MR. BELKA:**  Your Honor, I think that the balance of as

24   it relates to the public interest strongly cues in favor of

25   enacted public policy that allows these institutions to function

1   as designed and the public policy that has been enacted is to

2   have them be a gun free zone.

3        **THE COURT:**  Is there anything -- the issue is having

4   the congregations be without any firearms is safer -- that's the

5   argument versus -- we're talking just about this Rule 65 prong

6   here -- versus letting the congregation carry, if that's what

7   they want to do and then that's safer.

8        Those are the competing arguments, I think.  And when

9   the rule is you can't carry into this place of worship, is the

10  bad guy going to listen to that rule?

11       Is that funny?  I mean, I think we're talking about

12  pretty serious things here.

13       **MR. BELKA:**  We are talking about serious things, Your

14  Honor.  I think that as a point of analysis, whether or not

15  individuals will follow the law is not a good way to decide

16  whether or not that law is valid.

17       **THE COURT:**  So the bad guy who wants to shoot up these

18  black churches, he's not going to listen to the statute, is he?

19       Not even close.

20       **MR. BELKA:**  I assume it's a rhetorical question.

21       **THE COURT:**  That's right.

22       Mr. Kirby, is there anything that you or your client

23  wishes to add?

24       **MR. BELKA:**  No, Your Honor.

25       **THE COURT:**  How about Mr. Crosby?

1      **MR. CROSBY:**  No, Your Honor.  Just that District

2  Attorney Seaman is kind of between a rock and a hard place in

3  that he's sworn to uphold the law and the law on its face at

4  this point appears to have some Constitutional challenges to it.

5          And we believe that as a result of that, the

6  appropriate remedy is to issue a TRO and have a judicial

7  determination as to the Constitutionality of the law.

8      **THE COURT:**  Mr. Rotsko, anything further from your

9  end?

10     **MR. ROTSKO:**  Nothing further, Your Honor.

11     **THE COURT:**  Mr. Belka --

12     **MR. BELKA:**  For the record, Your Honor, if a TRO is

13  issued, defendant would request that it be limited to these two

14  individual plaintiffs.

15     **THE COURT:**  Okay.  So anything to that, Mr. Rotsko?

16     **MR. ROTSKO:**  We would object.  We think that the TRO

17  should be -- should enjoin enforcement of the statute against

18  all potential defendants who -- or against -- broadly, Your

19  Honor -- not just against our two plaintiffs.  Let's put it that

20  way.

21     **THE COURT:**  How would that work, Mr. Belka?  That just

22  these two plaintiffs are allowed to carry in their place of

23  worship and that's it?  Everybody else in the state can't?

24     **MR. BELKA:**  It's generally done in order to preserve

25  the status quo, Your Honor.

 1          **THE COURT:**  All right.  I don't need anything else

 2    from you now.  I'll reserve decision, but I'm fairly close on

 3    this, as I indicated earlier.

 4          I've had a good deal of time with your arguments --

 5    the previous version of your arguments submitted in Goldstein

 6    last Friday, as well as the same expert submission that was

 7    submitted then, too, so I was able to spend some time with all

 8    of it.

 9          So a written decision will be coming shortly.

10          Anything else, Counsel?

11          **MR. ROTSKO:**  No, Your Honor.

12          **MR. BELKA:**  Nothing from the defendants, Your Honor.

13          **MR. KIRBY:**  No, Your Honor.

14          **MR. CROSBY:**  No, Your Honor.

15          **THE COURT:**  Everybody have a good day thank you.

16          **MS. MORTON:**  Thank you, Your Honor.

17          **MR. ROTSKO:**  Thank you.

18

19                  (Proceedings concluded at 2:15 p.m.)

20                          *    *    *

21

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3    original notes are a true and correct record of proceedings in

4     the United States District Court for the Western District of

5         New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    *s/ Bonnie S. Weber*              October 26, 2022
         Signature                        Date

11

12   BONNIE S. WEBER

13   Official Court Reporter
     United States District Court
14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25