UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JIMMIE HARDAWAY, JR., et al.,

                          Plaintiffs,
                                                    Case No.: 1:22-cv-771

          v.

STEVEN A. NIGRELLI, et al.,

                          Defendants.


_____


**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

I.   Plaintiffs Have Demonstrated A Likelihood of Success......................................... 1

    a.   Plaintiffs' Conduct Falls Squarely Within the Presumptive Protection of the

       Second Amendment. .................................................................................. 1

    b.   The State Has Not Demonstrated the Place of Worship Ban is Consistent with the

       American Tradition of Firearms Regulation. ................................................ 3

        i.   The State's Evidence Comes Far Too Late............................................. 3

        ii.   The State's Anachronistic Evidence is Insufficient. ................................ 7

        iii.   Places of Worship Are Not Analogous To Genuine Sensitive Places. ........ 9

II.   Plaintiffs Have Demonstrated Irreparable Harm and the Public Interest. ........................ 10

CONCLUSION.............................................................................................................. 10

CERTIFICATE OF SERVICE .......................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) ...................................................................................5

*Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 5239895
    (N.D.N.Y. Oct. 6, 2022)........................................................................................................7

*Brownlee v. State*, 32 S.W. 1043 (Tex. Ct. Crim. App. 1895)...........................................................8

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................................................................4, 8, 9

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ....................................................................5

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012)..............................................2

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022)................................................................................6

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................................................................4

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)..........................................................................6

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)...............2, 3, 4, 5, 6, 7, 8, 9

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .........................................................................................1

*State v. Wilforth*, 74 Mo. 528 (1881) .........................................................................................8

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ......................................................................5

*Virginia v. Moore*, 553 U.S. 164 (2008) .........................................................................................5


**Statutes**

42 U.S.C. § 1983........................................................................................................................1


**Other Authorities**

1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811)...............................................10

1 LAWS OF THE STATE OF NEW YORK (2nd ed., Albany: Websters and Skinner 1807).................10

2 LAWS OF THE STATE OF DELAWARE (Samuel & John Adams, eds., 1797) ................................10

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
    1800 Ga. Laws 611 (Robert Watkins ed., 1800)..............................................................10

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA (Augustine Davis ed., 1796)......10

Amicus Br. of The Independent Institute, *Bruen*, No. 20-843 (July 20, 2021) ..............................6

CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS
    (Henry Palolucci, trans., Indianapolis: Bobbs-Merrill, 1963) (1764)................................9

Patrick J. Charles, *The Fugazi Second Amendment*, 71 CLEV. ST. L. REV. (forthcoming),

available at https://bit.ly/3FBt7VF (last visited Nov. 2, 2022)............................................7

David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine:*
*Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. (2018) .............7, 8

Mark W. Smith, *"Not all History is Created Equal": In the post-Bruen World,  the Critical*
*Period for Historical Analogues is when the Second  Amendment was Ratified in 1791,*
*and not 1868 (working draft)*, Oct. 1, 2022, *available at* https://bit.ly/3CMSKjw
(lasted visited Nov. 1, 2022) ...............................................................................................4

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the*
*Founders: Understanding the Meaning and Purpose of the Second Amendment's*
*Right to Keep and Bear Arms*, 2020 PEPP. L. REV. (2020) ..................................................9

Office of the Attorney General, *Official Advisory Opinion*, Opinion No. 11-043,
2011 WL 1452118 (Apr. 8, 2011) .......................................................................................8

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81 (WM. Stanley Ray ed., 1904) .........10

Stefan B. Tahmassebi, *Gun Control and Racism*, 2 GEO. MASON U. CIV. RTS. L.J. (1991) .......8, 9

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND:
NOVEMBER SESSION 1791 (Frederick Green ed., 1795)......................................................10

**INTRODUCTION**

When the Second Amendment's plain text presumptively protects Plaintiffs' proposed course of conduct, the burden falls on the State to justify a regulation of that conduct by demonstrating it is consistent with the American tradition of firearms regulation. As this Court held when issuing a temporary restraining order to enjoin the Place of Worship Ban, "New York fails that test. The State's exclusion is, instead, *inconsistent* with the Nation's historical traditions, impermissibly infringing on the right to keep and bear arms in public for self-defense." Decision and Order, Doc. 35, at 2 (Oct. 20, 2022) ("Order"). Aside from noting its disagreement with this Court's temporary restraining order, the State's Response mainly rehashes arguments that this Court has already found insufficient to meet the State's burden. *See* State's Mem. of Law in Opp'n, Doc. 40 (Oct. 28, 2022) ("State Response"). Simply put, the State's Place of Worship Ban remains unconstitutional. With Plaintiffs suffering ongoing, irreparable harm and the public interest being squarely in favor of upholding constitutional rights, a preliminary injunction is warranted.[1]

I.   **Plaintiffs Have Demonstrated A Likelihood of Success.**[2]

    a.   **Plaintiffs' Conduct Falls Squarely Within the Presumptive Protection of the Second Amendment.**

Plaintiffs are "ordinary, law-abiding citizens to which the Second Amendment applies."

---

[1] As Plaintiffs' TRO Reply Brief more fully explains and as this Court has already determined, "Hardaway and Boyd have standing." Order at 9. The State offers no new arguments to the contrary. Because Reverend Hardaway and Bishop Boyd have standing, there is no need for this Court to address the standing of FPC and SAF. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006). In all events, FPC and SAF preserve the right to seek to overrule circuit precedent that an organization does not have standing to assert the rights of its members under 42 U.S.C. § 1983. Compl., Doc. 1, at ¶ 12 (Oct. 13, 2022) ("Compl.").

[2] As this Court already held, contrary to the State's assertions, there is no heightened standard applicable to these proceedings because Plaintiffs seek a prohibitory injunctive order to maintain the status quo. *See* Pls.' Mem., Doc. 9-1, at 15 (Oct. 14, 2022) ("Opening Br.") (noting the relevant status quo is before the effective date of S51001). In all events, Plaintiffs meet any heightened standard. *See* Pls.' Reply Mem., Doc. 31 at 3 n.2 (Oct. 20, 2022) ("TRO Reply Br.").

Order at 29. "The next question is whether the State has met its historical burden." *Id*. Yet before

attempting (and failing) to meet its burden, the State offers two spurious arguments.

First, the State claims that this Court "improperly used an 'as-applied' analytical frame by

referring back to Plaintiffs' particular allegations to justify its conclusions in the Temporary

Order." State Response at 10. But this Court did no such thing. Instead, this Court determined that

the Place of Worship ban, at a minimum, "lacks a plainly legitimate sweep in that it forces

individuals to give up their rights to armed self-defense outside the home." Order at 13 n.7 (internal

quotation marks omitted). The State does not even gesture at a single permissible application.

Second, the State attempts to flip the burden to Plaintiffs by citing a pre-*Bruen* Eleventh

Circuit decision. *See* State Response at 12–13 (citing *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d

1244, 1260–61 (11th Cir. 2012)). In that case, the Eleventh Circuit held that "Plaintiffs must take

the position that the Second Amendment protects a right to bring a firearm on the private property

of another against the wishes of the owner." *GeorgiaCarry.Org*, 687 F.3d at 1261. Because of this

pre-*Bruen* holding, the State argues that Plaintiffs must demonstrate that the Second Amendment

"textually extends to the private property at issue here." State Response at 13. Plaintiffs need do

no such thing. The Supreme Court explicitly cited *GeorgiaCarry.Org* as an exemplar of the

approach to the Second Amendment that it was rejecting. *New York State Rifle & Pistol Ass'n v.*

*Bruen*, 142 S. Ct. 2111, 2127 n.4 (2022). And in so rejecting *GeorgiaCarry.Org*'s approach, the

Supreme Court established in *Bruen* that "[n]othing in the Second Amendment's *text* draws a

home/public distinction with respect to the right to keep and bear arms." *Id.* at 2134 (emphasis

added). In articulating this right to carry in public, the Court neither made nor endorsed any finer

textual distinction between areas that happened to be owned by private property owners and areas

owned by governmental authorities. The Second Amendment protects a general right to carry arms.

The limits on that general right must be established by the government through relevant history.

Instead of any additional textual analysis of where law-abiding citizens may carry firearms, *Bruen* explained that the burden is on the State to demonstrate it has the authority to regulate "handgun carrying in areas *frequented* by the general public" and "show" its law is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135 (emphasis added) (cleaned up). As relevant here, the Place of Worship Ban bars firearms by ordinary, law-abiding citizens in places of worship—indisputably frequented by the general public. Thus, this Court's historical analysis need not consider the extent of *private property owners*' authority to bar firearms-carrying in places of worship because that is simply not at issue—Plaintiffs' churches would permit them to carry. Opening Br. at 4–6. Rather, the sole question presented is whether historical tradition empowers the *State* to ban firearms completely by ordinary, law-abiding citizens in places of worship *against* the wishes of church leadership. *Bruen*, 142 S. Ct at 2135.

### b. The State Has Not Demonstrated the Place of Worship Ban is Consistent with the American Tradition of Firearms Regulation.

This Court correctly concluded in its detailed opinion granting a temporary restraining order that the sparse statutes and court decisions identified by the State do not carry its burden. Order at 27–36. Instead, what the State has identified are enactments that "are far too remote, far too anachronistic, and very much outliers," which makes them "insufficient, then, in the search for an American tradition" supporting the Place of Worship Ban. *Id.* at 35.

### i. The State's Evidence Comes Far Too Late.

As this Court recognized, the State has pointed to *zero* evidence at the time of the Founding. *Id.* at 35 n.20. Instead, *all of the evidence* before the Court shows not a single comparable restriction to the Place of Worship Ban anywhere in what would become the United States, as of 1791. *Bruen*, 142 S. Ct. at 2150 (noting it is New York's burden to "sift the historical materials");

3

*id*. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."). For the reasons in Plaintiffs' Opening Brief and TRO Reply Brief, the lack of Founding Era evidence is dispositive. Opening Br. at 9-10; TRO Reply Br. at 5–8.

In its Response, the State makes no effort to remedy its lack of Founding Era evidence.[3] Instead, the State doubles-down on a few laws from the Reconstruction Era. And both the State and its amicus argue that it is *this* era, instead of the Founding Era, that the Court should focus on. State Response at 14; *See* Amicus Curiae Br. of Everytown for Gun Safety, Doc. 47 (Oct. 29, 2022) ("Amicus Br."). But as discussed in Plaintiffs' Opening Brief and TRO Reply Brief, the Founding Era is the only appropriate time period for the historical analysis. Opening Br. at 9–10; TRO Reply Br. at 6; *See generally* Mark W. Smith, *"Not all History is Created Equal": In the post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868 (working draft)*, Oct. 1, 2022, *available at* https://bit.ly/3CMSKjw (lasted visited Nov. 1, 2022). This Court is bound by two lines of Supreme Court precedent, which mandate (1) that the scope of the Second Amendment with respect to the Federal Government is based on the public understanding in 1791, *see, e.g., District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008), and (2) that incorporated Bill of Rights provisions mean the same thing when applied to the States and the Federal Government, *see, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010).

---

[3] The State's arguments against reliance on Founding Era laws mandating the carrying of firearms to places of worship are meritless, as Plaintiffs have previously explained. *See* TRO Reply Br. at 5-8. In its latest briefing, the State additionally claims that these laws may not "have survived the later adoption of the Establishment Clause." State Response at 19. But this is irrelevant: the key inquiry is not whether mandates to carry in church are otherwise constitutionally permissible, rather the State must prove that *bans* on carrying in places of worship survived the adoption of the *Second Amendment*. It cannot do so when the contemporaneous evidence shows (1) mandated firearms in places of worship at the Founding and (2) no evidence of any bans until nearly a century after the Revolution.

The State and Amicus make three arguments to the contrary. These are without merit. First, the State and Amicus argue that *Bruen* left the appropriate time period "open." Amicus Br. at 3. But *Bruen* did not leave the question of 1791 or 1868 open. Instead, *Bruen* merely declined to "address" the issue because it did not make a difference for the outcome of the case. 142 S. Ct. at 2138. *Bruen* did not suggest that its precedent was equivocal on this point—it acknowledged that the Supreme Court had always "assumed that the scope of the protection [of the Bill of Rights] . . . is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," and the only debate on the issue was a "scholarly" one. *Id*. at 2137–38. It may be that, with this language, the Supreme Court was signaling that parties in future cases should address the issue for the Court, but it was not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve." *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment). This Court is bound by that precedent and has no grounds to predict whether the Court may ultimately take a different direction. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). There is just one Second Amendment, and its meaning was established in 1791.

Second, Amicus cites several pre-*Bruen* circuit court decisions that treated 1868 as the relevant time period and argues that *Bruen* implicitly treated them as "good law." Amicus Br. at 2–3. But looking to circuit court decisions and their approaches after *Bruen* expressly abrogated the analytical approach of each of those decisions is questionable at best. And in fact, several of the circuit cases cited by *Bruen* do not actually favor 1868, but only state that courts should review relevant history from both periods. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021). It does not save the amicus argument that *Bruen* stated that the "step one" analysis some circuits applied was "broadly

5

consistent with *Heller*." 142 S. Ct. at 2127 (cited at Amicus Br. at 3). *Bruen*'s analysis (and binding precedent) is specifically inconsistent with treating 1868 as the key date when assessing the validity of a state law under the Second Amendment. What is more, the circuits were not uniform in their treatment of 1868 as the crucial year, *see, e.g., Jones v. Bonta*, 34 F.4th 704, 714, 719–20 (9th Cir. 2022), and the Seventh Circuit was not even internally consistent on the point and stated in other opinions that 1791 was the key date, *see Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *see also id.* at 943 (Williams, J., dissenting). *Bruen* therefore cannot be read to have established that circuit cases focusing on 1868 are "good law" on this point.

Third, the State and Amicus argue that the sensitive place analysis *in particular* merits looking to 1868 because *Bruen*—in setting out examples of sensitive places—used the phrase in the "18th- *and 19th-century*." 142 S. Ct. at 2133 (emphasis added). But this singular clause of *Bruen* does not endorse ignoring the Founding altogether—as the State and Amicus propose here—instead, it confirms that the 18th century *is* relevant. What this clause merely reaffirms, consistent with *Heller* and the rest of the discussion in *Bruen*, is that evidence from Reconstruction can be relevant to the extent that it serves as "mere confirmation of what the Court thought *had already been* established." *Id.* at 2137 (emphasis added). Indeed, the amicus brief cited by *Bruen* in support of this proposition identified colonial and Founding-era limitations on carry in all three locations identified by *Bruen*—polling places, legislative assemblies, and courts. *See* Amicus Br. of The Independent Institute, *Bruen*, No. 20-843, at 11–14 (July 20, 2021). There is no similar Founding-era precedent for banning guns in churches. And the same amicus brief, within the discussion cited by *Bruen*, identified 19th-century limitations on carry in churches as laws that "represented deviations from the laws of most other States" that "should not provide any insight into the original meaning of the Second Amendment." *Id*. at 16. The other source cited by *Bruen*

on this point, a law review article, similarly described 19th-century laws barring carry in churches as emanating from "former slave states" that "were the center of the gun control movement." David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 250 (2018). These late-arriving outliers cannot meet the State's burden to justify its ban.

### ii.   The State's Anachronistic Evidence is Insufficient.

The State and Amicus argue that a "small number of state laws" from Reconstruction "can demonstrate a 'public understanding' of a limitation on the Second Amendment." Amicus at 9; State Response at 17. As this Court already held, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." Order at 32 (quoting *Bruen*, 142 S. Ct. at 2137). This is especially so when the claimed "tradition" pointed to by the State is made up of "one-offs, outliers, or novel enactments" and when these outliers directly "contrast" with laws from the Founding Era. Order at 34–35. In all events, whatever is the threshold to establish an American tradition justifying the Place of Worship Ban, the "small number" that the State has identified—Texas, Georgia, Virginia, Missouri, Arkansas, and Tennessee—falls short.[4] Not only do these laws not agree on the particulars, *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 5239895, at *15 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*") (noting various exceptions to these statutes), but this is a fraction of the Union, which at the time numbered 37 States. The absence of other analogues suggests a tradition of *not* forbidding firearms in places of worship.

---

[4] In an article, the State's expert has claimed "it is impossible for historians to reconstruct how often, when, and where armed carriage restrictions were enforced." Patrick J. Charles, *The Fugazi Second Amendment*, 71 CLEV. ST. L. REV. *81 (forthcoming), available at https://bit.ly/3FBt7VF (last visited Nov 2, 2022). Since the burden falls on the *State* to "sift the historical materials for evidence to sustain New York's statute," any lack of historical evidence merits a finding in Plaintiffs' favor. *Bruen*, 142 S. Ct. at 2150.

Plaintiffs' TRO Reply Brief explains why these specific laws do not establish an analogous American tradition justifying the Place of Worship Ban. TRO Reply Br. 8–9. The State has offered nothing to rebut these arguments, thus only a few additional points should be noted. First, it appears that Texas and Missouri countenanced judicially recognized exceptions for self-defense. *See Brownlee v. State*, 32 S.W. 1043, 1044 (Tex. Ct. Crim. App. 1895) ("If, at the time appellant armed himself, he was then apprehensive of an attack . . . and he had not time to appeal to the law for protection, there would be some excuse for him."); *State v. Wilforth*, 74 Mo. 528, 529–30 (1881) ("Defendant also asked the court to instruct the jury to the effect that if they believed defendant carried the pistol for the purpose . . . to protect himself against [] harm, they would acquit. These instructions were properly refused for the reason (if for no other) that there was not a scintilla of evidence upon which to base them."). Virginia too had a statutory "good and sufficient cause" exception, 1877 Va. Acts 305, which has been understood to include a self-defense exception. Office of the Attorney General, *Official Advisory Opinion*, Opinion No. 11-043, 2011 WL 1452118, at *1–2 (Apr. 8, 2011); *cf. Bruen*, 142 S. Ct. at 2141 n. 11 ("To the extent there are multiple plausible interpretations of Sir John Knight's Case, we will favor the one that is more consistent with the Second Amendment's command."). As in *Heller*, the presence of a self-defense exception confirms these laws are not relevantly similar. *See Heller*, 554 U.S. at 631–32.

Second, Missouri's and Tennessee's laws both appear to have allowed at least one avenue for the exercise of Second Amendment rights: Missouri "seemingly" allowed for "open carry," *Bruen*, 142 S. Ct. at 2155 n.30; *Wilforth*, 74 Mo. at 531, and "[w]hether the 1869 Tennessee statute applied to long guns is uncertain," Kopel & Greenlee, *supra*, at 253.

Third, it bears reiterating that reliance on laws enacted in the Reconstruction South should be approached cautiously. TRO Reply Br. at 7–8; *see also* Stefan B. Tahmassebi, *Gun Control and*

*Racism*, 2 GEO. MASON U. CIV. RTS. L.J. 67, 74 (1991).

### iii.   Places of Worship Are Not Analogous To Genuine Sensitive Places.

The Supreme Court has instructed that the State must demonstrate both *how* the historical regulations they rely on burdened the right to bear arms and *why* they did so. *Bruen*, 142 S. Ct. at 2133. The State has not identified any tradition of a complete ban on firearms in places of worship, except in outlier states, thus their historical regulations fail the *how* metric, *i.e.*, there is no tradition that "impose[s] a comparable burden" as the Place of Worship Ban. *Id.* And the tradition at the Founding included imposing a duty to carry in church because of a society beset by violence. *See* TRO Reply Br. at 9. Thus, the *why* metric is in Plaintiffs' favor too: the tradition at the Founding to protect people at places of worship was to impose a *duty* to carry at church, rather than a ban. *Heller*, 554 U.S. at 601. In fact, this approach is consistent the views of a leading Enlightenment theorist, Cesare Beccaria, who wrote that laws banning firearms "make things worse for the assaulted and better for the assailants; they serve rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man." CESARE BECCARIA, AN ESSAY ON CRIMES AND PUNISHMENTS 87–88 (Palolucci, trans., Bobbs-Merrill, 1963) (1764). Thomas Jefferson copied this passage into his commonplace book. *See* Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020).

Moreover, a relevant inquiry on "why" arms are forbidden is whether the State has assumed the duty to protect individuals in those "sensitive places" and so provided protection, such that the need for self-defense is reduced. Order at 30 (noting "secured" nature of permissible sensitive places). The State does not provide special protection to places of worship. This stands in stark contrast to evidence dating to the Founding and the first years after ratification in which there is

9

substantial evidence of security officials at legislatures, courthouses, and polling places. *See, e.g.,*
VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER
SESSION 1791, at *2 (Frederick Green ed., 1795) (appointing sergeant at arms and door-keeper for
state legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2nd ed., Albany: Websters and
Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables
within their respective counties, that they be then and there in their own persons… . And the said
respective sheriffs and their officers shall then and there attend in their own proper persons."); A
DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Robert Watkins ed., 1800)
("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose
of enforcing the orders of the presiding magistrates in preserving good order.").[5] This is a key
distinction between permissible sensitive places and places of worship.

## II.   Plaintiffs Have Demonstrated Irreparable Harm and the Public Interest.

Plaintiffs have demonstrated both irreparable harm and the public interest because
Plaintiffs are "forced to give up their rights to armed self-defense outside the home, being left to
the mercy of opportunistic, lawless individuals who might prey on them and have no concern about
the place of worship exclusion." Order at 37. By enjoining the Ban, the public interest is served
by "fostering self-defense at places of worship across the State." *Id*.

**CONCLUSION**

For the foregoing reasons, the Court should preliminarily enjoin Defendants from
enforcing the Place of Worship Ban.

---

[5] Other examples: PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (WM. Stanley
Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); ABRIDGEMENT OF THE
PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Augustine Davis ed., 1796) (court's "serjeant at arms);
1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE
STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (polling places).

Respectfully submitted, this 2nd day of November 2022.


David H. Thompson*                        /s/ Nicolas J. Rotsko
Peter A. Patterson*                        Nicolas J. Rotsko
John W. Tienken*                          PHILLIPS LYTLE LLP
COOPER & KIRK, PLLC                       One Canalside
1523 New Hampshire Avenue, N.W.           125 Main Street
Washington, D.C. 20036                    Buffalo, NY 14203-2887
(202) 220-9600                            (716) 847-5467
(202) 220-9601 (fax)                      (716) 852-6100 (fax)
dthompson@cooperkirk.com                  NRotsko@phillipslytle.com
ppatterson@cooperkirk.com
jtienken@cooperkirk.com


 *Admitted *pro hac vice*

11

## CERTIFICATE OF SERVICE

I hereby certify I filed the foregoing with the Clerk of the District Court using its CM/ECF system on this 2nd day of November 2022.

/s/ Nicolas J. Rotsko
Nicolas J. Rotsko