```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


JIMMIE HARDAWAY, JR.,                    Docket Number:
LARRY A. BOYD,                       1-22-cv-00771-JLS
FIREARMS POLICY COALITION,
INC.,
SECOND AMENDMENT FOUNDATION,*
                             *
Plaintiffs,                  *
                             *
                             *       Buffalo, New York
             v.              *       November 3, 2022

                             *       2:01 p.m.
                             *
STEVEN A. NIGRELLI,                  ORAL ARGUMENT
In his official capacity as
Superintendent of the New
York State Police,
BRIAN D. SEAMAN,
In his official capacity as
District Attorney for the
County of Niagara, New York,
JOHN J. FLYNN,
In his official capacity as
District Attorney for the
County of Erie, New York.   *
                             *
Defendants.                  *
                             *
* * * * * * * * * * * * * * *


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOHN L. SINATRA, JR.
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:              PHILLIPS LYTLE LLP,
                                 By NICHOLAS J. ROTSKO, ESQ.,
                                   SAMUEL M. WILLIAMS, ESQ.,
                                 One Canalside,
                                 125 Main Street,
                                 Buffalo, New York  14203-2887
```

```
 1
    For the Defendant Nigrelli:      NEW YORK STATE ATTORNEY
 2                                   GENERAL'S OFFICE,
                                     By RYAN LANE BELKA, ESQ.,
 3                                   Main Place Tower,
                                     Suite 300A,
 4                                   350 Main Street,
                                     Buffalo, New York  14202.
 5
    For the Defendant Seaman:        GIBSON McASKILL & CROSBY, LLP.,
 6                                   By BRIAN P. CROSBY, ESQ.,
                                     69 Delaware Avenue
 7                                   Suite 900,
                                     Buffalo, New York  14202.
 8
    For the Defendant Flynn:         COUNTY OF ERIE,
 9                                   DEPARTMENT OF LAW,
                                     By KENNETH R. KIRBY, ESQ.,
10                                   95 Franklin Street,
                                     Suite 1634,
11                                   Buffalo, New York  14202.

12  PRESENT:                         NIAGARA COUNTY ATTORNEY,
                                     CLAUDE A. JOERG, ESQ.,
13                                   Niagara County Courthouse,
                                     175 Hawley Street,
14                                   Lockport, New York  14094

15

16  The Courtroom Deputy:     KIRSTIE L. HENRY

17  Court Reporter:           BONNIE S. WEBER,
                              Notary Public,
18                            Robert H. Jackson Courthouse,
                              2 Niagara Square,
19                            Buffalo, New York  14202,
                              Bonnie_Weber@nywd.uscourts.gov.
20

21        Proceedings recorded by mechanical stenography,
               transcript produced by computer.
22

23          (Proceedings commenced at 2:01 p.m.)

24

25        THE CLERK:  All rise.
```

1          The United States District Court for the Western

2     District of New York is now in session.  The Honorable John

3     Sinatra presiding.

4          **THE COURT:**  Please be seated.

5          **THE CLERK:**  The Court advises parties and listeners

6     that they are strictly prohibited from recording these

7     proceedings in whole or in part by any device.

8          In Hardaway and others versus Nigrelli and others,

9     case number 22-CV-771.  This is the date set for a hearing on a

10    motion for preliminary injunction.

11         Counsel for the plaintiffs, please state your

12    appearances for the record.

13         **MR. ROTSKO:**  Nicholas Rotsko and Samuel M. Williams of

14    Phillips Lytle for the plaintiffs.

15         **THE CLERK:**  And counsel for the defendants.

16         **MR. BELKA:**  Assistant Attorney General Ryan Belka,

17    Office of the Attorney General for defendant Nigrelli.

18         **MR. KIRBY:**  Kenneth R. Kirby, Assistant Erie County

19    Attorney appearing for John J. Flynn, in his official capacity

20    as district attorney for the County of Erie New York.

21         **MR. CROSBY:**  Brian Crosby and Claude Joerg on behalf

22    of Brian Seaman in his official capacity as District Attorney of

23    Niagara County.

24         **THE COURT:**  Okay.  Good afternoon, Counsel.  We're

25    here for argument -- a hearing, if you like, on plaintiff's

 1   motion for a preliminary injunction.

 2          I'll start by indicating for the record that this

 3   proceeding incorporates the argument on the TRO motion that took

 4   place two weeks ago, October 20th.

 5          So for the purpose of my decision on the preliminary

 6   injunction, we don't need to repeat today what was argued at --

 7   the last time you were here, the TRO argument.

 8          Is that acceptable to everyone?

 9          **MR. ROTSKO:**  Yes, Your Honor.

10          **MR. BELKA:**  Yes, Your Honor.

11          **MR. KIRBY:**  Yes, Your Honor.

12          **MR. CROSBY:**  Yes.

13          **THE COURT:**  Okay.  So like we did the last time, I've

14   got some questions for you.

15          Again, like the last time, if you've got something

16   that my questions don't cover and you need to say, go ahead and

17   indicate that and I'll give you the opportunity to say that as

18   well.

19          First thing I want to cover, as a preliminary matter,

20   regarding the scope or the facial versus the as-applied issue

21   that is pressed by the State or by defendant Nigrelli, who

22   argues that plaintiffs can only succeed if they show no set of

23   circumstances exists where the statute would be valid.

24          In other words, that the law is unconstitutional in

25   all applications, or at least that it lacks a plainly legitimate

1    sweep.

2          Am I bound to search my imagination for a plainly

3    legitimate sweep?  Does anyone have one?  Does anyone want to

4    articulate what a plainly legitimate sweep is?

5          Mr. Belka, it's your argument.

6          **MR. BELKA:**  Thank you, Your Honor.  In fact, I noted

7    in the reply that there is a claim that we haven't actually

8    identified a situation in which the Second Amendment right to

9    carry would be prohibited in places of worship and in a

10   situation where that might be legitimate.

11         Your Honor, I think that the frame that the Court has

12   taken in the TRO is to take the very specific allegations of the

13   plaintiffs and to review them against the analytical frame of

14   Bruen.

15         Our argument is that what is required is that a more

16   difficult situation, as opposed to one where the parishioners

17   want to concealed carrying.  But, in fact, a situation where the

18   parishioners do not want somebody to have a concealed carry.

19         In fact, that parishioners feel that somebody

20   concealing carry amongst their midst might infringe upon their

21   fundamental rights to express their -- themselves and their

22   religion in their places of worship.

23         That that is a more suitable analytical view for a

24   facial challenge -- a preenforcement facial challenge, as has

25   been advanced by the plaintiffs here.

1          **THE COURT:**  Mr. Rotsko?

2          **MR. ROTSKO:**  The situation where a church may or a

3    parishioner may not want to be in a church with somebody with a

4    concealed carry weapon, that doesn't give rise to a plainly

5    legitimate sweep, because the -- there is nothing under the

6    Second Amendment that would prevent the church from regulating

7    concealed carry within its own property.

8          So this -- this -- the place of worship ban here does

9    not have a plainly legitimate sweep.

10          There is nothing obvious -- there is no obvious set of

11    facts that are plain and simple on the surface, where it does

12    not infringe upon the right -- the Second Amendment rights of

13    parishioners or clergy.

14          **THE COURT:**  If I were to work really hard at this,

15    Mr. Belka, like maybe I've been doing -- you can assume I've

16    been doing some thinking about what a plainly legitimate sweep

17    might be.

18          And if I were to do that and rack my brain and come up

19    with something, then I have got to refine it and refine it and

20    refine it and test it and think about it and test it and think

21    about it and am I not legislating at that point?

22          **MR. BELKA:**  Your Honor, I don't think that you are

23    legislating.  I think that you are looking for -- I think that

24    it is supposed to be hard to overturn, in this case, a -- the

25    legislation that has been passed by democratically elected

1   leaders.

2        So I would suggest to the Court that it is supposed to

3   be difficult to, in some ways, search our brains and our

4   imagination for those kinds of situations that are more

5   difficult than the ones than these individual plaintiffs

6   present, in part, because this law is not being enforced against

7   these plaintiffs.

8        It is not being applied to them.  It is a

9   preenforcement challenge to a piece of legislation and it's

10  supposed to be difficult.

11       Obviously, we cite to the Georgia carry law from the

12  11th Circuit that does articulate a little bit of what type of

13  analysis the Court should be going through and determining

14  whether an individual who wants to carry into a place of

15  worship, where they don't want it, would an arrest under those

16  circumstances violate the Second Amendment.

17       I believe that's the kind of analytical frame we need

18  to look at in a facial challenge.

19       **THE COURT:**  All right.  Anyone else on this topic?

20       **MR. ROTSKO:**  I would just point out, Your Honor, that

21  if it's a hard and difficult endeavor to find an instance where

22  the law might not be unconstitutional, then it isn't a plainly

23  legitimate sweep.  I think plainly is there for a reason.

24       **THE COURT:**  All right.  Next, let's move to likelihood

25  of success on the merits and a couple of questions there.

 1          Driven -- I've -- driven somewhat by the prior round

 2   of arguments, but also kind of reenforced by what I heard from

 3   the amicus and the State's expert as well -- I believe he's got

 4   something in there, too.  If it wasn't the expert, then it was

 5   you, Mr. Belka, this issue of 1791 versus, you know,

 6   reconstruction era laws.

 7          Can it be that the Second Amendment meant something in

 8   1791 and then the meaning of the Second Amendment evolved over

 9   the 75 or 80 years following?

10          **MR. BELKA:**  I don't think that it's an evolution in

11   the interpretation.  It's just the test requires available

12   history.

13          And as our expert noticed, history is hard.  And in

14   order to resurrect what history is available, it depends on

15   chance, what's been digitized and easily searchable.

16          And I think that it is difficult to reflect when you

17   are looking at 19th century law that we presented to the Court

18   and the High Court commentary that's available, where clearly

19   certain states and territories had prohibited concealed carry in

20   places of worship.

21          And when those courts were asked to comment on it,

22   they certainly didn't identify that this was obviously a

23   violation of the Second Amendment.

24          In contrast, those courts looked at it and thought

25   that it was plainly legitimate for a state to regulate carry in

1    places of worship, as if it had been done significantly more in

2    advance of the 19th century law that we have cited.

3            I don't think it was created.  It's just the available

4    history that we've been able to find in the relatively short

5    time frame that we've been able to search the historical record.

6            Do I anticipate that as this goes on and we have more

7    availability to search the historical record, we may find more

8    statutes going back further and further in time.

9            **THE COURT:**  Can it be the case that the Second

10   Amendment means something vis-a-vis Congressional enactments

11   informed by what was going on around 1791 and then means

12   something different as to the states informed by what was going

13   on around the time of the enactment of the 14th Amendment and

14   reconstruction?

15           Can't it have two different meanings applicable to two

16   different sets of governments or are we bound by one meaning of

17   the Second Amendment?

18           **MR. BELKA:**  I believe that what McDonald says is that

19   we were bound by one meaning of the Second Amendment, as applied

20   to the Federal Government and the states.  And I think that that

21   would probably be true, as it relates to what McDonald says.

22           **THE COURT:**  And then I think the corollary question,

23   Mr. Rotsko, I can't -- I'm not supposed to ignore all of the

24   enactments that came after 1791, am I?

25           Don't the Supreme Court cases actually look at

1    enactments post 1791?

2          **MR. ROTSKO:**  Correct, Your Honor.  If you are looking

3    for analogies to a new sensitive place, then most certainly the

4    enactments that come after the founding era have some -- should

5    be examined, particularly when they -- to see whether they

6    confirm the understanding of the meaning of the Second Amendment

7    during the founding era.

8          They can't -- you know, if statutes that depart from

9    the text are enacted later, they can't -- they can't be

10   considered to trump the meaning of the text.

11         But looking at historical tradition -- I mean, you are

12   absolutely right that Justice Thomas in Bruen spent quite a bit

13   of time analyzing historical tradition and, you know, many of

14   the same statutes that the State's expert has identified here.

15         **THE COURT:**  What about this argument -- it's not so

16   much in the -- it's not so much in Mr. Belka's brief, but more

17   in his expert's declaration and in the amicus brief, I think,

18   the suggestion that -- I think it's a suggestion that the

19   Supreme Court had a pretty thin historical record when it

20   recognized those three sensitive places.

21         And if it's okay for the Supreme Court, then it's okay

22   for me to recognize a thin historical record.  I think that's a

23   fair representation of the argument.

24         How do you respond to that, Mr. Rotsko?

25         **MR. ROTSKO:**  First, that I don't think that the -- the

1   Supreme Court did have a thin historical record for recognizing

2   those three types of sensitive places.

3       They had the -- the Supreme Court there cites an

4   amicus brief from the independent institute which provides the

5   colonial and early founding era statutes from several of the 13

6   states with respect to each of those, the poling place, the

7   courts and the legislative assemblies.

8       And we had identified on page ten of the reply brief

9   some additional state's statutes from around the time of the

10  founding with respect to those three types of sensitive places,

11  so I would I disagree with their expert, that it's a thin

12  historical record.

13      And then with respect to the other point that -- if

14  you just have a few states, that should be sufficient.  I think

15  that the holding in Bruen undermines that point in general.

16      Which is, you know, there were seven or six -- six

17  states, plus the District of Columbia where the -- a law that

18  was analogous to the Sullivan law.

19      And they have been on the books for a long time and

20  that was insufficient to establish an American tradition that

21  would preserve the Constitutionality of those restrictions.

22      **THE COURT:**  Anything to respond to that, Mr. Belka?

23      **MR. BELKA:**  I think that one of the responses is that

24  this court has viewed some of the evidence that has been

25  provided by the defendants as outlier jurisdictions or in

 1   some -- in some cases, immature governmental systems,

 2   territories that were evolving into what would be states.

 3          I think that four states; two territories with spot on

 4   statutes that restrict guns in places of worship; four

 5   municipalities; six other municipalities that completely

 6   prohibited firearms; nine other states that completely

 7   prohibited public carry and, therefore, did not require

 8   place-of-worship-type restrictions, to me, it is a substantial

 9   historical record that's been put before the Court.

10          And not anything close to the single statute and two

11   cases that the Supreme Court in Bruen deemed to be insufficient

12   or outliers.

13          **THE COURT:**  All right.  Well, we've talked about

14   breadth.  Let's talk about duration and endurance.

15          Mr. Belka, your position echoed -- I can't remember

16   for sure, again, if it's only in your brief or if your expert

17   says the same thing; and the amicus -- all three of you say the

18   same thing, I'm not sure, but the argument is that endurance

19   doesn't matter.

20          Why?

21          **MR. BELKA:**  I just don't think that endurance was part

22   of the test in Bruen.  Part of the difficulty of history is

23   resurrecting it to its actual form.

24          And what this court has required, in part, is an

25   enduring American tradition, with the example of the Sullivan

 1   law being in existence for 107 years and not being enough.

 2        Any regulation of firearms will not pass that

 3   standard.  And we know that that cannot be the case, because the

 4   Second Amendment cannot be a regulatory straightjacket.

 5        And if the standard that is applied is an enduring

 6   American tradition, as this court has understood it, meaning,

 7   that had the Sullivan law -- or, I'm sorry, this court's

 8   interpretation of Bruen, that the Sullivan law, 107 years, does

 9   not suffice for an enduring American tradition, all gun

10   regulations will fail.

11        And that cannot be the case, because the Second

12   Amendment is not a regulatory straightjacket.

13        **THE COURT:**  Well, don't you also have the ability to

14   regulate by analogy to the sensitive places?

15        That's less dependent -- maybe not dependent at all on

16   durability and endurance, right?

17        In other words, if you create a law today that is an

18   analogy to courthouses, legislative assemblies, poling places,

19   then you stop there.

20        **MR. BELKA:**  I think the idea of new is kind of

21   interesting, right?

22        Since we're arguing, in fact, that a sensitive place

23   in a place of worship is not new.  It's the plaintiff's argument

24   that this is a new sensitive location and so I think that it's a

25   little bit different than that.

1        **THE COURT:**  I mean, I think you have got two ways to

2   get at it, as the State, don't you?

3        You can either show there is an analogy.  And if there

4   is no analogy, then you can show that there is a tradition.

5        **MR. BELKA:**  I think that that's this court's

6   understanding of Bruen, yes.

7        **THE COURT:**  Am I wrong about that?  Are there -- is

8   there not a duality -- two different ways to get at

9   Constitutionality?

10       **MR. BELKA:**  I'll take two different ways, Your Honor.

11       **THE COURT:**  All right.

12       Mr. Rotsko?

13       **MR. ROTSKO:**  I don't think I have anything further on

14   that question right now, unless you had a specific question for

15   me on that.

16       **THE COURT:**  My concern about the argument about

17   endurance doesn't matter, is that it seems to me that Bruen

18   thinks that it does.

19       Bruen was searching for:  "An enduring American

20   tradition of state regulation."  And in a couple different

21   times, gave little weight to enactments that were short lived.

22   So I feel like Bruen, itself, is telling me to look for

23   endurance.

24       **MR. ROTSKO:**  Correct, Your Honor.  There is no doubt.

25   Bruen even uses that very phrase:  Enduring tradition.

1          And in your decision on the TRO, you -- you quoted a

2   number of different passages from Bruen that specifically make

3   it clear that it needs to be an enduring tradition.

4          And in another passage in the Bruen decision, the

5   Court says it needs to be well established and representative.

6          And so -- and then, of course, it has to have gone

7   back to the founding era, so I think it's unquestionable that it

8   needs to be an enduring tradition.

9          **THE COURT:**  Anything else, Mr. Belka?

10         **MR. BELKA:**  In this section on American tradition, in

11  Your Honor's temporary restraining order, you do cite the

12  language from Bruen, where the Court says it should not give

13  disproportionate weight to single state statute or a pair of

14  court decisions.

15         To the extent that the bar for an enduring American

16  tradition relates to the single state statute or a pair of

17  court -- a pair of state court decisions, again, I believe that

18  the State has provided significantly more evidence, as I just

19  detailed with the four states, two territories, ten

20  municipalities, nine other general prohibitions on public carry.

21         Again, I've argued that this is not a counting test.

22  I do not believe that what Bruen requires is tallying up the

23  numbers and saying that if you've got three, you have got a

24  tradition.

25         I don't believe that it's that -- I don't think that

 1   it's how many scoops makes a sundae.  I just think it's whether

 2   or not you've got dessert.

 3         **THE COURT:**  Well, the Court does a lot of analysis

 4   where it concludes that the statute it was looking at was an

 5   outlier and it does that many times.

 6         **MR. BELKA:**  I think that that is -- as many people

 7   have argued, the very difficult part about a historical test

 8   that is not -- where the analysis is not guided by expert

 9   testimony is that you can work backwards to different kinds of

10   results through historical analysis by dismissing a state

11   statute or a municipal statute as an outlier.

12         There is only one percent of the population that that

13   covered.  There are lots of ways to find excuses to ignore

14   history and I just don't think that the Bruen test was to ignore

15   history.

16         I think it was to acknowledge and revere history and I

17   think that -- sometimes that that can get mixed up.

18         **THE COURT:**  I don't -- I don't think that what I'm

19   doing or what Bruen is doing is looking for excuses to ignore

20   history.

21         But instead, I think, what we're trying to get at and

22   trying hard to get at is when the Second Amendment was enacted

23   in 1791, it meant something.

24         It didn't create the right.  It codified the right

25   that preexisted 1791.  So what everyone is trying to figure out

 1   is what was the right.

 2          And the way to figure it out is to see what were

 3   people willing to tolerate.

 4          **MR. BELKA:**  And really good evidence to determine what

 5   they were willing to tolerate is the kind of evidence that we've

 6   provided, again, from 1868, from the reconstruction era, right?

 7          Either because the stuff from 1791 doesn't exist,

 8   because it hasn't made it to us throughout the course of history

 9   or because we just haven't found it yet.

10          **THE COURT:**  And willingness to tolerate legislative

11   enactments, to me, means that they should be on the books for a

12   length of time; maybe they should be enforced from time to time,

13   that sort of thing.

14          That, to me, is why I believe endurance matters.

15          Anything else on that topic, Mr. Rotsko?

16          **MR. ROTSKO:**  Well, one point I would make is that I'm

17   fairly skeptical that the State has failed to identify any

18   founding era statutes or regulations merely because they haven't

19   had enough time to do so.

20          A lot of the material cited by the State was provided

21   to the Supreme Court in Bruen by the same expert.  And they

22   had -- they had some additional time after the TRO decision and

23   all he could come up with was one new statute from Harrisburg,

24   Pennsylvania banning firearms everywhere in town, which is

25   clearly unconstitutional under Heller.

1          So I don't think -- I don't think that a lot of this

2    regulatory tradition is going to merely appear if they have more

3    time.  It's just not there.

4          **MR. BELKA:**  It's been 11 days since the TRO decision.

5    It is the whole span of American history that needs to be

6    searched by somebody who also has a day job.

7          Respectfully, maybe my math is wrong on the number of

8    days.

9          **THE COURT:**  I think it was 14 days.  We were here two

10   weeks ago, today.

11         **MR. BELKA:**  I don't know why I thought it was November

12   1st.  My math was correct in my head.  14 days, you are right,

13   Your Honor.

14         And, respectfully, it's a large historical record,

15   some of which is not digitized and readily searchable.  And,

16   yes, historians are looking into it.  And, yes, I expect it to

17   change over time, as more information is discovered.

18         **THE COURT:**  Do any of you want to speak to irreparable

19   harm?

20         I don't have any new questions on that topic.  Anyone?

21         **MR. ROTSKO:**  I don't have any further points on that

22   topic, if Your Honor doesn't have any questions on it.

23         **THE COURT:**  No.

24         **MR. BELKA:**  Same.  Nothing, if you don't have any

25   questions.

1          **THE COURT:**  Regarding public interest, there is --

2    there is a quote that I want to ask you about -- all of you,

3    from defendant Flynn, where he was interviewed and then I'll ask

4    you whether I can even consider something like that.

5          I'm going to read the quote first, where he's being

6    asked by a reporter, WGRZ, October 20th.

7          The question from the reporter is:  Now the burden is

8    on the concealed carrying -- the lawful concealed carrier to

9    know where they can and where they can't, even though there is

10   considerable changing over the last few weeks, right?

11         And Mr. Flynn's answer is:  Yes.  It's confusing, to

12   say the least.  It's confusing because what happens, Scott, is

13   that you have -- you have legal gun owners, gun owners out

14   there, you know, who have a permit and have the Constitutional

15   right to carry a weapon and you have all these laws and all

16   these rulings out there that contradict one another.

17         And, you know, you can't do this -- you can't do this

18   and you can't do that.  And, unfortunately, it's confusing for

19   the lawful citizen.

20         When in reality, it's the illegal gun owner who is

21   causing all the problem in the City of Buffalo.  All of my

22   homicides, all of my shootings that occur in the City of

23   Buffalo, none of them are being done by the legal gun owner,

24   okay?

25         They are all being done by individuals who have

1   illegal weapons.  And, unfortunately, like you said, it's the

2   legal gun owner who gets caught up in all the confusion.

3         So the first question I have is -- this is from an

4   interview that defendant Flynn gave on October 20th -- is it

5   something I can even consider on this record, since none of you

6   submitted it to me?

7         Mr. Kirby, do you want to start?  He's your client.

8         **MR. KIRBY:**  Well, Your Honor, the -- this is the first

9   I've heard of the interview or its contents, so I'm looking

10  somewhat blind here.

11        But my first impression would be that if the public

12  interest is something that the case law requires you to

13  consider, and if Mr. Flynn's apparent comments to the news media

14  have bearing on that, you very well might consider it.

15        Despite the fact that in the ordinary course of

16  things, I'll acknowledge that usually the record is confined to

17  what the parties bring before it.

18        So this presents a -- kind of a rather novel question

19  to me.

20        **THE COURT:**  Mr. Belka --

21        **MR. BELKA:**  So I would consider it not a particularly

22  novel question.  The point of having evidence presented in

23  court, in a record before the Court is that the parties know

24  what to respond to.

25        If it's a part of the public record, I mean,

 1  presumably the plaintiffs don't want to respond to every social

 2  science study that identifies that guns are bad, right?

 3         So I think -- understanding that this was a statement

 4  made by a party in this action, I -- I don't think that it's the

 5  kind of thing that the Court should take into account in making

 6  its decision.

 7         **THE COURT:**  That's a fair argument.

 8         Does anyone disagree?  Mr. Rotsko?

 9     **MR. ROTSKO:**  I haven't researched the judicial notice

10  doctrine with respect to statements made to the press by

11  parties, but, you know, clearly Mr. Flynn knows -- he has

12  personal knowledge about what he's talking about in that

13  statement.

14         **THE COURT:**  Let me ask you this then:  As an

15  abstraction, leaving that evidence -- if you will, leaving that

16  aside, do any of you have anything to say about the topic

17  generally?

18         In other words, is it or isn't it a truism that the

19  people committing crimes are not lawful gun owners, carrying

20  their sidearms with the concealed carry permit in their other

21  pocket?

22         Yet, instead, it's people carrying illegal weapons who

23  are committing the crimes -- or 99 percent of the crimes or

24  whatever the number is -- does anyone have any thoughts,

25  arguments or data on that?

1          **MR. BELKA:**  I have a couple of thoughts.  And, one,

2    just to the totality of the record, right, I thought about, but

3    did not -- after the issuance of the TRO, the plaintiffs in this

4    case, the individual plaintiffs in this case made certain

5    statements essentially saying that they were always going to

6    follow the law.

7          And did I think about adding that to the record in

8    this case in order to bolster my argument, that these

9    individuals do not have standing and that the statute -- my

10   client, who is the State Police, would never enforce this claim

11   against these individuals, who devoutly want to follow whatever

12   the law is.

13         I did not do that, but to the extent that the Court

14   wishes to take judicial notice of plaintiff or defendant Flynn's

15   statements to the press, I might also ask that the same be done

16   with respect to plaintiffs' statements to the media surrounding

17   whether or not they will ever violate this law.

18         **THE COURT:**  If you had a second point, hold it for

19   just a second --

20         **MR. BELKA:**  Sure.

21         **THE COURT:**  -- because I don't want to forget my

22   thoughts on this one, which is, one, I'm not going to consider

23   the Flynn statement at this point, on this motion.

24         And, secondly, I do -- just in fairness to you,

25   remember that you argued something along those lines on the

 1   standing issues with respect to these individual plaintiffs the

 2   last time we were here together, so that argument was something

 3   that was already baked into the analysis, in my mind.

 4          So was there a second part of what you wanted to say

 5   in response to my last question?

 6          **MR. BELKA:**  Understood.  And I wasn't trying to

 7   resurrect any additional claims here.

 8          I'm going to ask you to just repeat the question,

 9   because I only held one of the two thoughts in my mind.

10          **THE COURT:**  My question was regarding the --

11          **MR. BELKA:**  The bad guy with the gun.  So -- I don't

12   mean to cut Your Honor off.

13          **THE COURT:**  That's it.

14          **MR. BELKA:**  But last time it was a rhetorical question

15   that I've thought a pretty significant amount about.  That

16   question and what purpose the concealed carry law serves as it

17   relates to the bad guy with the gun.

18          And while I don't think that it's a particularly good

19   frame to determine whether or not the Concealed Carry

20   Improvement Act is an unconstitutional statute, if an individual

21   is looking to be a bad actor, which is sort of what some of

22   these gun cases are about, and they want to sit in the pews with

23   their gun, I'm not sure that you can do anything -- alert

24   authorities or anything else, until the guns start firing if the

25   Concealed Carry Improvement Act is invalid and guns in places of

Hardaway, et al v. Nigrelli, et al - Proceedings - 11/3/22 24

1  worship are allowed.

2          I think that if the Concealed Carry Improvement Act is

3  allowable, that that individual who maybe people are scoping out

4  in the pews and feel some sort of concern about, you can address

5  the situation and perhaps even have law enforcement involvement

6  to prevent somebody who has entered the church with a gun and

7  you can determine whether or not the intentions are good or bad.

8          If you are determining it another way and it becomes a

9  rights violation, because you're challenging their ability to

10  carry in a place of worship -- and, certainly, they are allowed

11  to do that if the CCIA doesn't exist, I do think that there are

12  valid ways that the CCIA can assist in the bad guy with a gun

13  circumstance.

14          Understanding, it's just incredibly hard to regulate

15  people who do not follow the law.  It's just a circumstance in

16  which the CCIA could be useful to the parishioners to keep them

17  safe, et cetera.

18          **THE COURT:**  If I'm the pastor and this is the church,

19  and all of you are the congregants, I don't know who is carrying

20  and who is not right now and I don't know who the bad guy is and

21  who the bad guy isn't.

22          So I don't know, what difference does it make, if

23  you've got this act or not, in terms of preventing that kind of

24  violence from the pews?

25          If he's carrying a concealed, you're not going to see

1   it.  Now, if someone were to walk in with a shotgun across his

2   chest, there are half a dozen other laws he's violating when he

3   does that, right?

4         Because you can't brazenly wave a shotgun around in

5   public, I don't think.  Mr. Kirby seems to agree.  He's seen

6   these cases.  That's the problem that I've got.

7         Mr. Rotsko, anything else on this point?

8         **MR. ROTSKO:**  Well, this is one reason why I like the

9   quote that you highlighted from District Attorney Flynn, because

10  he tethers the discussion back to reality here.

11        And if you think about the Tops shooter from back in

12  May, who intended to go into a church the next day, he's going

13  to come in quickly.

14        And at least when -- without the CCIA, the church has

15  a fighting chance of trying to protect the -- or the pastor has

16  a fighting chance of trying to protect the congregants.

17        There is nothing that is going to stop that guy.

18        **THE COURT:**  Go ahead, Mr. Belka, before I ask another

19  question.

20        **MR. BELKA:**  Go ahead, Your Honor.

21        **THE COURT:**  My question is something you said about

22  your client indicating that he wasn't going to enforce the

23  statute.

24        How -- how do people rely on something like that if

25  all three defendants come in and say this statute is here.  It's

1  on the books, but I'm not going to enforce it.

2          **MR. BELKA:**  I'm not saying --

3          **THE COURT:**  Does that take away standing?

4          **MR. BELKA:**  I apologize.  I didn't say my client won't

5  enforce it.  I'm saying that they are not going to enforce it

6  against the plaintiffs, because the plaintiffs have indicated

7  that they will not, under any circumstance violate the law.

8          **THE COURT:**  All right.  I understand your point.

9          All right.  Anything else on public interest?

10          **MR. BELKA:**  Nothing from the defendants, Your Honor.

11          **THE COURT:**  Anyone?

12          **MR. ROTSKO:**  Nothing here, Your Honor.

13          **THE COURT:**  Okay.  On any of the topics?  Anyone?  Any

14  final thoughts?

15          **MR. KIRBY:**  Your Honor, on behalf of District Attorney

16  Flynn, we would just like to say that no award of cost

17  disbursements or attorney fees ought to be made as against him,

18  because the challenged statute is a creature of New York State

19  law and he did not enact it.

20          **THE COURT:**  And I understand, Mr. Crosby, that your

21  client takes that position as well?

22          **MR. CROSBY:**  We do, Your Honor.

23          **THE COURT:**  Okay.  Anything else, Mr. Rotsko?

24  Mr. Belka?

25          On the merits first, we'll do some housekeeping at the

1    end, so --

2         **MR. BELKA:**  Perhaps to the merits or to logistics, but

3    defendants request that if a preliminary injunction is issued

4    that it be stayed for three days, so that an emergency appeal

5    can be taken, as has been done in other cases regarding the

6    CCIA.

7         **THE COURT:**  And what's the argument for the stay for

8    three days?

9         That's it?  I mean, you want -- I understand why you

10   want it, but what's your argument on the -- there is factors

11   that go into staying a preliminary injunction.

12        **MR. BELKA:**  I --

13        **THE COURT:**  Likelihood of success on the appeal,

14   irreparable harm, those sorts of things.

15        **MR. BELKA:**  We've got all of them.  No -- Your Honor,

16   I just -- it's a request for a preservation of a legislative

17   statute that certainly will be appealed, if there is a

18   preliminary injunction issued.

19        **THE COURT:**  Okay.

20        Mr. Rotsko, do you want to respond to that?

21        **MR. ROTSKO:**  I think that we would oppose a stay, Your

22   Honor.

23        **THE COURT:**  All right.  I understand the arguments.  I

24   just remind everyone that as we sit here right now, the TRO

25   remains in effect until I issue an order on the motion for a

1    preliminary injunction.

2         I will do that soon, like I did the last time.  And

3    I'm able to move at a good pace here, because of the

4    availability of the arguments and the fact that we did this --

5    80 percent of it, two weeks ago already, so I'll be able to move

6    relatively soon on that.

7         What's next in this case?  I know that defendants will

8    need to respond to the complaint with an answer, a motion to

9    dismiss.

10        I don't know how this issue gets T'd up next, if there

11   will be discovery or not; if there will be cross motions for

12   judgment on the pleadings or cross motions for summary

13   judgement.

14        I don't know how this will play out as a litigation

15   matter, but is there a deadline that the defendants are

16   operating under at this point to respond to the complaint?

17        **MR. BELKA:**  I don't know that there is a deadline, as

18   an operation of law.  But if Your Honor wanted to set a deadline

19   a month out for answers and motions, that will be acceptable to

20   defendants.

21        **THE COURT:**  Okay.  Sounds reasonable to me.

22        Mr. Rotsko, any thoughts on December 2, which is a

23   Friday, for that deadline?

24        **MR. ROTSKO:**  I -- that's fine with the plaintiffs.  I

25   think that may be a little earlier, but we don't mind -- you

1   know, under the Rules of Procedure, but December 2nd is

2   acceptable to us.

3           **THE COURT:**  Okay.  So we'll go from there.  If there

4   is a motion filed, we'll set a briefing schedule.  I don't think

5   I need to do anything else housekeeping-wise.

6           Mr. Rotsko --

7           **MR. ROTSKO:**  Nothing from the plaintiffs there, Your

8   Honor.

9           **THE COURT:**  Mr. Belka --

10          **MR. BELKA:**  Nothing from defendants, Your Honor.

11          **THE COURT:**  Mr. Kirby?

12          **MR. KIRBY:**  Nothing else, Your Honor.

13          **THE COURT:**  And Mr. Crosby?

14          **MR. CROSBY:**  Nothing, Your Honor.

15          **THE COURT:**  Okay.  Have a great day, everybody.  Thank

16  you.

17          **MR. ROTSKO:**  Thank you.

18          **MR. BELKA:**  Thank you.

19

20                  (Proceedings concluded at 2:41 p.m.)

21                          *    *    *

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3   original notes are a true and correct record of proceedings in

4    the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    *s/ Bonnie S. Weber*                    November 8, 2022
       Signature                              Date

11

12   BONNIE S. WEBER

13   Official Court Reporter
     United States District Court
14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25